John H. Maddock III (VSB No. 41044)
Bryan A. Stark (VSB No. 75471)
McGUIREWOODS LLP
One James Center
901 East Cary Street
Richmond, Virginia 23219-4030
(804) 775-1000

*Attorneys to Wells Fargo Bank, N.A.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CASCADIA PARTNERS, LLC, | ) | Case No. 10-63442 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| WELLS FARGO BANK, N.A., | ) | |
| | ) | |
| Movant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CASCADIA PARTNERS, LLC, | ) | |
| | ) | |
| Respondent. | ) | |

## MOTION OF WELLS FARGO BANK, N.A.
## FOR RELIEF FROM THE AUTOMATIC STAY

Wells Fargo Bank, N.A. ("WF"), as successor by merger to Wachovia Bank, N.A.

("Wachovia"), through undersigned counsel, pursuant to section 362 of title 11 of the United

States Code (the "Bankruptcy Code") and Rule 4001 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), for its Motion for Relief from the Automatic Stay (the

"Motion") respectfully states as follow:

## PRELIMINARY STATEMENT

In its bankruptcy petition, Cascadia Partners, LLC (the "Debtor") indicates it is a "single

asset real estate" debtor.  Pursuant to section 362(d)(3) of the Bankruptcy Code, a creditor who is

secured by an interest in single asset real estate may move for relief from the automatic stay if

within ninety (90) days from the order of relief the debtor has not filed a plan of reorganization

that has a "reasonable possibility of being confirmed within a reasonable time" or the debtor has

commenced monthly interest payments at the applicable contract rate.  On February 28, 2011,

the day before the ninety (90) day period expired, the Debtor filed its plan of reorganization and

accompanying disclosure statement.  However, the plan does not conform to the requirements of

the Bankruptcy Code and has no possibility of being confirmed.  Alternatively, "cause" exists

under section 362(d)(1) of the Bankruptcy Code to grant WF relief from the automatic stay

because the Debtor proposes to reduce WF's equity cushion below that required under applicable

case law without providing adequate protection.  Therefore, WF should be granted relief from

the automatic stay to enforce its rights under the Loan Documents (as defined below) under

applicable non-bankruptcy law.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157(b) and

1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of this case and this Motion in

this District is proper under 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief requested herein are Bankruptcy Code

sections 105 and 362 and Bankruptcy Rule 4001.

## BACKGROUND

### I.      The Loan Documents and Foreclosure.

3.      On July 25, 2007, the Debtor and Wachovia entered into that certain Construction

Loan Agreement in the original principal amount of $6,300,000 (the "Loan").  In connection

with the Loan, on July 25, 2007, the Debtor executed that certain Promissory Note in the amount

of $6,300,000 for the benefit of Wachovia (the "Note").

4.      On July 25, 2007, to provide collateral and secure payment under the Note, the

Debtor executed that certain Deed of Trust, Assignment of Rents and Security Agreement (the

"Deed of Trust").  The Deed of Trust granted Wachovia an interest in the Debtor's real property

as described in more detail in the Deed of Trust (the "Real Property").

5.      On July 25, 2007, Robert M. Hauser ("Hauser") executed that certain Guaranty

Agreement (the "Guaranty" and collectively with the Loan, the Note, and the Deed of Trust, as

amended, modified, or supplemented, the "Loan Documents").  Pursuant to the Guaranty, Hauser

agreed to fully and unconditionally guarantee the Debtor's obligations under the Loan

Documents.

6.      On December 31, 2008, in accordance with the terms of the Loan Documents,

Wachovia sent a demand letter (the "Demand Letter") to the Debtor and Hauser.  The Demand

Letter notified the Debtor and Hauser that each was in default under the Loan Documents and

made demand for immediate payment of all outstanding amounts owed.  To date, neither the

Debtor nor Hauser has cured the default.

7.      Following the Debtor and Hauser's default, WF commenced foreclosure

proceedings against the Real Property pursuant to the Loan Documents.  A foreclosure sale (the

"Foreclosure Sale") was scheduled to take place on December 2, 2010.

**II.      The Debtor's Bankruptcy Case, Disclosure Statement, and Plan.**

8.      On December 1, 2010 (the "Petition Date"), the day prior to the Foreclosure Sale,

the Debtor filed its petition (the "Petition") under chapter 11 of title 11 of the United States Code

(the "Bankruptcy Code") commencing the Bankruptcy Case in the United States Bankruptcy

Court for the Western District of Virginia (the "Bankruptcy Court").

9.      On the Petition Date, the Debtor filed its Schedules of Assets and Liabilities (the

"Schedules").  On Schedule D, the Debtor scheduled Wachovia as holding a secured claim in the

amount of $3,886,274.34 (the "WF Claim")[1] which is secured by a "1st Deed of Trust" on the

Real Property.  The WF Claim is not listed as contingent, unliquidated, or disputed.

10.      The Petition states, among other things, that the nature of the Debtor's business is

"Single Asset Real Estate as defined in 11 U.S.C. § 101(51B)."  With regard to single asset real

estate bankruptcy cases, section 362(d)(3) of the Bankruptcy Code, provides that, within ninety

(90) days of the petition date, a debtor must either (i) file a plan of reorganization with a

reasonable possibility of being confirmed within a reasonable time or (ii) commence monthly

payments to the debtor's in an amount equal to interest at the applicable nondefault contract rate.

If a debtor fails to comply with section 362(d)(3), the secured creditor is entitled to relief from

---

[1] As date of this Objection, WF has not filed a proof of claim with the Bankruptcy Court
evidencing its claim against the Debtor.  The deadline to file a proof of claim is April 18, 2011.
WF's reference to the WF Claim in this Objection does not ratify the amount or any
characteristic of the scheduled claim.  To the contrary, WF specifically and unequivocally
reserves its right to file a proof of claim to supersede the WF Claim.

the automatic stay to act against the single asset real estate.  In the Debtor's Bankruptcy Case,

the ninety (90) day period from the Petition Date ran on March 1, 2011.  The Debtor has not

commenced monthly interest payments to WF.

11.    On February 28, 2011, the Debtor filed its Plan of Reorganization (Docket No.

21) (the "Plan") and accompanying Disclosure Statement (Docket No. 22) (the "Disclosure

Statement").  Pursuant to section 2.01 of the Plan, WF's secured claim is separately classified in

Class 1.  Pursuant to section III of the Plan, WF's secured claim is impaired, and, therefore, WF

is entitled to vote on the Plan.  Because WF's secured claim is separately classed, WF controls

the vote of Class 1.  Pursuant to section 4.01 of the Plan, WF shall retain its lien on the Real

Property and WF's secured claim will be paid in full with 4.5% interest.  Section 4.01 of the Plan

further provides that WF will receive distributions on account of its secured claim only after

Union Bank is paid in full on account of the Union Loan (as defined below) "which should be in

late 2012 or early 2013."  WF intends to vote against the Plan.

## RELIEF REQUESTED

12.    By this Motion, WF respectfully requests that this Court enter an order granting

WF relief from the automatic stay pursuant to section 362(d)(3), or in the alternative, pursuant to

section 362(d)(1).

## ARGUMENT

**I.    The Debtor Failed to File a Confirmable Plan of Reorganization Pursuant to Section 362(d)(3) and WF Must Be Granted Relief from the Automatic Stay.**

13.    The Bankruptcy Code defines "single asset real estate" as:

> [R]eal property constituting a single property or project, other than
> residential real property with fewer than 4 residential units, which
> generates substantially all of the gross income of a debtor who is

> not a family farmer and on which no substantial business is being
> conducted by the debtor other than the business of operating the
> real properties and activities incidental.

11 U.S.C. § 101(51B).

14.     It is undisputed the Real Property is single asset real estate and the Debtor is a

single asset real estate debtor.  Not only does the Real Property fall squarely within the

Bankruptcy Code's definition, but the Debtor specifically designated its business as "single asset

real estate" on its Petition.

15.     Secured creditors who have an interest in single asset real estate are afforded an

additional form of relief from the automatic stay.

> (d) On request of a party in interest and after notice and a hearing,
> the court shall grant relief from the stay provided under subsection
> (a) of this section . . . –
>
> . . . .
>
>     (3) with respect to a stay of an act against single asset real
> estate under subsection (a), by a creditor whose claim is secured by
> an interest in such real estate, unless, not later than the date that is
> 90 days after the entry of the order for relief (or such later date as
> the court may determine for cause by order entered within the 90-
> day period) or 30 days after the court determines that the debtor is
> subject to this paragraph, whichever is later –
>
>         (A) the debtor has filed a plan of reorganization that
> has a reasonable possibility of being confirmed within a reasonable
> time; or
>
>         (B) the debtor has commenced monthly payments
> that –
>
>             (i) may, in the debtor's sole discretion,
> notwithstanding section 363(c)(2), be made from rents or other
> income generated before, on, or after the commencement of the
> case by or from the property to each creditor whose claim is

secured by such real estate (other than a claim secured by a
judgment lien or by an unmatured statutory lien); and

(ii) are in an amount equal to interest at the
then applicable nondefault contract rate of interest on the value of
the creditor's interest in the real estate.

11 U.S.C. § 362(d)(3).

16.    By including section 362(d)(3) in the 1994 amendments to the Bankruptcy Code,

"Congress expressly attempted to avoid the usual delays experienced in Chapter 11 in single

asset real estate cases, which historically have been filed to avoid a foreclosure and in the hope

that the debtor can come up with some form of a miracle in order to formulate an acceptable

plan." *NationsBank, N.A. v. LDN Corp. (In re LDN Corp.)*, 191 B.R. 320, 326 (Bankr. E.D. Va.

1996).  Moreover, section 362(d)(3) "was enacted *to assist secured creditors in single asset real

estate cases.*" *Id*. at 327 (emphasis added).

17.    Importantly, single asset real estate debtors must strictly comply with the

requirements set forth in section 362(d)(3).  *Id*.  If a single asset real estate debtor fails to comply

with a single element set forth therein, section 362(d)(3) requires a court to grant relief to the

secured creditor.

18.    It is undisputed that the Debtor has failed to commence payments to WF to satisfy

the requirements of section 362(d)(3)(B).  Although, the Debtor filed its Plan within ninety (90)

days of the Petition Date, the Plan is not confirmable and, therefore, WF must be granted relief

from the stay under section 362(d)(3)(A).

**A.    *The Plan Fails to Seek Approval of the Lot Purchase Agreement and the Union
Loan.***

19.     Through the Plan, the Debtor proposes to obtain a loan (the "Union Loan") from Union First Market Bank ("Union") to develop the Real Property.  Presumably, after such development, the Debtor proposes to sell a portion of the Real Property (the "NVR Lots") to NVR, Inc. ("NVR") pursuant to the terms of that certain letter of intent executed by NVR dated December 15, 2010 (the "Letter of Intent") and a supposed draft lot purchase agreement allegedly to be executed by the Debtor and NVR (the "Lot Purchase Agreement").

20.     However, nowhere in the Plan does the Debtor seek approval of the Lot Purchase Agreement and the Union Loan upon which the Plan is entirely dependent.  The Debtor's failure in this regard is fatal.

21.     Although a debtor may sell its assets to provide for adequate means to implement a plan, *see* 11 U.S.C. § 1123(a)(5)(D), or sell its assets to pay its creditors, *see id*. § 1123(b)(4), court approval of such sale is required.  The Debtor's Plan contains only a single reference to the Lot Purchase Agreement.  Section 4.01 of the Plan provides that the Debtor's real property "may be sold pursuant to the terms of the Lot Purchase Agreement described in the Disclosure Statement.  Each lot will be conveyed free and clear of all liens at the closing of each lot sale." Such scant reference to the Lot Purchase Agreement, without reference to the governing Bankruptcy Code provisions hardly qualifies as a request for approval of the Lot Purchase Agreement.  Nor can such a request be implied as the Debtor, as described above, has failed to disclose any facts on which this Court could determine that the standards for approving such sale have been met.

22.     Nor does the Debtor request the Court to approve the Union Loan.  Pursuant to section 364(d)(1), and as set forth above, a debtor may borrow funds secured by a priming lien

only if the debtor can demonstrate that it could not obtain the loan on other terms and can

provide adequate protection of any interest that is primed, and only upon notice and hearing.  11

U.S.C. § 364(d)(1).  In section 4.01 of the Plan, the Debtor simply states that it will obtain a loan

from Union secured by a first priority lien.  The Debtor fails to actually request approval of the

Union Loan and for good reason.  It simply could not request approval of the Union Loan when

the Plan was filed because there was, and is, no loan to approve.  The Debtor's failure and

inability to attach a loan agreement and its use of the verbiage "will obtain a loan" makes this

abundantly clear.  Thus, the Plan, by its own terms, is not confirmable as the Debtor lacks the

ability to comply with its own Plan.

23.      In addition to borrowing funds pursuant to the Union Loan, the Lot Purchase

Agreement also provides for financing secured by a priming lien although such financing is

disguised as a "deposit."  Pursuant to section 3.g of the Lot Purchase Agreement, the purchaser is

required to deliver a $500,000 deposit (the "Deposit") to the Debtor on an installment basis.  The

Deposit is to be used by the Debtor "solely for the acquisition and development of the Property

and for no other purpose."  Lot Purchase Agreement, § 3.g.  The Debtor is to repay the Deposit

by providing the purchaser a credit for each lot purchased by the purchaser.  The Debtor's

obligation to repay the Deposit is to be secured by a deed of trust on the Real Property

subordinated only to the Debtor's "institutional acquisition and development loan(s)" (the "Lot

Purchase Deed of Trust").

24.      As an initial matter, other than attaching a copy of the unexecuted Lot Purchase

Agreement, the Debtor fails to mention the Deposit, its repayment, or the Lot Purchase Deed of

Trust at all, no less requesting approval under section 364.  Without approval, the Deposit and its

repayment are not enforceable and the Lot Purchase Agreement cannot be approved.

25.     Secondly, by use of the vague term "institutional acquisition and development

loan(s)" it is not clear whether the Debtor intends for the Lot Purchase Deed of Trust to prime

WF's Deed of Trust.  To the extent the Debtor intends for the Lot Purchase Deed of Trust to

prime WF's Deed of Trust, the Debtor fails to disclose any information with regard to the

standards that must be met under section 364.

26.     Because the Plan fails to seek approval of the Lot Purchase Agreement, including

the Deposit, and the Union Loan, the Debtor is prohibited from entering into either transaction

and the Plan cannot be consummated.  Therefore, because the Plan fails to seek such mandatory

approval, it is not confirmable and the Court must grant WF relief from the automatic stay.

**B.     *The Plan Is Not Feasible and Cannot Be Confirmed.***

27.     Assuming somehow the Debtor can avoid the fatal defect of not seeking approval

of the Lot Purchase Agreement and the Union Loan, the Plan is not feasible on its face and,

therefore, cannot satisfy the requirements of section 1129(a) of the Bankruptcy Code.  To satisfy

the feasibility requirement of the Bankruptcy Code, the confirmation of a plan must not likely be

followed by the liquidation or need for further financial reorganization of the debtor or any

successor.  11 U.S.C. § 1129(a)(11).  "[T]he feasibility standard is whether the plan offers a

reasonable assurance of success."  *Kane v. Johns-Manville Corp.*, 843 F2d 636, 649 (2d Cir.

1988).  "'The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes

which promises creditors and equity security holders more under a proposed plan than the debtor

can possibly attain after confirmation.'"  *Pizza of Hawaii, Inc. v. Shakey's Inc. (In re Pizza of*

*Hawaii, Inc.*), 761 F.2d 1374, 1385 (9th Cir. 1985) (quoting 5 Collier on Bankruptcy ¶1129.02

[11] at 1129-34 (15th ed. 1984)).  Here, the Plan is not feasible because, among other reasons, it

relies entirely on the unexecuted Lot Purchase Agreement which fails to offer the Debtor any

certainly of reorganizing.

28.     As stated, the Lot Purchase Agreement is not executed and NVR has no

obligation to perform thereunder.  Simply put, without a firm commitment from NVR, the Plan is

impossible to perform and, therefore, the Plan cannot meet with feasibility requirement under

section 1129(a)(11) of the Bankruptcy Code.

29.     Even if the Lot Purchase Agreement were a binding agreement, the Plan remains

infeasible because NVR may terminate the Lot Purchase Agreement, at its sole discretion,

without repercussion.  Section 1B of the Lot Purchase Agreement provides for a sixty (60) day

"feasibility period" commencing after the effective date of the agreement.  During such period,

the Debtor at its sole expense must undertake certain engineering, development, marketing and

other studies as NVR directs and deliver to NVR copies of various reports, studies, and samples.

In the event that NVR is not satisfied with the NVR Lots or any information the Debtor delivers

to NVR, it may, "for any reason or ***no reason at all***," terminate the Lot Purchase Agreement

during the sixty-day feasibility period.  Lot Purchase Agreement, § 1B (emphasis added).

30.     Similarly, the Debtor must conduct, at its sole risk and expense, a phase I

environmental assessment on the NVR Lots.  If the results of such environmental study are not

acceptable to NVR in its sole discretion, NVR may terminate the Lot Purchase Agreement after

receiving an environmental study.  *Id*. at § 2. Thus, even under an executed Lot Purchase

Agreement, the Lot Purchase Agreement is not a firm commitment and is simply a "visionary

11

scheme" from which the Debtor hopes it can perform and eventually comply with the terms of the Plan.

31.     Additionally, and perhaps more importantly, in the event of NVR's breach of the Lot Purchase Agreement, the Debtor's *sole* remedy is to retain NVR's deposit.  Section 12.a provides that the Debtor's "sole and exclusive right and remedy shall be to retain the Deposit paid to date or remaining in the Seller's hands as full, fixed and liquidated damages, not as a penalty, whereupon th[e] [Lot Purchase] Agreement shall terminate."  It is, therefore, very possible for NVR to breach the Lot Purchase Agreement at any time leaving the Debtor with a negligible deposit as its sole remedy and without any ability to perform under the Plan.

32.     Thus, because the Plan heavily relies on an illusory and one-sided Lot Purchase Agreement, the Plan is not feasible under section 1129(a)(11) and cannot be confirmed. Accordingly, WF must be granted relief from the stay pursuant to section 362(d)(3).

**C.**     ***The Plan Cannot Satisfy the Cramdown Requirements in Section 1129(b)(2)(A) Because It Is Not "Fair and Equitable" with Respect to WF's Secured Claim.***

33.     Further, even if the Court were to determine that the Plan satisfies the requirements of section 1129(a), the Plan is not fair and equitable as to WF, a holder of an impaired claim who has not accepted the Plan, thus, the Plan fails to meet the cramdown requirements of section 1129(b).

34.     Section 1129(b) of the Bankruptcy Code provides that a court shall confirm a plan of reorganization which satisfies all of the requirements under section 1129(a) other than subsection (8), if the plan "does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan."  11

U.S.C. § 1129(b)(1).  Thus, if a plan is deemed "fair and equitable" as to impaired, non-accepting classes, it may be "crammed down" on such impaired, non-accepting classes.

           *1.*      *The Plan is Not Fair and Equitable Under Section 1129(b)(2)(A)(i).*

35.     A plan is "fair and equitable" with respect to a class of secured claims if the plan provides:

> (i)     (I) the holders of such [secured] claims **retain the liens** securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and
>
>      (II) that each holder of a [secured] claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property[.]

11. U.S.C. 1129(b)(2)(A)(i) (emphasis added).

36.     Of particular importance to the present case, a plan cannot be crammed down on an impaired non-accepting class of secured creditors unless each of the secured creditors in the class "retains its lien" on the collateral.  In limited circumstances, a plan may be deemed to comply with the requirements of section 1129(b)(2)(A)(i) where a secured creditor is to retain its lien and such lien is to be primed, but only if such priming lien leaves the secured creditor's lien unaffected.  Specifically, if a plan proposes to prime a secured creditor's lien, the priming lien may attach only to the collateral's future appreciation in value, thereby leaving the secured claimant's collateral base unaffected.  *Compare In re Sherwood Square Assocs.*, 107 B.R. 872, 880-81 (Bankr. D. Md. 1989) (finding that a secured lien is deemed retained under section 1129(b)(2)(A)(i) when a priming lien for a construction loan attaches only to the "actual added market value" added to the value of the collateral), *with In re L.B.G. Prop., Inc.*, 72 B.R. 65,

(Bankr. S.D. Fla 1987) (finding that senior lien that is subordinated to a new lien fails to preserve the existing lien and fails to satisfy section 1129(b)(2)(A)(i)).

37.     In this case, the Plan proposes to prime WF's lien on the Real Property by granting Union a new lien to secure the Debtor's obligations under the Union Loan.  This proposed priming lien is not limited to a first priority lien on any increased value of the Real Property, but rather is to be a first priority lien as to *all* of the Real Property.  Proposed financing on these terms fails to conform to the limited circumstances outlined in *Sherwood Square* where a priming lien may be acceptable under section 1129(b)(2)(A)(i).  Thus, WF cannot be considered to retain its lien for purposes of section 1129(b)(2)(A)(i).  As such, the Plan is not "fair and equitable," and the Plan cannot be crammed down on WF.

38.     Additionally, a secured creditor does not retain its lien for purposes of 1129(b)(2)(A)(i) if a plan proposes to deplete the secured creditor's collateral through systematic sales of the collateral free and clear of the secured creditor's lien.  *See In re Sparks*, 171 B.R. 860, 865 (Bankr. N.D. Ill. 1994) ("The Debtor's Plan does not meet the requirements of clause (i) because the Plan requires [the secured creditor] to release its lien on each converted condominium as it is sold.").

39.     In *Sparks*, the debtor's plan of reorganization proposed to pay a secured creditor 100% of its secured claim plus interest through the sale of condominiums.  As the condominiums were sold, the plan required the secured creditor to release its lien on each condominium unit sold.  *Id*. at 864.  Because the plan required the secured creditor to release its lien on each condominium sold, the bankruptcy court concluded that the plan did not comply with the provisions of section 1129(b)(2)(A)(i).  *Id*. at 865.  Similarly, because the Debtor's Plan requires

WF to partially release its lien on the Real Property as the NVR Lots are sold, WF cannot be

considered to retain its lien for purposes of section 1129(b)(2)(A)(i) and the Plan cannot be

crammed down over WF's objection. *See* Plan, at § 4.01 (proposing to sell the NVR Lots "free

of all liens at the closing of each lot sale"); *see also* Lot Purchase Agreement, at § 1A ("[T]he

Lots shall be conveyed free and clear of all liens . . . .").

> 2.    *The Plan Is Not Fair and Equitable Under Section 1129(b)(2)(A)(ii).*

40.    A plan may also be fair and equitable to an impaired, non-accepting class of

secured creditors if the plan provides

> for the sale, subject to section 363(k) of this title, of any property
> that is subject to the liens securing such claims, free and clear of
> such liens, with such liens to attach to the proceeds of such sale,
> and the treatment of such liens on proceeds under clause (i) or (iii)
> of this subparagraph.

11 U.S.C. § 1129(b)(2)(A)(ii).

41.    In addition to the Plan proposing to sell the NVR Lots free and clear of WF's lien

in contravention of section 1129(b)(2)(A)(i), the Plan fails to provide for WF's lien to attach to

the proceeds of the NVR Lots.  Rather the Plan proposes to use the NVR Lot sale proceeds to

repay the Union Loan and satisfy the claims of other creditors, including creditors who do not

have an interest in the Real Property.  Such proposal unreasonably shifts all of the risk of the

Debtor's ability to successfully reorganize from the Debtor, Union, and the remaining creditors

in the Bankruptcy Case to WF alone.  Such risk-shifting is not "fair and equitable" and is

contrary to the requirements set forth in section 1129(b)(2)(A)(ii).  Thus, the Plan cannot be

crammed down over WF's objection. *See In re EFH Grove Tower Assocs.*, 105 B.R. 310, 313

(Bankr. E.D.N.C. 1989) (finding that a plan that presents significant risk to the secured creditor

and poses great reward and minimal risk on the debtor is not "fair and equitable" under section

1129(b)).

42.     Thus, for the foregoing reasons, the Plan's treatment of WF and WF's secured

claim is not "fair and equitable" under section 1129(b)(1) and the Plan cannot be crammed down

over WF's objection.

      ***D.***      ***The Plan Does Not Provide for Payments of Administrative Claims on the
Effective Date.***

43.     Finally, the Plan fails to satisfy section 1129(a)(9)(A) of the Bankruptcy Code

because it does not provide for the payment of allowed administrative claims on the effective

date of the Plan.  Section 1129(a)(9)(A) requires, as a requirement for the confirmation of a plan,

that "with respect to a claim of a kind specified in section 507(a)(2) or 507(a)(3) of this title, on

the effective date of the plan, the holder of such claim will receive on account of such claim cash

equal to the allowed amount of such claim."  11 U.S.C. § 1129(a)(9).  It is well-settled that a plan

cannot be confirmed without the payment of administrative claims on the plan's effective date,

unless the holder of such claim consents to different treatment.  *See CIT Commc'n Fin. Corp. v.

Midway Airlines Corp. (In re Midway Airlines Corp.)*, 406 F.3d 229, 242 (4th Cir. 2005).

44.     Here, the Plan does not provide for the payment of administrative expenses on the

Plan's effective date.  Rather, the Plan seeks to pay the Class 4[2] and Class 6 administrative

claims "upon approval by the Bankruptcy Court," and seeks to pay Class 5 claims over an

ambiguous period of time following the sale of the NVR Lots.  Because the Plan does not

propose to pay any administrative claim on the Plan's effective date, it violates section 1129 of

---

[2] Admittedly, the Debtor's counsel has likely consented to this treatment.

the Bankruptcy Code and well-settled case law, and it is incumbent upon the Court to grant WF

relief from the automatic stay.

**II.     In the Alternative, WF Should Be Granted Relief from the Automatic Stay Pursuant to Section 362(d)(1) Because WF Is Not Adequately Protected.**

45.     In the event the Court determines that the Plan is confirmable on its face and WF

is not entitled to relief from the stay under section 362(d)(3), the Court should grant WF relief

from the automatic stay for "cause" pursuant to section 362(d)(1).

46.     Section 362(d)(1) of the Bankruptcy Code provides:

> On request of a parting in interest and after notice and a hearing,
> the court shall grant relief from the stay provided under subsection
> (a) of this section, such as by terminating, annulling, modifying, or
> conditioning such stay –
> (1)     for cause, *including the lack of adequate protection* of an
> interest in property of such party in interest;

11 U.S.C. §362(d)(1) (emphasis added).

47.     It is within the Bankruptcy Court's discretion whether to lift the automatic stay.

*Robbins v. Robbins (In re Robbins)*, 964 F.2d 342, 345 (4th Cir. 1992).  Although "cause" under

section 362(d)(1) is not defined, the Bankruptcy Code explicitly includes "lack of adequate

protection" as "cause."  A finding of "cause" should be determined on a case-by-case basis.  *See

Id*.;  *Ewald v. Nat'l City Mortg. Co. (In re Ewald)*, 298 B.R. 76, 80-81 (Bankr. E.D. Va. 2002).

Here, WF will not be adequately protected and "cause" exists to grant it relief from the automatic

stay.

48.     Although not specifically disclosed in the Disclosure Statement or otherwise,[3] the Debtor appears to conclude that WF is adequately protected by its equity cushion in the Real Property.  "The amount of equity cushion sufficient to adequately protect the creditor is determined on a case-by-case basis."  *Drake v. Franklin Equip. Co. (In re Franklin Equip. Co.)*, 416 B.R. 463, (Bankr. E.D. Va. 2009) (citing *Kost v. First Interstate Bank of Greybill (In re Kost)*, 102 B.R. 829, 831 (D. Wyo. 1989)).

49.     Nevertheless, it is universally accepted that an equity cushion below 11% is insufficient to provide adequate protection.  *Id.*; *see also Principal Mut. Life Ins. Co. v. Atrium Dev. Co. (In re Atrium Dev. Co.)*, 159 B.R. 464, 471 (Bankr. E.D. Va. 1993) ("In this case there is an equity cushion over Principal's deed of trust balance of approximately 12% based on the court's findings in its ruling on Principal's motion for relief from stay. In my view, *the 12% equity cushion falls far short* of establishing that Principal is demonstrably oversecured.") (emphasis added).  Under the applicable case law, WF's equity cushion under the terms of the proposed Plan is insufficient to provide it adequate protection.

50.     The Disclosure Statement alleges that an appraisal performed by the Appraisal Group, Inc. dated February 10, 2011 (the "Appraisal") values the Real Property in the amount of $8,850,000.[4]  The WF Claim is scheduled in the amount of 3,886,274.34.  The Debtor also scheduled Albemarle County with statutory tax liens totaling $263,979.75 and W.W. Associates, Inc. with a mechanics' lien in the amount of $109,797.

---

[3] WF has filed a separate objection to the Debtor's Disclosure Statement due to its overwhelming lack of disclosure.

[4] WF strongly disagrees with the Debtor's alleged value of the Real Property and, upon information and belief, believes the Debtor's value is inflated.  WF reserves all of its rights with regard to the value of the Real Property.

51.     In addition to the tax and mechanics liens, the Debtor's Plan refers to the Union

Loan in the amount of $4,000,000 and granting Union a priming lien pursuant to section 364(d).

All totaled, using the Debtor's own figures, secured claims total $8,260,051.09 on the Real

Property appraised at $8,850,000.  Accordingly, under the Plan, and using the Debtor's own

figures, WF has only a 6.67% equity cushion which is wholly insufficient to provide WF

adequate protection.  Moreover, in the event the Debtor is unable to establish a value of

$8,850,000 and the actual value of the Real Property is determined to be less than $8,850,000,

WF's equity cushion is reduced even further.  Thus, "cause" exists under section 362(d)(1)

because the Debtor has failed to offer to provide adequate protection of WF's lien.  Accordingly,

WF should be granted relief from the automatic stay.

52.     Finally, WF respectfully requests that the Court waive the 14-day stay provided

for in Bankruptcy Rule 4001(a)(3).

## CONCLUSION

WHEREFORE, WF respectfully requests that the Court enter an order, substantially in

the form annexed hereto, granting the relief requested in the Motion, granting relief from the 14-

day stay provided for in Bankruptcy Rule 4001(a)(3), and such other and further relief as may be

just and proper.

Dated: April 11, 2011                          Respectfully submitted,

                                               /s/ John H. Maddock III
                                               John H. Maddock III (VSB No. 41044)
                                               Bryan A. Stark (VSB No. 75471)
                                               McGUIREWOODS LLP
                                               One James Center
                                               901 East Cary Street
                                               Richmond, Virginia 23219-4030
                                               (804) 775-1000

                                               *Attorneys to Wells Fargo Bank, N.A.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 11, 2011, a copy of *MOTION OF WELLS FARGO BANK, N.A. FOR RELIEF FROM THE AUTOMATIC STAY* was served by (I) the Court's ECF system on all parties and entities who have filed notices of appearance or otherwise requested to receive notice in the above-captioned case; and (II) the parties listed below by first-class mail postage prepaid.

| | |
|---|---|
| W. Stephen Scott<br>Scott Kroner, PLC<br>418 Water Street<br>Charlottesville, Virginia 22902<br>*Counsel to the Debtor* | Margaret K. Garber<br>Office of the United States Trustee<br>210 First Street, Suite 505<br>Roanoke, Virginia 24011<br>*United States Trustee* |
| Stonehaus, LLC<br>2421 Ivy Road<br>Charlottesville, Virginia 22903<br>*Creditor* | Cline Design Associates, PA<br>125 N. Harrington Street<br>Raleigh, North Carolina 27603<br>*Creditor* |
| Stonehaus Construction, LLC<br>2421 Ivy Road<br>Charlottesville, Virginia 22903<br>*Creditor* | |

/s/ John H. Maddock III
John H. Maddock III

## PROPOSED ORDER

John H. Maddock III (VSB No. 41044)
Bryan A. Stark (VSB No. 75471)
McGUIREWOODS LLP
One James Center
901 East Cary Street
Richmond, Virginia 23219-4030
(804) 775-1000

*Attorneys to Wells Fargo Bank, N.A.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## CHARLOTTESVILLE DIVISION

|  |  |
|---|---|
| In re: | Chapter 11 |
| CASCADIA PARTNERS, LLC, | Case No. 10-63442 |
| Debtor. | |
| WELLS FARGO BANK, N.A., | |
| Movant, | |
| v. | |
| CASCADIA PARTNERS, LLC, | |
| Respondent. | |

## ORDER GRANTING MOTION OF WELLS FARGO
## BANK, N.A. FOR RELIEF FROM THE AUTOMATIC STAY

Upon the motion of Wells Fargo Bank, N.A. for Relief from the Automatic Stay (the

"Motion"),[1] pursuant to section 362(d)(1) & (3) of the Bankruptcy Code, for an order granting

WF relief from the automatic stay (as more fully set forth in the Motion); and this Court having

jurisdiction to consider the Motion and the relief sought therein pursuant to 28 U.S.C. § 1334;

and due notice of the Motion having been provided, and it appearing that no other and further

notice need be provided; and the Court having found that the Plan does not have a reasonable

possibility of being confirmed, as that term is used in 11 U.S.C. § 362(d)(3)(A) and that the

Debtor has failed to commence monthly payments as provided in 11 U.S.C. 362(d)(3)(B); and

after due deliberation and sufficient cause appearing therefore, it is hereby

**ORDERED, ADJUDGED, and DECREED that:**

1.    The Motion is GRANTED.

2.    WF is granted relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(3).

3.    This Order is not stayed pursuant to Bankruptcy Rule 4001(a)(3) and the terms

and conditions of this Order shall be immediately effective and enforceable upon its entry.

4.    The Court retains jurisdiction with respect to all matters arising from or related to

the implementation of this Order.

Dated: Lynchburg, Virginia

_____, 2011

_____

HONORABLE WILLIAM E. ANDERSON
UNITED STATES BANKRUPTCY JUDGE

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms
in the Motion.

WE ASK FOR THIS:

_____
John H. Maddock III (VSB No. 41044)
Bryan A. Stark (VSB No. 75471)
McGUIREWOODS LLP
One James Center
901 East Cary Street
Richmond, Virginia 23219-4030
(804) 775-1000

*Attorneys to Wells Fargo Bank, N.A.*