John H. Maddock III (VSB No. 41044)
Bryan A. Stark (VSB No. 75471)
McGUIREWOODS LLP
One James Center
901 East Cary Street
Richmond, Virginia 23219-4030
(804) 775-1000

*Attorneys to Wells Fargo Bank, N.A.*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CASCADIA PARTNERS, LLC, | ) | Case No. 10-63442 |
| | ) | |
| Debtor. | ) | |

**RESPONSE AND OBJECTION OF WELLS FARGO BANK, N.A. TO THE
DEBTOR'S MOTION FOR APPROVAL OF LOT PURCHASE AGREEMENT**

Wells Fargo Bank, NA ("WF"), as successor by merger to Wachovia Bank, NA

("Wachovia"), through undersigned counsel, hereby responds and objects (the "Objection") to

the Motion for Approval of Lot Purchase Agreement (Docket No. 50) (the "Motion") filed by

Cascadia Partners, LLC (the "Debtor") in the above-captioned bankruptcy case (the "Bankruptcy

Case").  In support of the Objection, WF respectfully states as follows:

**BACKGROUND**

**I.      The Loan Documents and Foreclosure.**

1.      On July 25, 2007, the Debtor and Wachovia entered into that certain Construction

Loan Agreement in the original principal amount of $6,300,000 (the "Loan").  In connection

with the Loan, on July 25, 2007, the Debtor executed that certain Promissory Note in the amount of $6,300,000 for the benefit of Wachovia (the "Note").

2.      On July 25, 2007, to provide collateral and secure payment under the Note, the Debtor executed that certain Deed of Trust, Assignment of Rents and Security Agreement (the "Deed of Trust").  The Deed of Trust granted Wachovia an interest in the Debtor's real property as described in more detail in the Deed of Trust (the "Real Property").

3.      On July 25, 2007, Robert M. Hauser ("Hauser") executed that certain Guaranty Agreement (the "Guaranty" and collectively with the Loan, the Note, and the Deed of Trust, as amended, modified, or supplemented, the "Loan Documents").  Pursuant to the Guaranty, Hauser agreed to fully and unconditionally guarantee the Debtor's obligations under the Loan Documents.

4.      On December 31, 2008, in accordance with the terms of the Loan Documents, Wachovia sent a demand letter (the "Demand Letter") to the Debtor and Hauser.  The Demand Letter notified the Debtor and Hauser that each was in default under the Loan Documents and made demand for immediate payment of all outstanding amounts owed.  To date, neither the Debtor nor Hauser has cured the default.

5.      Following the Debtor and Hauser's default, WF commenced foreclosure proceedings against the Real Property pursuant to the Loan Documents.  A foreclosure sale (the "Foreclosure Sale") was scheduled to take place on December 2, 2010.

## II.      The Debtor's Bankruptcy Case, Disclosure Statement, and Plan.

6.      On December 1, 2010 (the "Petition Date"), the day prior to the Foreclosure Sale, the Debtor filed its petition (the "Petition") under chapter 11 of title 11 of the United States Code

(the "Bankruptcy Code") commencing the Bankruptcy Case in the United States Bankruptcy Court for the Western District of Virginia (the "Bankruptcy Court").

7.     The Petition states, among other things, that the nature of the Debtor's business is "Single Asset Real Estate as defined in 11 U.S.C. § 101(51B)."  With regard to single asset real estate bankruptcy cases, section 362(d)(3) of the Bankruptcy Code, provides that, within ninety (90) days of the petition date, a debtor must either (i) file a plan of reorganization with a reasonable possibility of being confirmed within a reasonable time or (ii) commence monthly payments to the debtor's in an amount equal to interest at the applicable nondefault contract rate. If a debtor fails to comply with section 362(d)(3), the secured creditor is entitled to relief from the automatic stay to act against the single asset real estate.  In the Debtor's Bankruptcy Case, the ninety (90) day period from the Petition Date ran on March 1, 2011.  The Debtor has not commenced monthly interest payments to WF.

8.     On the Petition Date, the Debtor filed its Schedules of Assets and Liabilities (the "Schedules").  On Schedule B, the Debtor scheduled no personal property including no cash on hand and no checking, savings or other financial accounts.  Additionally, the Debtor's monthly operating reports (collectively, the "Monthly Operating Reports") each state that the Debtor has produced no income during the pendency of the Bankruptcy Case.

9.     On February 28, 2011, the Debtor filed its Plan of Reorganization (Docket No. 21) (the "Plan") and accompanying Disclosure Statement (Docket No. 22) (the "Disclosure Statement").[1]  Pursuant to section 2.01 of the Plan, WF's secured claim is separately classified in

---

[1]  The Disclosure Statement attached an unexecuted, incomplete draft lot purchase agreement (the "Draft Lot Purchase Agreement") as Exhibit B.

Class 1.  Pursuant to section III of the Plan, WF's secured claim is impaired, and, therefore, WF

is entitled to vote on the Plan.  Because WF's secured claim is separately classed, WF controls

the vote of Class 1.  Pursuant to section 4.01 of the Plan, WF shall purportedly retain its lien on

the Real Property and WF's secured claim will be paid in full with 4.5% interest.  Section 4.01 of

the Plan further provides that WF will receive distributions on account of its secured claim only

after Union Bank is paid in full on account of the Union Loan (as defined below) "which should

be in late 2012 or early 2013."

10.    On April 11, 2011, WF filed the Motion of Wells Fargo Bank, N.A. for Relief

from the Automatic Stay (Docket No. ) (the "Motion for Relief").  The Motion for Relief seeks

relief from the automatic stay pursuant to section 362(d)(3) of the Bankruptcy Code because

within ninety (90) days of the Petition Date, the Debtor failed to (i) file a plan of reorganization

with a reasonable possibility of being confirmed within a reasonable time or (ii) commence

monthly payments to the debtor's in an amount equal to interest at the applicable nondefault

contract rate.  In addition, as more fully set forth in the Motion for Relief, WF asserts that the

Plan does not have a reasonable possibility of being confirmed within a reasonable time because

the Plan fails to satisfy the provisions of sections 1129(a) & (b) of the Bankruptcy Code.

11.    On April 18, 2011, WF filed its proof of claim asserting a secured claim in the

amount of $4,022,693.82 (the "WF Claim").  The WF Claim is secured by a first priority lien on

the Real Property pursuant to the Deed of Trust.

12.    On April 20, 2011, the Court entered its order approving the Disclosure Statement

(Docket No. 45) (the "Disclosure Statement Order").

13.    On April 26, 2011, the Debtor distributed Plan packages and solicited votes on the

Plan.  The distributed packages included copies of the Plan, the Disclosure Statement, the

Disclosure Statement Order, and a voting ballot.  The Disclosure Statement included in the Plan

package attached the unexecuted Draft Lot Purchase Agreement.

14.    On April 28, 2011, the Debtor filed the instant Motion seeking the Court's

approval of a revised Lot Purchase Agreement dated April 26, 2011 (the "<u>Lot Purchase

Agreement</u>") by and between the Debtor and NVR, Inc. ("<u>NVR</u>").  Motion 1.  The Lot Purchase

Agreement, unlike the Draft Lot Purchase Agreement attached to the Disclosure Statement, is

fully executed.  The Lot Purchase Agreement is attached to the Motion as Exhibit 1.

15.    In its Motion, the Debtor seeks the Court's approval of the Lot Purchase

Agreement which "relat[es] to the development and sale of the Debtor's real property which is

an essential element of the Plan of Reorganization."  Motion ¶ 1.

16.    On May 3, 2011, WF submitted its ballot rejecting the Plan.

## <u>ARGUMENT</u>

17.    The Court should deny the Motion because (i) the Debtor lacks any development

funding and, therefore, cannot comply with the terms of the Lot Purchase Agreement; (ii) the

Motion is merely an attempt to perpetuate an unconfirmable plan of reorganization; (iii) the

Motion fails to satisfy the requirements of section 364 to allow the Debtor to obtain credit; and

(iv) the Motion lacks any discussion of whether the Lot Purchase Agreement represents the best

available price for the property to be sold and therefore, it is not possible to determine whether

the Debtor exercised proper business judgment in entering into the Lot Purchase Agreement.

**I.    The Debtor Lacks Any Development Funding and, Therefore, Cannot Comply with
the Terms of the Agreement.**

18.     Pursuant to the Lot Purchase Agreement, the Debtor is obligated to prepare and develop a portion of the Real Property (the "NVR Lots") to sell to NVR.  However, the Debtor has no ability to perform its development obligations under the Lot Purchase Agreement because it lacks any working capital or funding.  Thus, because the Debtor is wholly unable to perform under the Lot Purchase Agreement, the Court should deny the Motion.

19.     Section 5 of the Lot Purchase Agreement outlines the Debtor's obligation to prepare the NVR Lots for sale to NVR.  Among other things, the Debtor must:

a.      "[P]erform over lot clearing and rough grading" of the Real Property  and "cut, fill and grade" the NVR Lots to provide for the proper drainage, Lot Purchase Agreement ¶ 5.a;

b.      "[C]lear, grade and grub" the NVR Lots in accordance with NVR's site plan (the "Site Plan"),[2] *id*. § 5.b;

c.      Prepare plans for drainage, obtain approval for the same from the necessary authorities, and construct various drainage and sewer facilities, *id*. § 5.c;

d.      Install water and sewer mains and obtain the necessary approvals for NVR to obtain building permits, *id*. § 5.d;

---

[2] The Lot Purchase Agreement fails to attach the Site Plan as Exhibit D.  Additionally, the Lot Purchase Agreement fails to attach the Record Plat as Exhibit A-2.  Without the Site Plan or the Record Plat, the Court, creditors, and other parties in interest lack crucial elements of the Lot Purchase Agreement and cannot sufficiently analyze the Lot Purchase Agreement or the Debtor's obligations thereunder.

e.      Post and maintain bonds for construction of streets, sidewalks, driveway

aprons, storm drains, sediment control and soil erosion, maintenance, and

all other bonds as may be required by law, *id*. § 5.e;

f.      Dedicate streets, roads, driveways, parking areas and other public and

private improvements (including, but not limited to, storm drainage

facilities) for public use and obtain acceptance from all the applicable

governmental authorities, *id*. § 5.f;

g.      Blast and/or excavate rock as may be necessary, *id*. § 5.h;

h.      Complete street paving, install sidewalks, curbs and gutters; provide street

lighting; and erect street signs, *id*. § 5.i;

i.      Maintain landscaping and trees on the Real Property, outside of the NVR

Lots that have been purchased, and erect and maintain a permanent entry

sign to the Real Property, *id*. § 5.*l*;

j.      Install permanent corner makers for each NVR Lot, *id*. § 5.n;

k.      To the extent necessary, remove and replace poor soil resulting in poor

soil conditions, including organic materials, trash, and sinkholes to create

proper footing and foundations, *id*. § 5.o;

l.      To the extent hazardous materials are found on any NVR Lot, the Debtor

must remediate in accordance with applicable laws or repurchase the

affected NVR Lot, *id*. § 5.p;

m.      Install street signs, *id*. § 5.q;

n.      Facilitate the installation of utilities, including telephone gas, cable television, and electricity, *id*. § 5.r;

o.      Prepare house siting and grading plans for each of the NVR Lots and the permit application, and County submission and review fees for the same, *id*. § 5.t;

p.      Install all fire lanes as required by law, *id*. § 5.u;

q.      Paying all proffers and fees including all off site improvement fees and contributions, *id*. § 5.v;

r.      Install retaining walls as shown on the Site Plan, *id*. § 5.w; and

s.      Obtain and maintain insurance policies, *id*. § 5.aa.

20.      Despite such significant obligations, the Debtor lacks any financial ability to undertake its obligations.  As set forth in the Debtor's Schedules, the Debtor has no cash, accounts receivables, or any other asset to finance the development of the Real Property pursuant to the Lot Purchase Agreement.  Indeed, as set forth in the Monthly Operating Reports and acknowledged by the Debtor's counsel at the April 18, 2011 hearings on the Disclosure Statement and other matters in this Bankruptcy Case (the "April 18 Hearing"), the Debtor has no income whatsoever.  *See* April 18, 2011 Hearing Tr. 5:14-15.  A copy of the April 18, 2011 Hearing Transcript is attached hereto as Exhibit A.

21.      Admittedly, pursuant to the Plan and Disclosure Statement, the Debtor states that it intends to obtain a loan (the "Union Loan") from Union First Market Bank ("Union") the proceeds from which the Debtor presumably will use to fund its development and construction

obligations under the Lot Purchase Agreement.  However, no such loan exists and it is mere

conjecture whether such loan will *ever* exist.

22.     At the April 18 Hearing,  the Debtor's counsel admitted that the Debtor "has been

attempting to find financing" since the Petition Date.  *Id.* 5:15-16.  Thus, despite its attempts for

at least the previous five (5) months, the Debtor has failed to secure any financing whatsoever.

23.     Apparently, the Debtor believes its failure to secure the financing is due in part to

the fact it lacked a fully-executed and Court-approved Lot Purchase Agreement.  At the April 18

Hearing, the Debtor's counsel reasoned that with the Lot Purchase Agreement, "the debtor is

able to go to its other sources for the development funding *to be able to **try*** to put together a

development proposal." *Id*. 7:11-15 (emphasis added).  Importantly, however, the comments of

Debtor's counsel are clear that with a fully-executed and Court-approved Lot Purchase

Agreement the Debtor can merely "try" to create a proposal to secure financing.  It is also clear

that neither the Union Loan nor any other financing awaits the Lot Purchase Agreement's

approval.[3]

24.     Indeed, despite the Plan and Disclosure Statement's collective insinuation that the

Union Loan is forthcoming, the Debtor's counsel already conceded that the Plan merely *outlines*

loan terms "*perceived to be necessary.*"  *Id*. 7:4-6 (emphasis added).  The Debtor's counsel's

comments are unequivocal:  No financing currently exists.  Rather, the Debtor has generically

concluded that only the most onerous financing, including a priming lien pursuant to section

---

[3] Despite the Debtor's counsel's repeated assertions that the Debtor hopes to find financing to
fund the Plan, the Debtor brazenly testified at the April 18 Hearing that the Union Loan is a mere
formality following the approval of the Lot Purchase Agreement.  *See* April 18 Hearing Tr. 52:7-
21.

364(d) of the Bankruptcy Code, will be sufficient to allow the Debtor to perform its obligations

under the Lot Purchase Agreement.  Otherwise, the Debtor will not have the ability to perform

under the Lot Purchase Agreement.

25.      Therefore, because no financing exists and because the Debtor has only hope that

financing may someday be secured, the Court must deny the Motion.  Otherwise, if the Court

were to approve the Lot Purchase Agreement, the Debtor's bankruptcy case will be left to

flounder indefinitely while the Debtor continues with its fruitless search for financing.

## II.     Because the Lot Purchase Agreement Merely Perpetuates an Unconfirmable Plan of Reorganization the Motion Should Be Denied.

26.      The Court should deny the Motion because it merely perpetuates an

unconfirmable plan of reorganization.  As set forth in WF's Motion for Relief, WF is entitled to

relief from the automatic stay pursuant to section 362(d)(3) because the Plan filed on February

28, 2011 did not have a reasonable likelihood of being confirmed in a reasonable time.  In

addition to the fact that the Plan is not feasible, the Plan fails to conform to the requirements of

section 1129(a) of the Bankruptcy Code.  Thus, because the Motion merely seeks to perpetuate

an unconfirmable plan, the Court should deny the Motion and save the Court, the Debtor, WF,

and all parties in interest from expending further time, energy, and resources associated with the

plan confirmation process.

### A.     The Plan Is Not Feasible and Cannot Be Confirmed.

27.      The Plan is not feasible on its face and, therefore, cannot satisfy the requirements

of section 1129(a) of the Bankruptcy Code.  To satisfy the feasibility requirement of the

Bankruptcy Code, the confirmation of a plan must not likely be followed by the liquidation or

need for further financial reorganization of the debtor or any successor.  11 U.S.C. § 1129(a)(11).

"[T]he feasibility standard is whether the plan offers a reasonable assurance of success."  *Kane v. Johns-Manville Corp.*, 843 F2d 636, 649 (2d Cir. 1988).  "'The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promises creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation.'" *Pizza of Hawaii, Inc. v. Shakey's Inc. (In re Pizza of Hawaii, Inc.)*, 761 F.2d 1374, 1385 (9th Cir. 1985) (quoting 5 Collier on Bankruptcy ¶1129.02 [11] at 1129-34 (15th ed. 1984)).  Here, the Plan is not feasible because, among other reasons, it relies entirely on the Lot Purchase Agreement which fails to offer the Debtor any certainly of reorganizing.

28.     The Plan is infeasible because NVR may terminate the Lot Purchase Agreement, at its sole discretion, without repercussion.  Section 1B of the Lot Purchase Agreement provides for a sixty (60) day "feasibility period" (the "Feasibility Period") commencing on the date the Bankruptcy Court enters an order confirming the Plan (the "Confirmation Date").  During such period, the Debtor at its sole expense must undertake certain engineering, development, marketing and other studies as NVR directs and deliver to NVR copies of various reports, studies, and samples.  In the event that NVR is not satisfied with the NVR Lots or any information the Debtor delivers to NVR, it may, "for any reason or ***no reason at all***," terminate the Lot Purchase Agreement during the Feasibility Period.  Lot Purchase Agreement, § 1B (emphasis added).

29.     Indeed, the Debtor and NVR materially altered the Feasibility Period provision in the Lot Purchase Agreement from the unexecuted Draft Lot Purchase Agreement attached as Exhibit B to the Disclosure Statement.  The changes provide the Debtor even less certainty that it can complete, or even begin, to operate under the terms of the Plan.  Under the Draft Lot

Purchase Agreement, the Feasibility Period ran from the effective date of the Draft Lot Purchase

Agreement, *i.e.* the last date a party signed the agreement.  However, the Feasibility Period in the

Lot Purchase Agreement commences on the Confirmation Date.

30.     The effective date of the executed Lot Purchase Agreement is April 26, 2011 (the

"Effective Date").  Thus, under the terms of the Draft Lot Purchase Agreement, the Feasibility

Period and NVR's right to terminate the agreement without repercussion likely would have

concluded by the time the Court were in a position to consider confirming the Plan.  In such an

instance, the Court and the Debtor could have been reasonably certain that the Debtor could, at

the very least, begin to perform under a confirmed plan of reorganization.

31.     However, the Feasibility Period in the Lot Purchase Agreement, for which the

Debtor seeks approval, begins only after the Court enters an order *confirming* the Plan.

Therefore, it is possible, if not likely, that within sixty (60) days of the Plan's confirmation, NVR

will terminate the Lot Purchase Agreement without repercussion leaving the Debtor wholly

unable to perform under the Plan.

32.     Similarly, the Debtor must conduct, at its sole risk and expense, a phase I

environmental assessment on the NVR Lots within thirty (30) days of the Plan's confirmation

("Environmental Study Period").  If the results of such environmental study are not acceptable to

NVR in its sole discretion, NVR may terminate the Lot Purchase Agreement after receiving an

environmental study.  *Id*. at § 2.  Again, the Draft Lot Purchase Agreement provided that the

Environmental Study Period commenced on the Effective Date.

33.     However, just as the Debtor and NVR materially modified the Feasibility Period

to commence on the Confirmation Date (as opposed to the Effective Date as was set forth in the

Draft Lot Purchase Agreement), the Environmental Study Period was also materially modified to commence on the Confirmation Date.  Thus, despite its execution, the Lot Purchase Agreement is not a firm commitment and is simply a "visionary scheme" from which the Debtor hopes it can perform and eventually comply with the terms of the Plan.

34.    Additionally, and perhaps more importantly, in the event of NVR's breach of the Lot Purchase Agreement, the Debtor's *sole* remedy is to retain NVR's deposit.  Pursuant to section 3.g of the Lot Purchase Agreement, NVR is required to deliver a $500,000 deposit (the "Deposit") to the Debtor on an installment basis.  Section 12.a provides that the Debtor's "sole and exclusive right and remedy shall be to retain the Deposit paid to date or remaining in the Seller's hands as full, fixed and liquidated damages, not as a penalty, whereupon th[e] [Lot Purchase] Agreement shall terminate."  It is, therefore, very possible for NVR to breach the Lot Purchase Agreement at any time leaving the Debtor with a negligible Deposit as its sole remedy and without any ability to perform under the Plan.

35.    Thus, because the Plan heavily relies on such a one-sided Lot Purchase Agreement that is terminable without penalty after the Plan is confirmed, the Plan is not feasible under section 1129(a)(11) and cannot be confirmed.  Accordingly, the Court should deny the Motion because it simply seeks to perpetuate an unconfirmable plan.

**B.    *The Plan Cannot Satisfy the Cramdown Requirements in Section 1129(b)(2)(A) Because It Is Not "Fair and Equitable" with Respect to WF's Secured Claim.***

36.    Further, even if the Court were to determine that the Plan satisfies the requirements of section 1129(a), the Plan is not fair and equitable as to WF, a holder of an impaired claim who has voted against the Plan, thus, the Plan fails to meet the cramdown requirements of section 1129(b).

37.     Section 1129(b) of the Bankruptcy Code provides that a court shall confirm a plan of reorganization which satisfies all of the requirements under section 1129(a) other than subsection (8), if the plan "does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1). Thus, if a plan is deemed "fair and equitable" as to impaired, non-accepting classes, it may be "crammed down" on such impaired, non-accepting classes.

   1.     *The Plan is Not Fair and Equitable Under Section 1129(b)(2)(A)(i).*

38.     A plan is "fair and equitable" with respect to a class of secured claims if the plan provides:

> (i)     (I) the holders of such [secured] claims **retain the liens** securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and
>
> (II) that each holder of a [secured] claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property[.]

11. U.S.C. 1129(b)(2)(A)(i) (emphasis added).

39.     Of particular importance to the present case, a plan cannot be crammed down on an impaired non-accepting class of secured creditors unless each of the secured creditors in the class "retains its lien" on the collateral. In limited circumstances, a plan may be deemed to comply with the requirements of section 1129(b)(2)(A)(i) where a secured creditor is to retain its lien and such lien is to be primed, but only if such priming lien leaves the secured creditor's lien unaffected. Specifically, if a plan proposes to prime a secured creditor's lien, the priming lien may attach only to the collateral's future appreciation in value, thereby leaving the secured

claimant's collateral base unaffected.  *Compare In re Sherwood Square Assocs.*, 107 B.R. 872, 880-81 (Bankr. D. Md. 1989) (finding that a secured lien is deemed retained under section 1129(b)(2)(A)(i) when a priming lien for a construction loan attaches only to the "actual added market value" added to the value of the collateral), *with In re L.B.G. Prop., Inc.*, 72 B.R. 65, (Bankr. S.D. Fla 1987) (finding that senior lien that is subordinated to a new lien fails to preserve the existing lien and fails to satisfy section 1129(b)(2)(A)(i)).

40.    In this case, the Plan proposes to prime WF's lien on the Real Property by granting Union a first priority lien to secure the Debtor's obligations under the Union Loan.  This proposed priming lien is not limited to a first priority lien on the increase in value of the Real Property attributable to the development of lots, but rather is to be a first priority lien as to *all* of the Real Property.  Proposed financing on these terms fails to conform to the limited circumstances outlined in *Sherwood Square* where a priming lien may be acceptable under section 1129(b)(2)(A)(i).  Thus, WF cannot be considered to retain its lien for purposes of section 1129(b)(2)(A)(i).  As such, the Plan is not "fair and equitable," and the Plan cannot be crammed down on WF.

41.    Moreover, the Debtor's argument that based on the value of the Real Property as set forth in its Appraisal (as defined below) WF will remain fully secured and, therefore, should be considered to retain its lien despite granting Union a first priority lien is misleading and factually incorrect because the Plan and the Disclosure Statement materially misrepresent the amount of the Union Loan.

42.    The claims secured by the Real Property total at least $4,396,470.57, consisting of the WF Claim in the amount of $4,022,983.82, statutory tax liens held by Albemarle County

scheduled in the amount of $263,879.75, and W.W. Associates, Inc.'s scheduled secured claim

in the amount of $109,797. When the $4,000,000 Union Loan is added, the total secured claims

on the Real Property will be in the approximate amount of $8,396,470.57.

43.    The Disclosure Statement states that an appraisal performed by the Appraisal

Group, Inc. dated February 10, 2011 (the "Appraisal") values the Real Property in the amount of

$8,850,000.[4] Thus, when the appraised value is compared to secured claims totaling

$8,396,470.57, the Debtor appears to argue that even after its lien is primed by the Union Loan,

the WF Claim remains oversecured and, therefore, WF should be considered to retain its lien on

the Real Property.[5] However, even using the Debtor's greatly inflated value of the Real

Property, WF will not be oversecured because the Plan and Disclosure Statement materially

misstate the actual amount the Debtor intends to borrow under the Union Loan.

44.    The Plan and the Disclosure Statement each state that the Union Loan will be "in

the amount of $4MM bearing 6% interest as a construction/revolving loan which will be granted

first lien priority." Plan § 4.01; Disclosure Statement 4. At the April 18 Hearing, WF's counsel

referenced the amount of the Union Loan as $4MM no less than six (6) times and neither the

---

[4] WF strongly disagrees with the Debtor's alleged value of the Real Property. WF will introduce into evidence an appraisal conducted by Integra Realty Resources-Richmond dated April 25, 2011 which values the Real Property in the amount of $6,000,000 (the "Integra Appraisal"). A copy of the WF Appraisal is being provided to the Debtor in response to the Debtor's discovery requests and will be filed with the Court as required by this Court's April 12, 2011 Pre-Hearing Order.

[5] In its Motion for Relief, WF argues that if the Court were to approve the Union Loan and grant Union a priming lien pursuant to 11 U.S.C. § 364(d)(1), WF would lack adequate protection and be entitled to relief from the automatic stay pursuant to section 362(d)(1) of the Bankruptcy Code. For further discussion on this issue, please see the Motion for Relief ¶¶ 45-51.

Debtor nor the Debtor's counsel disputed or made any attempt to correct the amount.  *See* April 19 Hearing Tr. 16:7, 21, 24; 21:21; 23:19; 39:1.

45.    A closer reading of the cash flow analysis attached as Exhibit C to the Disclosure Statement (the "Cash Flow Analysis") and a review of the Lot Purchase Agreement, however, make it readily apparent that the Debtor intends to borrow at least $6,000,0000 under the Union Loan thereby leaving a significant portion, if not all, of the WF Claim unsecured.  The "Finance Assumptions" of the Cash Flow Analysis assume that the Union Loan "Revolver Cap" will be $4,000,000.  However, the "Union Bank Loan" component of the Cash Flow Analysis makes clear that the Debtor intends to draw $3,987,047 in 2011, $1,980,282 in 2012, $84,895 in 2012 for a total draw of $6,052,224 through the end of 2012.  Thus, rather than accurately list the total funds the Debtor intends to borrow under the Union Loan or the total amount of principal the Debtor will repay under the Union Loan, the Plan and Disclosure Statement refer only to what appears to be a cap on the revolver aspects of the Union Loan.  Such material contradictions in the Plan and Disclosure Statement raise serious issues with respect to the accuracy of the disclosures made in the Disclosure Statement.

46.    That the Debtor's intent is to borrow an amount greater than $6,000,000 is confirmed by the Lot Purchase Agreement which states that the Debtor intends to borrow $6,500,000.  As more fully set forth below, *see infra* § III, the Lot Purchase Agreement provides that NVR's Deposit will be secured and subordinated to a "third priority position" behind the Union Loan and the WF Claim.  The Union Loan is specifically described as the Debtor's "development financing *in the amount of $6,500,000.*"  Lot Purchase Agreement § 3.g.

47.     Thus, it is clear that contrary to the representations made in the Plan and Disclosure Statement, the Debtor intends to borrow well in excess of $4,000,000. Nevertheless, the Debtor seems to take the position that because the WF Claim will be primed by only $4,000,000 at any given time, the total amount the Debtor borrows from and repays to Union Bank before WF is paid a penny from the sale of its collateral is irrelevant. The Debtor, however, disregards the fact that because WF's collateral is the only source of funds to repay the Union Loan, WF's collateral will be depleted each time the Debtor sells an NVR Lot. Thus, as the Cash Flow Analysis suggests, it is possible, if not likely, that the Debtor will borrow $4,000,000 under the Union Loan, repay $2,000,000 from the sale of the NVR Lots, *i.e.* reducing WF's collateral, and then borrow an additional $2,000,000 up to the proposed revolver cap. The end result: WF's lien remains primed by the $4,000,000 first priority lien with $2,000,000 of its collateral sold. Such scenario depletes WF's collateral by more than 30%, but does not reduce WF's claim by a single cent. Under such circumstances, WF cannot be considered to have retained its lien for the purposes of section 1129(b)(2)(A)(i) and the Plan cannot be crammed down on WF.

48.     Additionally, a secured creditor does not retain its lien for purposes of 1129(b)(2)(A)(i) if a plan proposes to deplete the secured creditor's collateral through systematic sales of the collateral free and clear of the secured creditor's lien. *See In re Sparks*, 171 B.R. 860, 865 (Bankr. N.D. Ill. 1994) ("The Debtor's Plan does not meet the requirements of clause (i) because the Plan requires [the secured creditor] to release its lien on each converted condominium as it is sold.").

49.    In *Sparks*, the debtor's plan of reorganization proposed to pay a secured creditor 100% of its secured claim plus interest through the sale of condominiums.  As the condominiums were sold, the plan required the secured creditor to release its lien on each condominium unit sold.  *Id*. at 864.  Because the plan required the secured creditor to release its lien on each condominium sold, the bankruptcy court concluded that the plan did not comply with the provisions of section 1129(b)(2)(A)(i).  *Id*. at 865.  Similarly, because the Debtor's Plan requires WF to partially release its lien on the Real Property as the NVR Lots are sold, WF cannot be considered to retain its lien for purposes of section 1129(b)(2)(A)(i) and the Plan cannot be crammed down over WF's objection.  *See* Plan, at § 4.01 (proposing to sell the NVR Lots "free of all liens at the closing of each lot sale"); *see also* Lot Purchase Agreement, at § 1A ("[T]he Lots shall be conveyed free and clear of all liens . . . .").

2.    *The Plan Is Not Fair and Equitable Under Section 1129(b)(2)(A)(ii).*

50.    A plan may also be fair and equitable to an impaired, non-accepting class of secured creditors if the plan provides

> for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph.

11 U.S.C. § 1129(b)(2)(A)(ii).

51.    Importantly, section 1129(b)(2)(A)(ii) "requires the debtor to pay 100% of the proceeds to the secured creditor or for the secured creditor to retain a lien on these proceeds." *Sparks*, 171 B.R. at 865.  The Plan fails to satisfy section 1129(b)(2)(A)(ii) because the Plan proposes to sell the NVR Lots free and clear of WF's lien but does not provide for WF's lien to

attach to the proceeds from the sale of the NVR Lots.  Rather the Plan proposes to use the NVR

Lot sale proceeds to repay the Union Loan and satisfy the claims of other creditors, including

creditors who do not have an interest in the Real Property.

> 3.      *The Plan Fails to Provide WF the "Indubitable Equivalent" of its Claim
>          and Is Not Fair and Equitable Under Section 1129(b)(2)(A)(iii).*

52.      Alternatively, a plan may be fair and equitable to an impaired, non-accepting class

of secured creditors if the plan provides "for the realization by such holders of the indubitable

equivalent of such claims."  11 U.S.C. § 1129(b)(2)(A)(iii).

53.      To satisfy the indubitable equivalent standard a court must conclude that the

substitute collateral is "completely compensatory" and determine the likelihood the creditor will

be paid.  *Sparks*, 171 B.R. at 866 (citing *In re San Felipe @ Voss, Ltd.*, 115 B.R. 526, 529 (S.D.

Tex. 1990)).  Specifically, a court must examine the value and the risk associated with substitute

collateral and conclude that it is "sufficiently 'safe' and 'completely compensatory.'"  *Id.*

54.      In *Sparks*, as part of the debtor's plan for reorganization, the debtor sought to

convert the secured lender's collateral apartments into condominiums for sale and satisfy its loan

obligations to the secured creditor through the sale of such condominiums.  In analyzing the

debtor's scheme with respect to the indubitable equivalent standard the court said that:

> New collateral with a value less than the value of the original
> collateral cannot be "completely compensatory."  Similarly, new
> collateral with a value projected to be equal to, or more than, the
> original is not "completely compensatory" if the new collateral is
> so much riskier than the original collateral that there is a
> substantially greater likelihood that the secured creditor will not be
> paid.

*Id.* at 866.  Thus, new collateral must have a value of at least the value of the original collateral

and its substitution for the original collateral cannot increase the risks of non-payment.  Applying

this standard, the *Sparks* court found that, although the converted condominiums may have a

greater value than the apartment complex, the risk of the conversion is significantly greater to the

secured creditor and, therefore, the plan failed to meet the indubitable equivalent standard. *Id*. at

867.

55.     Here, through the Plan, WF receives no "value" and bears all of the "risk" of the

Debtor's reorganization, thus, the Plan fails to provide WF with the indubitable equivalent of its

claim.  When the Debtor and WF entered into the Loan Documents, WF negotiated and was

granted a fully secured first priority lien, which WF currently maintains.  With respect to its first

lien position, WF maintains an equity cushion of nearly $2,000,000 based on the Integra

Appraisal.  Thus, WF is adequately protected and sits in the same position that it negotiated and

for which it bargained.

56.     Nevertheless, the Plan proposes to subordinate the WF Claim to the $6,000,000

Union Loan with WF's secured priority lien secured by the Real Property.  To the extent the Real

Property can be considered "new" collateral, it is not plausible that this "new" collateral, *i.e.*, the

Real Property reduced by the $6,000,000 priming lien, is of an equal or greater value than the

"original" collateral, *i.e.*, the Real Property without the $6,000,000 priming lien.  Nor is it

plausible to argue that WF's risk of non-payment is not significantly greater once its lien is

primed by a first priority $6,000,000 lien.  Therefore, WF receives no "value," the Plan's

treatment of the WF Claim is not "completely compensatory," and the Plan fails to satisfy the

indubitable equivalent standard.

57.     Moreover, WF bears all of the risk relating to the Debtor's reorganization.

Because the Plan proposes to subordinate the WF Claim to a second lien position behind a

$6,000,000 priming lien on the Real Property valued at only $6,000,000, such priming lien will

transform the WF Claim from a fully secured claim with a 50% equity cushion to a fully

unsecured claim.  This scenario is the diametrical opposite to a secured creditor receiving the

indubitable equivalent of its claim and, therefore, the Plan fails to satisfy the indubitable

equivalent standard under section 1129(b)(2)(A)(iii).

58.     In sum, such scheme is in clear contravention of section 1129(b)(2)(A)(iii) and

case law interpreting the same, as the Debtor's Plan unreasonably shifts all of the risk associated

with the Debtor's effort to reorganize from the Debtor and its equity holders to WF alone.  As

such, the Plan cannot be crammed down over WF's objection.  *See In re EFH Grove Tower

Assocs.*, 105 B.R. 310, 313 (Bankr. E.D.N.C. 1989) (finding that a plan that proposed to prime

the lien of an existing secured creditor imposed significant risk to the secured creditor and

provided the possibility of great reward with minimal risk to the debtor is not "fair and

equitable" under section 1129(b)).

### C.     *The Plan Does Not Provide for Payments of Administrative Claims on the Effective Date.*

59.     Finally, the Plan fails to satisfy section 1129(a)(9)(A) of the Bankruptcy Code

because it does not provide for the payment of allowed administrative claims on the effective

date of the Plan.  Section 1129(a)(9)(A) requires, as a requirement for the confirmation of a plan,

that "with respect to a claim of a kind specified in section 507(a)(2) or 507(a)(3) of this title, on

the effective date of the plan, the holder of such claim will receive on account of such claim cash

equal to the allowed amount of such claim."  11 U.S.C. § 1129(a)(9).  It is well-settled that a plan

cannot be confirmed without the payment of administrative claims on the plan's effective date,

unless the holder of such claim consents to different treatment.  *See CIT Commc'n Fin. Corp. v.*

*Midway Airlines Corp. (In re Midway Airlines Corp.)*, 406 F.3d 229, 242 (4th Cir. 2005).

60.     Here, the Plan does not provide for the payment of administrative expenses on the

Plan's effective date.  Rather, the Plan seeks to pay the Class 4[6] and Class 6 administrative

claims "upon approval by the Bankruptcy Court," and seeks to pay Class 5 claims over an

ambiguous period of time following the sale of the NVR Lots.  Because the Plan does not

propose to pay any administrative claim on the Plan's effective date, it violates section 1129 of

the Bankruptcy Code and well-settled case law.

### III.  Although Described as a "Deposit" the Deposit is a Loan and an Attempt to Obtain Credit but the Motion Fails to Satisfy the Requirements of 11 U.S.C. § 364.

61.     The Lot Purchase Agreement provides for financing secured by a lien on the Real

Property although such financing is disguised as a "deposit."  The Debtor fails to seek the

Court's approval to obtain credit pursuant to section 364(c) of the Bankruptcy Code or

Bankruptcy Rule 4001(c)(3), thus, the Motion must be denied.

62.     As set forth above, NVR is required to deliver the Deposit to the Debtor on an

installment basis.  The Deposit is to be used by the Debtor "solely for the acquisition and

development of the Property and for no other purpose."[7]  Lot Purchase Agreement, § 3.g.  The

---

[6] Admittedly, the Debtor's counsel has likely consented to this treatment.

[7] Importantly, the Lot Purchase Agreement also provides that NVR may require the Debtor to provide NVR with adequate assurance that acquisition and development financing has been secured prior to tendering any portion of the Deposit.  Lot Purchase Agreement, § 3.g.  Thus, without the Union Loan or other form of development financing, the Debtor will not receive the Deposit and, therefore, will have no recourse against NVR should NVR breach the Lot Purchase Agreement.  *See* Lot Purchase Agreement, § 12.a ("Seller's sole and exclusive right and remedy shall be to retain the Deposit paid to date or remaining in Seller's hands as full, fixed and liquidated damages . . . .").

Debtor is to repay the Deposit by providing NVR a credit for each lot purchased by NVR.  The

Debtor's obligation to repay the Deposit is to be secured by a deed of trust on the Real Property

subordinated only to the Union Loan and the WF Claim (the "<u>Lot Purchase Deed of Trust</u>").

63.    The Motion, however, makes no mention of the Lot Purchase Deed of Trust and

lacks any request to obtain credit under section 364 of the Bankruptcy Code.

64.    Section 364 of the Bankruptcy Code provides, in pertinent part:

> If the trustee is unable to obtain unsecured credit allowable under
> section 503(b)(1) of this title as an administrative expense, the
> court, after notice and a hearing, may authorize the obtaining of
> credit or the incurring of debt—
>
> . . .
>
> (3) secured by a junior lien on property of the estate that is
> subject to a lien.

11 U.S.C. § 364(c)(3).

65.    A motion to obtain credit pursuant to section 364(c) must contain "a concise

statement of the relief requested" and list "all material provisions of the proposed credit

agreement and form of order, including interest rate, maturity, events of default, liens, borrowing

limits, and borrowing conditions."  Fed. R. Bankr. P. 4001(c)(1)(B).

66.    Despite such clear statutory requirements, the Motion lacks any request to obtain

credit under section 364, makes no attempt to comply with the specific requirements set forth in

Bankruptcy Rule 4001(c)(1), and lacks any request to approve the Lot Purchase Deed of Trust.

Nevertheless, the Court's granting the Motion and approving the Lot Purchase Agreement would

authorize the Debtor to obtain credit secured by a lien on property of the estate without satisfying

the Bankruptcy Code's specific requirements.  Without such express request, the Court is

without authority to grant relief under section 364(c).  Thus, the Court must deny the Motion.

**IV.     The Debtor Fails to Allege the Lot Purchase Agreement Resulted From Any Marketing Effort or that the Debtor Could Not Obtain a Less-Onerous Agreement.**

67.     Finally, the Motion should be denied because the Debtor fails to allege that it

made any effort to market the Lot Purchase Agreement or seek a better offer and fails to allege

that the Debtor could not obtain a less onerous and one-sided agreement.

68.     The Motion simply attaches the Lot Purchase Agreement and asks the Court to

approve it.  It provides no information on the negotiation of the Lot Purchase Agreement or the

key terms of the Lot Purchase Agreement.  It further fails to describe whether the Debtor

contacted other parties who may have interest in the Real Property.  Indeed, the Motion simply

says nothing at all.

69.     The Court should not grant the Motion and should not approve the Lot Purchase

Agreement unless the Debtor discloses its efforts to market the NVR Lots and/or the Real

Property so the Court and parties in interest can be assured that the Debtor is maximizing the

value of its assets.  If the Debtor failed to adequately market the Real Property whether on an "as

is" basis or after the Debtor's proposed development, one cannot determine whether the Lot

Purchase Agreement is in the best interests of the Debtor and its bankruptcy estate, its creditors,

or other parties in interest.

## CONCLUSION

WHEREFORE, WF respectfully requests that the Court enter an order denying the

Motion and such other and further relief as may be just and proper.

Dated: May 16, 2011                          Respectfully submitted,

                                             /s/ John H. Maddock III
                                             John H. Maddock III (VSB No. 41044)
                                             Bryan A. Stark (VSB No. 75471)
                                             McGUIREWOODS LLP
                                             One James Center
                                             901 East Cary Street
                                             Richmond, Virginia 23219-4030
                                             (804) 775-1000

                                             *Attorneys to Wells Fargo Bank, N.A.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 16, 2011, a copy of *RESPONSE AND OBJECTION OF WELLS FARGO BANK, N.A. TO THE DEBTOR'S MOTION FOR APPROVAL OF LOT PURCHASE AGREEMENT* was served by (I) the Court's ECF system on all parties and entities who have filed notices of appearance or otherwise requested to receive notice in the above-captioned case; and (II) the parties listed below by first-class mail postage prepaid.

| | |
|---|---|
| W. Stephen Scott<br>Scott Kroner, PLC<br>418 East Water Street<br>Charlottesville, Virginia 22902<br>*Counsel to the Debtor* | Margaret K. Garber<br>Office of the United States Trustee<br>210 First Street, Suite 505<br>Roanoke, Virginia 24011<br>*United States Trustee* |
| Stonehaus, LLC<br>2421 Ivy Road<br>Charlottesville, Virginia 22903<br>*Creditor* | Cline Design Associates, PA<br>125 N. Harrington Street<br>Raleigh, North Carolina 27603<br>*Creditor* |
| Stonehaus Construction, LLC<br>2421 Ivy Road<br>Charlottesville, Virginia 22903<br>*Creditor* | |

/s/ John H. Maddock III
John H. Maddock III

\30990108

# Exhibit A

1

1    IN THE UNITED STATES BANKRUPTCY COURT
     FOR THE WESTERN DISTRICT OF VIRGINIA
2            CHARLOTTESVILLE DIVISION

3    _____

4

5    CASCADIA PARTNERS, LLC                    10-63442

6

7

8    _____

9

10                    PROCEEDINGS
11    BEFORE THE HONORABLE WILLIAM E. ANDERSON
                  April 18, 2011
12            Charlottesville, Virginia

13

14
     DISCLOSURE STATEMENT HEARING; MOTION BY DEBTOR FOR
15   AUTHORITY TO EXECUTE DEED OF EASEMENT; CONT'D STATUS
                      HEARING
16

17                   Chapter 11

18

19              *    *    *    *

20

21                 EVANS & COMPANY
                   Court Reporters
22              Post Office Box 11822
            Lynchburg, Virginia 24506-1822
23                 (434) 239-2552

24

25   Reported by:  MARILOU DESETTO, Certified Court Reporter

1   Appearances:

2

3

4                SCOTT & KRONER, PC

5                    418 E. Water Street

6                    Post Office Box 2737

7                    Charlottesville, VA 22902

8            BY: WILLIAM STEPHEN SCOTT, ESQUIRE

9

10

11

12                MCQUIRE WOODS

13                    Court Square Building

14                    310 4th Street NE  Suite 300

15                    Charlottesville, Virginia  22902

16            BY: JOHN MADDOCK, ESQUIRE

17                    Counsel for Wells Fargo

18

19

20

21

22

23

24

25

3

1                           I   N   D   E   X

2

3        WITNESS:            EXAMINATION BY:              PAGE:

4

5        ROBERT HAUSER

6                      Mr. Scott                    42

7                      Mr. Maddock                  49

8

9

10

11

12

13    .

14          .

15

16

17

18

19

20

21

22

23

24

25

4

1    (April 18, 2011)

2

3         THE CLERK:  Cascadia Partners LLC.

4         MR. SCOTT: Stephen Scott, counsel for the

5    debtor in this case.

6         Judge, I think we have on the docket this

7    afternoon three matters.  One is a status hearing.

8    I think this is the first status hearing we've had

9    in this case.  I can't remember.  Status hearing,

10   the hearing on the disclosure statement, and then

11   a motion which the debtor has filed seeking

12   authority to execute actual amendment to a deed of

13   easement.  If you'd like for me to bring the court

14   up on the status of the case, too, I can proffer

15   to what Mr. Hauser would testify to.

16        As the court may recall, this case was

17   filed, I believe it was December the 1st of 2010.

18   This is a single asset real estate case involving

19   the piece of real estate, I think its got 60 acres

20   in Albemarle County east of town off of Route 20

21   north.  It's undeveloped piece of property, I

22   think there may be some old residences,

23   uninhabited, on the property.  Purchased by the

24   debtor several years ago to be developed to a

25   residential and related housing.  Wachovia did the

1    financing for the purchase of the property.   They

2    have a first deed of trust on the property.

3    Foreclosure.   The debtor went into default, and

4    initially foreclosure was scheduled for last June

5    or July.   And because of a need to do an

6    environmental report analysis, Wachovia rescinded

7    that foreclosure sale and conducted whatever it

8    needed to do.   And subsequently, because the

9    debtor had not been able to resolve its obligation

10   with Wachovia, it rescheduled the foreclosure

11   sale.   And that's what precipitated the filing of

12   the Chapter 11.

13        Since the debtor has been in Chapter 11 it

14   has been acting as debtor-in-possession.   It has

15   no income.   And it has been attempting to find

16   financing and develop a plan with a partner to

17   develop the real estate so that it can be sold off

18   and so that Wachovia can get paid.   The debtor has

19   timely filed its Chapter 11 plan and disclosure

20   statement within the 90 day period subsequent to

21   the filing of the case.   Because it has no income

22   it has not been able to make any other interest

23   accrual payments to Wachovia.   Wachovia is owed,

24   apparently, somewhere about $3.8 million.

25        As far as I'm aware, Wachovia has not yet

1    filed a proof of claim in the case.  To be filed

2    today.  So we don't know exactly what the final

3    numbers are at least as of now, and when the plan

4    and disclosure statement were prepared we did not

5    have a break down on what the number is.  But, the

6    plan was filed based upon the best information the

7    debtor had some months ago.  And the plan

8    basically provided for entering into a contract

9    with a national home builder, which is Ryan Homes,

10   to, in essence, buy the property.  The lots down

11   from the debtor and build on that.  And through

12   that process, in conjunction with a development

13   loan, would be obtained through a third party.

14   Whether it be additional investors, or commercial

15   lender the debtor would be able to do the upquick

16   work or site work to get the property ready so

17   that the contractor or developer, Ryan Homes,

18   could construct the properties.  And it would be

19   ultimately a build-out over a period of several

20   years.

21        When the plan and disclosure statement were

22   filed, two of the elements that were presented in

23   the plan and disclosure statement was the fact

24   that we were negotiating a contract with Ryan.

25   And we were only able to attach an unexecuted copy




1    to it at that time because the terms were still

2    being negotiated.  The plan also referred to the

3    fact that we would be needing to get a development

4    loan.  And we identified, generally, what the

5    terms of that loan were perceived would be

6    necessary.  And so subsequently, and really as of

7    today, the debtor has obtained a contract with

8    Ryan.  They finished negotiating the terms, and

9    one of four parties at Ryan has signed the

10   contract.  The contract is subject to court

11   approval.  And now that that contract, the debtor

12   is able to go to its other sources for the

13   development funding to be able to try to put

14   together a development proposal as the second part

15   of this plan design.  The debtor has been

16   continuing to operate by holding the property.

17   Its filed its plan timely.  And we are optimistic

18   that within the next few months we'll be able to

19   complete the second necessary factor of getting

20   the development funding commitment in place so the

21   proposal can go forward.

22       Also while the debtor's been in Chapter 11,

23   we have the debtor has been working with two other

24   groups with regard to a sewer easement.  These

25   other groups which are identified in this motion

1    to include the execution or authorization to

2    execute a sewer easement on adjoining parcels of

3    land.  Under their proposal, a couple years ago in

4    2008 the debtor entered an agreement with them

5    that related to the placement of a sewer line

6    easement, which in fact crossed this particular

7    property.  We are asking the court today to

8    consider an amendment to that easement that was

9    granted in 2008 which would basically change the

10   location, to some extent, as to where this sewer

11   line easement would be going.  It certainly is a

12   benefit to the debtor's estate for this easement,

13   and certainly the site plan and the county

14   requirements are going to require public sewer

15   service on this particular property.  That is

16   something that would be necessary.  So the debtor

17   has been working with other third parties to

18   improve the property and to put easements in place

19   that would help the property be developed and

20   become more valuable and be available for proper

21   development.

22        While the debtor has been in Chapter 11 it

23   obtained an appraisal of the property from an

24   independent appraiser that shows value of $8.8

25   million.  There was clearly a substantial amount



1   of equity in the property, which we believe to be

2   there to protect the bank, as well as bring

3   through this development plan.  In many instances,

4   as the Court's heard several time this morning, we

5   just need a little bit of time to be able to get

6   those factors in place.

7       As far as the debtor's compliance with the

8   requirement of the United States Trustee's office,

9   its been filing its reports timely, and not seeing

10  any deficiency note by the office of the U. S.

11  Trustee.  That's pretty much what the status of

12  the Chapter 11 case is.

13      I should say that one other matter that has

14  come up within the last week is Wachovia/Wells

15  Fargo has also filed a motion for relief from

16  automatic stay.  And that is set to be heard I

17  believe on May 23.  Discovery has been sent out by

18  both sides relating to that motion, and so we'll

19  see where we are with regard to that motion in

20  May.  That's pretty much the status.

21          THE COURT:  All right.  Thank you.

22          MR. SCOTT:  I guess the next point, unless

23  there are any other questions or questions about

24  that, would be looking at the plan and the

25  disclosure statement.  Wachovia/Wells Fargo has



1    objected to it.  No other creditor or party in

2    interest as filed an objection.  I received an

3    e-mail from Ms. Garber of the office of the United

4    States Trustee on April 8 which indicates that

5    she's reviewed the disclosure statement filed in

6    this case and she believes the information

7    contained therein is accurate "and you may

8    represent this to the court."  So I would ask that

9    this be presented to the court for its

10   consideration.  That is Ms. Margaret Garber of the

11   office of U. S.  Trustee.

12        THE COURT:  All right.

13        MR. SCOTT:  I'm happy to respond to the

14   point that was raised in the objection of Wells

15   Fargo/Wachovia, unless they would like to go ahead

16   and present their objection to the statement as

17   filed.

18        MR. MADDOCK:  Your Honor, I'm happy to voice

19   our objection at this time.

20        THE COURT:  Go ahead.  Let's hear what you

21   have to say.

22        MR. MADDOCK:  Your Honor, John Maddock with

23   McGuire Wood on behalf of Wells Fargo.  Wells

24   Fargo is successor to Wachovia Bank for purposes

25   of question.  With me today at counsel table is

1    Brian Stark, also of McQuire Wood.  Also in the

2    courtroom with me is Rebecca Fisher, vice

3    president of Wells Fargo.

4         THE COURT:  All right.

5         MR. MADDOCK:  Your Honor, as you've heard,

6    Wells Fargo is the secured lender in this case.

7    The fully secured creditor.  Its collateral is the

8    property that Mr. Scott described in Albemarle

9    County.  The objections to the disclosure

10   statement are in two categories.  One, Your Honor,

11   is the lack of adequate disclosure and that the

12   standards in 1125 haven't been met.  The second,

13   Your Honor, is the well settled doctrine that if

14   the underlying plan is not confirmable on its

15   face, there is no point in approving the

16   disclosure statement.  That is the second category

17   of our objection.

18        Before that, before addressing those two

19   categories in objection, I would like to give you

20   a minute or two of background.  As Mr. Scott

21   described, this is a single asset real estate

22   case.  And as Your Honor knows and has heard

23   earlier today, under section 362(d)(3) a secure

24   creditor is entitled to relief from the automatic

25   stay unless within 90 days of petition the debtor

1    has filed a plan that has a reasonable possibility

2    of being confirmed, or the debtor has commenced

3    making monthly interest payments.  I can represent

4    to the court, I think Mr. Scott said this as well,

5    there have been no payments to Wachovia.  So the

6    only thing preventing the actual stay from lifting

7    on the 90th day was if the debtor filed a plan.

8    They did so on the 89th day.

9         As you consider the adequacy of the

10   disclosure statement, Your Honor, I think it's

11   important to keep two things in context.  One, as

12   Mr. Scott stated, this case was filed the day

13   before the scheduled foreclosure sale.  Second,

14   the disclosure plan was filed the day before the

15   90th day and the stay would have terminated.  I

16   think you should keep those two in mind as you

17   consider our objection.  And lastly, we have filed

18   a motion for relief from automatic stay primarily

19   based on 362(d)(3) that the plan, we don't believe

20   it's confirmable.

21        Your Honor, with that, as I mentioned the

22   first category on our objections are that the

23   standards of 1125 have not been met.  Not been

24   adequately disclosed.  The standard or perspective

25   for determining adequate disclosure is from the

1    perspective of a hypothetical investor of the type

2    resembling the holders of claims in the debtor's

3    bankruptcy case.   And then through the eyes of the

4    hypothetical investor is the information provided

5    sufficient to allow that investor to make an

6    informed judgment about the plan.

7         The first specific objection, Your Honor, is

8    treatment of Wells' claim.   And I mentioned

9    earlier that we, Wells, is filing a proof of claim

10   today.   But looking at the disclosure statement,

11   Your Honor, it's impossible to determine what

12   amount Wells will be paid under the plan.   On

13   page 3 of the disclosure statement it states that

14   Wells Fargo's claim is $3.8 million.   There's no

15   information about how that was calculated, doesn't

16   include interest, fees, anything else.   Not

17   stated.   If it does, what amount are those fees or

18   interest.   Also, Your Honor, the plan does provide

19   for post effective date interest.   I believe at

20   4.5 percent.   But there's no mention at all in the

21   plan about post petition interest.   I believe

22   Mr. Scott represented Wachovia's over secured.

23   Wachovia's entitled to post petition interest, but

24   there's no mention at all whether it will be paid.

25   If it is going to be paid, at what rate.   Simply

1   not stated.  No information.  No disclosure

2   whatsoever.

3         Your Honor, completely inconsistent with the

4   $3.8 million figure on page 3 is the Exhibit C to

5   the disclosure statement, which is cash flow

6   analysis.  In that cash flow analysis, the debtor

7   states that Wachovia debt is three million five

8   hundred thousand.  So $300,000 less than what the

9   text of the disclosure statement says.  There's no

10  indication why two different figures are used.

11  Certainly if the $3.8 million number is correct, a

12  red flag should go up regarding the cash flow

13  analysis, since that is based on the $3.5 million

14  figure.

15        Lastly, Your Honor, the debtor did schedule

16  Wells Fargo's claim as a secured claim.  That

17  figure is $3,886,274.34.  So that's the third

18  figure that we've seen in this case.  The

19  scheduled amount is closer, obviously, relatively

20  consistent with the $3.8 million figure in the

21  text of the disclosure statement, but again, it's

22  over $300,000 off from what's used in the cash

23  flow analysis.

24        Bottom line, Your Honor, is, a hypothetical

25  investor should not have to guess as to what, in

1     our case Wells Fargo, will be paid under the plan.

2     It should be clear.  There should be supporting

3     information as to the amount.

4          Your Honor, the last point with regard to

5     the Wells Fargo claim and its payment, is under

6     the terms of the plan Wells Fargo will not start

7     to receive payments until the development loan

8     Mr. Scott referred to is paid off in full.  And I

9     believe that's estimated to be in late 2012 or

10    early 2013.  Despite the fact that payment of

11    Wells' claim and when the payments will start is

12    completely dependent on the debtor's ability to

13    sell those lots and develop those lots.  The

14    disclosure statement provides absolutely no

15    information in that regard.  No information at all

16    about the debtor's ability to develop the lots, at

17    what rate it could develop the lots.  There's no

18    information on the residential real estate market

19    which would determine the price that lots can be

20    sold for.  Ultimately through Ryan Homes.  And

21    then the absorption rate of lots.  So again, the

22    timing of when those payments start is entirely

23    dependent on that type of information.  None of

24    which appears in the disclosure statement.

25         Your Honor, Mr. Scott referred to a

1    development loan.  In the disclosure statement it

2    states that that loan would be from Union First

3    Market Bank.  I don't know if that's still true

4    today.  But this is obviously a critical component

5    of the plan.  Page 4 of the disclosure statement

6    states that the debtor will obtain a loan from

7    Union Bank in the amount of $4 million at six

8    percent interest which will be secured by a first

9    priority lien.  The disclosure statement then goes

10   on to say that the debtor expects to repay the

11   loan by late 2012 or early 2013.  Your Honor, for

12   a $4 million loan that is to prime Wells Fargo's

13   lien, what I just said to you, those two

14   sentences, is all of the information that is

15   provided in this disclosure statement about that

16   loan.  If this was a separate motion to incur debt

17   the motion would be two sentences long.

18       Your Honor, there are no loan documents.  We

19   heard from Mr. Scott earlier that if Ryan Homes

20   contract is fully executed -- which it's not

21   today -- then they'll go out shopping for the

22   loan.  There's just no loan.  There's no

23   information, whatsoever, about this loan.  And

24   again, this is a priming lien, Your Honor.  Four

25   million dollars.  There's no information regarding




1   any fees that might be associated with the loan.

2   Even if a loan was real, Your Honor, there's no

3   information under 364(d) for a priming lien.  That

4   has to be provided to the court.  There's no

5   disclosures regarding adequate protection be

6   provided to Wells Fargo or other secured

7   creditors.  There's no information regarding the

8   debtor's attempts to find other less onerous

9   financing.  None of that information is included,

10   Your Honor.  It's well short of what the

11   hypothetical investor would need to make a

12   judgment on the plan.

13        Your Honor, the next point we made with the

14   disclosure statement does not include liquidation

15   analysis.  I think it's universally accepted that

16   at this point in time disclosure statements do

17   include liquidation analysis.  They allow

18   creditors to view their treatment under the plan,

19   the risks associated with the plan, and to

20   determine if they would be better off under the

21   plan or better off simply if the debtor's assets

22   were liquidated.  In this regard, page 3 of the

23   disclosure statement simply states sale of the

24   debtor's real property other than under distressed

25   conditions will pay creditors' claims in full but

1    may not produce a return to investors.  That's the

2    liquidation analysis in the disclosure statement.

3    There's no information as to what creditors would

4    receive under distress conditions.  There's no

5    description of definition or anything as to what

6    distressed conditions even mean.  It's simply

7    inadequate, Your Honor.

8         With regard to the development and sale of

9    debtor's property.  The disclosure statement

10   that's before you, Your Honor, has a letter of

11   intend executed by NVR, which contemplates the

12   execution of a lot purchase agreement.  And

13   Mr. Scott stated that the lot purchase agreement

14   attached to the disclosure statement which is

15   what's before you today, is not executed.  The

16   unexecuted lot purchase agreement that is attached

17   contemplates the sale or purchase by NVR of

18   developed lots.  The property right now is

19   currently not developed.  There's no information

20   as to how the debtor would develop the lots.  Will

21   the debtor develop the lots itself; will it

22   contract with third parties; with whom; at what

23   price; with a bid that would work out?  None of

24   that information is included.

25        Your Honor, assuming, and again it's an

1    assumption because the disclosure statement

2    doesn't say so, but assuming the development loan

3    or Union Bank loan proceeds would be used to

4    develop the lots, what if that loan doesn't

5    materialize?  What if there's nobody out there to

6    make the loan?  How are the costs and development

7    to be paid in that case, or would the debtor

8    simply default under the lot purchase agreement.

9    Not addressed.  No information whatsoever.

10        Your Honor, there's also an issue with what

11   I would call the description of the property.  The

12   unexecuted lot purchase agreement contemplates the

13   sale of 113 lots.  But there's no information

14   provided that would provide the reader with an

15   acreage or total acreage of what size or total

16   size of those lots would be.  So if one is not

17   able to determine how much or what percentage of

18   the property is subject to the NVR sale and then

19   what is left over.  The importance is on page 3 of

20   the disclosure statement.  It simply states that

21   remaining lots would be developed or sold upon

22   terms and with parties not yet determined.  Your

23   Honor, how could a hypothetical investor make an

24   informed decision as to possible realization of

25   value on the remaining lots if that's all they're

1    given; that remaining lots would be developed or

2    sold upon terms with parties to be determined.

3         There is simply no information, as well,

4    Your Honor, for a hypothetical investor to

5    determine the bona fides of the sale under the

6    proposed lot purchase agreement.  Were other

7    possible buyers contacted; what was the extent of

8    marketing efforts; is there any relationship

9    between NVR or Ryan Homes and the debtors, or

10   among their affiliates?  How can a hypothetical

11   investor or this court, for instance, determine

12   the bona fides of the sale.

13        Your Honor, it's somewhat ironic that this

14   information is not included, because despite

15   failing to provide this information the section 1a

16   of the lot purchase agreement, NVR is requiring

17   those findings in any order that you enter

18   approving the plan.  So, despite NVR asking for

19   this information, it wants to see it in an order.

20   Yet none of it is provided to creditors in the

21   disclosure statement.  And Your Honor, for these

22   reasons we don't believe the disclosure statement

23   contains adequate information.  Doesn't meet the

24   requirements of 1125.

25        Your Honor, I also mentioned the plan, our

1    second category, that the plan is not confirmable

2    on its face.  As we stand today, Your Honor, we

3    have a lot purchase agreement that we concur is

4    executed by one of a total of four parties.  I

5    think that's completely irrelevant.  The

6    disclosure statement, the only item before you is

7    the unexecuted lot purchase agreement attached to

8    the disclosure statement.  Your Honor, there's no

9    agreement to approve, there's no agreement to be

10   evaluated at this time based on the disclosure

11   statement.  With the Union loans, or with the

12   development loan, that situation I think is even

13   worse.  We don't have, unlike the lot purchase

14   agreement where we at least have an unexecuted

15   copy that has brackets and other blanks in it, we

16   don't even have that for the Union loan.  There's

17   no documents whatsoever.  I'm not sure that it's

18   even going to be Union after what I've heard from

19   Mr. Scott, that it will even be Union Bank out

20   there making the loan.  This plan is just not

21   confirmable if it depends on a $4 million

22   development loan and there's no loan.

23       Your Honor, we also believe there's a

24   significant feasibility issue.  The unexecuted lot

25   purchase agreement we cited in our objection.

1   There are a number of provisions which allow the

2   purchaser to simply walk away.  I won't go through

3   all of them, but the primary section that we're so

4   hesitant about is section 12, which limits the

5   debtor's remedy in the event that NVR breaches to

6   return of its deposit.  There is a deposit which

7   is provided on a sliding scale over time.  And

8   then that deposit is credited against sales as

9   sales of lots are made.  So it's a $500,000 total

10  deposit, but at any given time there's not

11  $500,000 on deposit.  All of it may have not been

12  deposited, and then some of it may have been

13  credited.  So the situation we've got is a plan

14  that's going to rely entirely on agreement which

15  allows purchaser to walk away perhaps with little

16  or no consequence.  Your Honor, when and if that

17  happens it will be Wells Fargo that's left holding

18  the bag and stuck with the pieces, Your Honor.

19  It's not feasible to rely on such a one-sided

20  agreement.

21      And lastly, Your Honor, and this is

22  certainly a point that is made in our motion for

23  relief that will be before you next month.  You

24  heard earlier in a case that the secured creditor

25  is not going to vote for a plan.  I think you can

1    probably guess based on what I said so far, that

2    Wachovia is not going to vote in favor of this

3    plan.  So it will be a cramdown situation.  The

4    plan proposes that Wachovia retain its lien.  And

5    then receive payments not for a few years or

6    commencing in a couple years, and then be paid

7    over time.  As Your Honor knows, when a plan is

8    crammed down over a secured creditor, the

9    treatment of that secured creditor's claim has to

10   be fair and equitable.  And one of the

11   possibilities of cramming down is 1129(b)(2)A-I,

12   which provides for a secured creditor retaining

13   its lien then receiving deferred cash payments in

14   the amount of its claim.  But what does it mean to

15   retain its lien in this situation.  Keep in mind,

16   Your Honor, if the plan were confirmed Wachovia's

17   roughly $4 million debt, or claim, gets moved to

18   the back.  Because there's going to be a

19   $4 million development loan in front of it.

20       Debtor says that Wachovia is retaining its

21   lien under those circumstances.  We don't think

22   that's the case, we don't think case law bears

23   that out.  When there was a priming situation in

24   order for a creditor to retain its lien, case law

25   states that the priming lien has to be limited to



1     any improvement of the property.  So only that

2     part of the property, or value of the property

3     that's actually improved.  We cited the Sherwood

4     Square Associates case from Maryland for that

5     proposition.  Your Honor, there's also case law

6     that a systematic completion of a creditor's lien

7     is not fair and equitable.  For that we cited the

8     In Re: Sparks case from Illinois.  If in this case

9     as the lots were sold Wells Fargo would be

10    required to release its lien give a partial

11    release each time a lot is sold, that partial

12    release flies in the face, it does not comport

13    with 1129(b)(2)A-I.  We're not retaining a lien if

14    we have to release it periodically over time.

15    Even on a partial basis.

16          Your Honor, and again those points are made

17    in our motion for relief, as well as the objection

18    to the disclosure statement.  Your Honor, really

19    what's happening under the plan is that the risk

20    of repayment is being shifted from the debtor's

21    equity owners to Wachovia.  Wachovia is fully

22    secured as we stand here today.  If we were

23    allowed to proceed with the foreclosure sale

24    Wachovia would have been paid off in full.

25    Instead, what the debtor proposes is to move

1    Wachovia to the back of the line and bear all the

2    risk that something goes wrong.  It is simply not

3    fair and equitable for an oversecured creditor to

4    be placed in that position, Your Honor.  And we

5    cited the EFH World Tower Associates case, which I

6    believe is a Judge Small's decision from the

7    Eastern District of North Carolina, that makes

8    that point very clear under these facts.

9        Your Honor, again, for these reasons we

10   don't believe the plan is confirmable on its face.

11   And Your Honor, with the lack of disclosure, the

12   Wells Fargo claim, the development loan, the

13   development sale of the property, the insufficient

14   liquidation analysis, the lack of adequate

15   disclosure, the standards of 1125 have not been

16   met and we would ask that disclosure statement not

17   be approved.

18       MR. SCOTT:  Your Honor, as Mr. Maddock

19   indicated, Wells Fargo doesn't intend to vote in

20   favor of the plan.  So they haven't indicated that

21   if any of the information in the disclosure

22   statement were different or would have been

23   provided that they would vote in favor of the

24   plan.  So it seems to me the situation, if you

25   listen to their argument, regardless of what we

1     put in the disclosure statement, Wells Fargo is

2     not going to vote in favor of the plan.  They must

3     know what it is we're saying because they're

4     saying they're not going to vote for it.  If there

5     was some confusion as to what we were saying in

6     the disclosure statement they would be saying well

7     we don't know whether we'll vote for it or not

8     because we don't have enough information.  So they

9     seem to know enough information to know they're

10    not going to vote for it.  The U. S. Trustee's

11    office apparently is satisfied with it.  And if

12    you can please the United States Trustee's office

13    you ought to be able to please just about anybody.

14    I've not received any objection from any other

15    creditor.  Any other party in interest.  So I

16    think if you look at their argument, it's really

17    just focused on one.  They don't intend to vote

18    for it regardless of what it says.

19         With regard to how we get ultimately to a

20    confirmed plan, and most of the issues that

21    Mr. Maddock is talking about today relate to

22    issues of confirmation which are to be heard at

23    the hearing on confirmation.  They relate to

24    feasibility.  That's not what the hearing on

25    disclosure statement is meant to cover.  We're not




1    dealing with feasibility at a hearing on approval

2    of a disclosure statement.  Wells Fargo objects

3    saying that well the debtor doesn't seem to

4    identify how much they're owed.  Well it would be

5    nice if they'd file proof of claim.  Then we would

6    know what the principal, what the base rate

7    interest is, what they say is their cost, their

8    attorney fees and all that might add up to.  Then

9    we could be much more precise.  We're dealing with

10   a figure that is seven months old.  Clearly, if

11   they are a fully secured creditor they are

12   entitled to be paid in full.  Plus, not just the

13   principal plus the interest, reasonable cost and

14   reasonable attorney fees, but they have to be paid

15   in full in order to have the plan confirmed.  So

16   at the end of the day when they say they don't

17   know what they're going to get or how much they're

18   going to get paid, they're going to get paid a

19   hundred percent on the dollar.  We believe that

20   there's value in the property to be able to do

21   that.

22        On page 9 of the objection they indicate

23   Wells Fargo indicates that plan fails to provide

24   adequate information relating to the loan.  Well,

25   we acknowledge that at this point there has been

1    no loan commitment.  And it's, in fact, due to the

2    fact that the debtor needed to obtain this

3    contract first.  Now we've got that.  It's always

4    been my plan to file separate motions as we got

5    the contracts, or when we got them all together.

6    One motion to approve the contract with Ryan or

7    whoever the ultimate purchaser of the lots was

8    going to be.  NVR is the same as Ryan Homes.  I

9    also had contemplated that we would be filing a

10   separate motion to incur indebtedness at the time

11   that we got the loan terms, or loan commitment, or

12   investor plan worked out.  And that would be

13   noticed and set for hearing.  Likewise, when it

14   came to the issue of the priming aspect.  Priming

15   Wells Fargo's loan with a super priority

16   development loan.  That would also be filed in a

17   separate motion.  I didn't contemplate or feel

18   that just putting that in the plan or disclosure

19   statement would really be the appropriate

20   procedural way to get those matters before the

21   court and the creditors.  And we knew generally

22   what the plan was going to be.  The cash flow

23   analysis was provided based upon certain

24   assumptions that the debtor had, but when it gets

25   down to it we were going to be filing separate

1    motions so the court and creditors could review

2    the specific contracts and as to what those

3    specific terms are.

4         Wells Fargo complains on page 11 of its

5    objection that this plan failed to provide a

6    liquidation analysis.  Well, we've indicated in

7    the plan that we have an appraisal which has been

8    shared with county, for Wells Fargo.  That the

9    property is worth $8.8 million.  I mean

10   liquidation analysis is fairly simple.  If they're

11   owed about 3.8 and there's another 150, or

12   200,000, or maybe $300,000 above the claim,

13   primarily all of which are secured either real

14   estate taxes or mechanic's lien claims, it's

15   fairly easy to say well there's plenty of equity

16   there and if the property is sold and somebody

17   pays a reasonable price for it, even if it's not

18   sold for $8.8 million everybody should get paid in

19   full.  That is what this plan contemplates.  It is

20   a plan that doesn't contemplate that everybody

21   will get paid on confirmation, but it will take

22   over a period of time for it to be done.

23        The court should also recognize that there's

24   only one general unsecured creditor in this case

25   that is not an insider.  Client Designs.  That

creditor is owed $700.  Everybody else is secured

in some form or another, or is an insider that has

insider unsecured claims which are being treated

as being receiving payment after the general

unsecured creditor, Client Designs, get paid.  So

when the court is looking at adequate information,

Colliers states in its analysis under paragraph

1125.02(1), that adequate information has to be

considered given the circumstances of the case.

And what the court might consider to be adequate

information in a small case might not been

considered to be adequate information in a very

large case.  The court also would look at the

sophistication of the parties involved.  And, you

know, someone like Mr. Maddock and his firm, and

Wells Fargo with all the analysts that they must

have as we work our way out of this financial bind

everybody is in, they ought to be pretty

sophisticated and they ought to be able to

determine what the details of the plan and

disclosure statement should be.  I guess they have

been able to make the analysis because they

concluded they're not going to vote in favor.  So

they must have adequate information.

They complain on page 12 of the objection



1    that the plan fails to show how the property would

2    be developed and sold.  The cost of the

3    development which they refer to in the objection

4    are contemplated by the debtor to be paid with the

5    development loan.  That's what the whole purpose

6    of the development loan is for is to be able to go

7    out to get the funding that's necessary to do the

8    infrastructure so Ryan can perform its contract.

9    But having said that, until that loan commitment

10    is obtained we can't be more specific.  Having

11    said that, ultimately though, that is a question

12    of feasibility and not adequacy of disclosure.

13        Wells Fargo, on page 15 of the objection,

14    says that the debtor fails to provide classes

15    four, five, six, eight, and nine will be paid.

16    Well, you know, if you look at the disclosure

17    statement the disclosure statement says we also

18    need to read the plan.  And I think between those

19    two documents it's clear as to when those classes

20    are going to be paid.  Class four is right now

21    it's presumed to be me.  Debtor's counsel.  And

22    it's an administrative claim.  We don't know of

23    any other administrative claims.  I have a

24    retainer, which the court is aware of, or the

25    U. S. Trustee is aware of.  Hopefully that will be



1   enough to pay those claims as allowed by the
2   court.   So there should be sufficient funding to
3   pay the class four claims.   Class five relates to
4   real estate taxes.   And they're going to be paid
5   as the lots are sold down.   Six.   Class six, that
6   should be just the claim of the U. S. Trustee for
7   their quarterly fees payable in the case.   This is
8   a situation where we're not running up large U. S.
9   Trustee fees because of the fact that there is no
10  income at this stage.   And the income will only be
11  generated once the plan is confirmed.   Once the
12  plan is confirmed then those fees would be payable
13  to the U. S. Trustee system.   So it seems to me
14  that the answer to that question is also set forth
15  in the plan and disclosure statement when you read
16  them together.   Class eight, the question of when
17  is class eight unsecured creditors going to get
18  paid.   Well, that's this one creditor.   $700.
19  Client Designs.   That could very well be paid out
20  of the development loan, or a loan, or
21  contribution to equity from the equity holders.
22  But at the end of the day, a $700 claim compared
23  to about $3.8 million of Wells Fargo debt is a
24  fairly nominal issue to deal with.   If we can
25  develop a plan that will show feasibility as to

1    how Wells Fargo's bill get paid, paying $700

2    shouldn't be a very big issue at the end of the

3    day.

4         Wells Fargo's objection on page 17 by saying

5    that the plan is not confirmable on its face

6    because it fails to seek approval of the lot

7    purchase agreement and the loan.  As I indicated a

8    moment ago, that's what we have contemplated to be

9    done by separate motion or by amendment to the

10   plan once we get these agreements executed.  As I

11   said, we've pretty much gotten the agreement with

12   Ryan Homes taken care of.  And the next thing is

13   the loan.  Whether or not we filed an amended plan

14   to ultimately include those final documents as

15   exhibits to the plan and disclosure statement, or

16   if filing a separate motion for approval is

17   sufficient that's the way that I would prefer to

18   go.  It seems to me that addresses that issue.

19        Finally, Wells Fargo argues on page 19 and

20   21 of their objection that the plan is neither

21   feasible or fair and equitable.  Both of those

22   factors are factors that are to be determined by

23   the court on the hearing on confirmation, not a

24   hearing that we have before the court today.  The

25   terms of the final contract and the loan, the




development loan, as I've indicated, will be set

forth in the separate motions seeking the court's

approval.

I referred to Collier a moment ago, in its

discussion on section 1125. And it analyses the

question of adequate information and how that term

is to be defined. Collier indicates that adequate

information, as set forth in section 1125 A-1,

requires that a disclosure statement include

information which is reasonably sufficient in

detail. And as far as practical. Collier's

indicated that the disclosure statement must

clearly and succinctly inform the average, average

unsecured creditor what it is going to get, when

it is going to get it, and what contingencies

there are to getting its distribution. Well, if

you look at this case, I think that the average

creditor whose got this plan and is reading it can

find the answers to those questions fairly easily.

They're going to get paid in full with interest at

four and-a-half percent. That's what they're

going to get. When are they going to get it?

They're going to get it when the lots are sold

under the contract. What are the contingencies?

Signed contract with Ryan and a signed development

1   loan.  You know, that's pretty clear, I believe,

2   from the documents.  Courts have indicate that

3   precisely what constitutes adequate information in

4   any particular instance will develop on a case by

5   case basis.  But the courts have to take a

6   practical approach to decide what is adequate

7   information in a particular case in looking at the

8   disclosure statement.  In reorganization cases,

9   Collier indicates there's frequently great

10   uncertainty.  I'm sure that's something that the

11   court is very familiar with.  And therefore, the

12   courts have to be flexible in working with these

13   particular issues.  The courts have to consider

14   what is practical and necessary under the

15   circumstances of a particular case.

16       I think that if the court will look at this

17   information and consider these arguments that it

18   should conclude that the disclosure statement that

19   we provided is adequate under the circumstances of

20   this case, and we'd ask the court to approve it.

21   If the court feels that it is not adequate and

22   that additional details are needed, we would be

23   happy to respond to those and we can file an

24   amended disclosure statement if that's what the

25   court thinks is appropriate for the creditor.

1      MR. MADDOCK:  Your Honor, I think it's

2   accepted Wachovia is not going to vote for the

3   plan.  But I think that's completely irrelevant

4   with regard to 1125.  I'm not aware of anything in

5   1125 that says disclosures can be different for

6   creditors who intend to vote for or against the

7   plan.  So whether or not Wachovia is going to vote

8   for or against the plan I think is completely

9   irrelevant.  And certainly, with all due respect

10  to the U. S. Trustee, they obviously reviewed the

11  disclosure statement, made their own

12  determination.  But Wachovia, as Mr. Scott said,

13  is by far the largest creditor in this case.  He

14  mentioned that the noninsider unsecured claim is

15  $700 in this case.  I think his point really

16  should be taken in inverse, and that is who really

17  has something at stake in this case.  It's not

18  that $700 creditor, it's Wells Fargo.

19      So with that, Your Honor, the fact that

20  Wells Fargo has decided, reviewed the disclosure

21  statement, found it inadequate and objected, I

22  think that should be taken in context with the

23  importance that Wells Fargo plays in this case.

24  Your Honor, certainly I agree with Mr. Scott that

25  certain of the points are confirmation issues.

1    But I made that clear.  But the overarching point,

2    Your Honor, is why confirm.  Why approve a

3    disclosure statement for an underlying plan that

4    has no chance of confirmation.  Why put the

5    parties through the paces, the cost and expense of

6    doing so.  Your Honor, Mr. Scott made a point of

7    stating that Wells Fargo will be paid in full

8    under the plan.  That's not the issue in this

9    case.  They're an oversecured creditor, they have

10   to be paid in full.  I think we all agree do that.

11       The issue in this case is risk, Your Honor.

12   Right now Wells Fargo has no risk.  It's over

13   secured.  Under this plan, if it's ever confirmed,

14   when Wachovia is moved to the back of the line

15   Wachovia will bear all the risk in this case.

16   That's what the issue is.  The issue is not

17   whether or not we can determine that the plan

18   proposes that we'll be paid in full.  The code

19   requires that.  We know that.  Your Honor, I've

20   heard for the first time today -- and I've read

21   the disclosure statement numerous times, as you

22   can imagine -- that separate motions are going to

23   be filed.  One to approve the lot purchase

24   agreement if it's fully executed, second to

25   approve a development loan that may or may not

1    happen.  Your Honor, I'm hearing that for the

2    first time from the podium, Your Honor.  That fact

3    should have been disclosed.  I mean disclosure

4    statement is four corners the paper.  It's not

5    the four corners plus whatever information may be

6    given at a hearing on anything else.  The

7    disclosure statement itself made no mention.  It

8    clearly should have.  It's clearly deficient.

9    Your Honor, the point with when classes

10    four, five, six, and eight will be paid, the point

11    that we made in the objection we can certainly

12    read and see what it says.  What it says is that

13    they'll be paid upon court approval.  What's not

14    said and what is not disclosed is when will court

15    approval be sought.  That's not disclosed.  We

16    can't tell what creditors may be paid before

17    Wachovia.  We know Wachovia's not getting paid

18    until 2013.  It's important to know who's getting

19    paid in front of us.  Out of our collateral, by

20    the way.

21    Your Honor, the point about the average

22    creditor having reasonable information.  The point

23    there is how would that average creditor evaluate

24    the risk.  This disclosure statement, this plan

25    provides for an unknown development loan which

1    will prime to the amount of $4 million.  There's

2    no information whatsoever.  There's a partially

3    signed lot purchase agreement.  How would the

4    average creditor make a determination on this

5    plan, Your Honor?

6        And lastly, my last point I'd like to make,

7    Your Honor, goes back to 365(d)(3).  We've heard

8    today there may be amendments to the plan.  We've

9    heard today there may be motions that affect the

10   plan.  365(d)(3) sets a 90-day period of time to

11   file a plan with a reasonable chance of

12   confirmation.  Your Honor, they filed a plan on

13   the 89th day.  It's that plan that has to meet the

14   test.  It's not a plan that may be filed a month

15   from now, two months from now, a year.  Time was

16   frozen on day 90.  Either the plan they filed had

17   a reasonable chance to confirm or it didn't, Your

18   Honor.  Amending it to provide for a loan that

19   might materialize six months later is simply...

20   You heard earlier in another case that's not what

21   365(d)(3) is meant to do.  It's meant to put a

22   time limit on single asset real estate cases, not

23   let these cases drag out forever.  That's exactly

24   the game plan of this debtor.

25       Thank you, Your Honor.

1    MR. SCOTT:  Your Honor, just briefly.  With

2    regard to these motions that I've discussed in

3    which I believe need to be filed at the

4    appropriate time.  The court can still, if the

5    court finds that the information is adequate, can

6    still approve the disclosure statement.  But it

7    doesn't have to direct that the plan and the

8    disclosure statement be sent out immediately for a

9    vote.  And the court could decide to hold off on

10   disseminating the disclosure statement with the

11   plan for voting purposes until the other motions

12   are filed and considered by the court, or such

13   times as the court would otherwise deem

14   appropriate.

15       I believe that counsel is present for W.W.

16   Associates, which is one of the other creditors in

17   the case.  I don't know if they have any comments

18   they wanted to make at this time or not.

19       FEMALE IN GALLERY:  Not at this time, Your

20   Honor.

21       THE COURT:  That completes everything?

22       MR. SCOTT:  With regard to this matter.  We

23   still have this other motion.

24       MR. MADDOCK:  Nothing further for us.

25       THE COURT:  All right.  Let's go to the

1    other motion.

2        MR. SCOTT:   Judge, this is the motion of the

3    debtor for authority to execute deed of easement.

4        I would like to call Robert Hauser to

5    testify.

42

1              ROBERT M. HAUSER,

2         was sworn and testified as follows:

3              E X A M I N A T I O N

4

5    BY MR. SCOTT:

6         Q      Will you state your name and indicate what

7    your relationship with the debtor is.

8         A      Robert M. Hauser, H-A-U-S-E-R.  I am

9    president of Stonehouse, LLC.  We are the managing

10   member of Cascadia, LLC.

11        Q      Okay.  And, are you familiar with the motion

12   for authority to execute this deed of easement that's

13   been filed in this case?

14        A      I am.

15        Q      Could you give the court some background

16   with regard to the easement that is in place and what

17   it relates to vis-a-vis the debtor's property?

18        A      The existing easement?

19        Q      Correct.

20        A      The existing easement is simply there for

21   the sewer that's in place on the property currently.

22        Q      And, when was that agreement established,

23   that easement established?

24        A      I don't remember for sure.  This is the one

25   that exists?

1     **Q**    Correct.  That's right.  Could you describe,

2  just briefly, how this easement connects and how it's

3  integral, if at all, to the development of this

4  property?

5     **A**    The proposed easement?

6     **Q**    Yes.

7     **A**    Okay.  Yeah.  The proposed easement would

8  allow for the sewer line to be put in along the lines

9  of the approved plan that would serve a good portion of

10  the Cascadia development.

11     **Q**    And the document that's before the court for

12  its consideration is an amendment relating to the

13  actual physical location of where that easement is to

14  be placed, correct?

15     **A**    Yes.  It allows for the extension of

16  easement through the property.

17     **Q**    All right.  And has this amendment, does it

18  involve other parties?

19     **A**    It involves the adjoining property owners.

20     **Q**    Who are those?

21     **A**    The two gentlemen I've dealt with are Frank

22  Ballif and Dr. Charles Hurt.

23     **Q**    Do they have a role with regard to the

24  installation of this sewer line, ultimately?

25     **A**    They could if they would like to.  The

44

1  agreement was put in place, the business agreement was

2  put in place because they -- we have sewer on our

3  property.  They own the property uphill from us.  They

4  wanted to get an agreement that we would allow sewer to

5  be run through Cascadia, which we were in support of,

6  if a couple conditions were met.  One would be the

7  sewer would be installed based on the need of Cascadia,

8  the geometry, the depth of the sewer.  And two, they

9  would pay what we deemed to be a fair share.  And so we

10  reached a business agreement.  This deed of easement

11  supports that.  They're not desiring to put the line

12  in.

13     Q     And do they need to run that so that they

14  can develop the property and the projects that they

15  have --

16     A     Exactly.

17     Q     -- that would use this line?

18     A     Yes, sir.

19     Q     Okay.  Now is there a sewer authority

20  involved in this particular county?

21     A     It's Albemarle County Service Authority.

22     Q     And do they have any authority over

23  condemnation or matters of that with regard --

24     A     They do.

25     Q     -- sewer easements?

1        **A**      They do.

2        **Q**      Would they be able to condemn Cascadia or

3    any other real estate for placement of a sewer line, if

4    necessary?

5        **A**      My experience is they're one of the few

6    governing bodies in Albemarle that will condemn for

7    public good.  So if they deem the extension of the

8    sewer within their jurisdictional territory to be in

9    the public good.

10        **Q**      If the amendment to this easement is

11    approved by the court and it proceeds forward in being

12    developed, does that, in your opinion, does that affect

13    the value of Cascadia property?

14        **A**      Yes, I would think it would significantly

15    enhance the value.

16        **Q**      Does the debtor incur any upfront or

17    immediate cost or expenditures with regard to this

18    easement if it is approved?

19        **A**      No.  The business terms allow for whichever

20    party went first to pay for it.  So there was adjoining

21    property owner and Cascadia.  Whoever had the need to

22    put it in would put it in at their cost.  And then

23    there was a reimbursement formula.

24        **Q**      And as the business plan exists now, when

25    would Cascadia conceivably have to spend any money for

1    its share of the costs?

2        **A**      The agreement allows for us to pay, I

3    believe it's sixty percent of the cost when we hook up.

4    Now, when you hook up is a little bit judgmental in

5    terms of as a developer, but it would be when you're

6    ready to convey lots.  So it would be well along the

7    development process.

8        **Q**      Do you have any, does Cascadia have any

9    other alternatives to, you know, to achieving this same

10   goal with regard to the installation of the sewer?

11       **A**      Sure.  We would put it in ourselves and pay

12   for it 100 percent.

13       **Q**      Or I guess it could be condemned.

14       **A**      Well, the adjoining property owner could

15   condemn it and then it would be run through the

16   property based on their judgment and the judgment of

17   the Authority.

18       **Q**      Would you have any control over where the

19   line ran, at that point?

20       **A**      Well, we'd make an argument.  It would be

21   their decision.  It would be, I'm guessing, the judge's

22   decision as to where the line got run.

23       **Q**      You are aware that Wachovia/Wells Fargo

24   would have a deed of trust on this property?

25       **A**      I am.

1          **Q**      And that deed of trust, I believe, was put

2     on in 2007, correct?

3          **A**      That's my recollection, yes.

4          **Q**      And the original easement which was entered

5     into and was recorded was recorded in 2008?

6          **A**      Well, the business agreement was, yeah.

7          **Q**      And, so, there's already an easement in

8     place on the property, correct?

9          **A**      Yes.

10          **Q**      And when that easement was recorded -- and

11     this is just to be an amendment to that easement,

12     correct?

13          **A**      Yes.

14          **Q**      When the original easement was put in place

15     in 2008, it was subordinate to the deed of trust of

16     Wells Fargo, correct?

17          **A**      Yes.

18          **Q**      Did anybody request Wells Fargo to

19     subordinate its deed of trust to that easement?

20          **A**      No.

21          **Q**      Is such a request routinely done?

22          **A**      Not in my experience.

23          **Q**      What is your experience, roughly?

24          **A**      My experience is developers sign and execute

25     easements for utilities, power, telephone, TV routinely

1    without the involvement of the lender.

2         **Q**      Although legally the easement is subordinate

3    to the claim of that lienholder?

4         **A**      Understand.  Yes.

5         **Q**      In this particular case is the debtor

6    seeking to require Wells Fargo or Wachovia to

7    subordinate its deed of trust to this easement, or keep

8    it in the same position as it already is?

9         **A**      We're not asking for subordination.  We did

10   want them to be aware since there were, I thought,

11   material benefits to the site.

12        **Q**      Did you approach representatives of Wells

13   Fargo before we filed this motion in order to get their

14   consent approval, or --

15        **A**      I have, yes.

16        **Q**      Were you able to have any discussions with

17   them with regard to this easement?

18        **A**      Not specifically, no.  There have been a

19   couple changes within their side in terms of personnel,

20   so we just never got that far.  By that point we were

21   in this proceeding and I followed your direction to

22   submit it to the court.

23             MR. SCOTT:  That's all I have.

24             THE COURT:  All right.  Your witness.

25

49

EXAMINATION

BY MR. MADDOCK:

    **Q**    Mr. Hauser, under the Wachovia loan documents is Cascadia allowed to encumber the property without Wachovia's consent?

    **A**    I don't remember specific language.  I would say it's typical language.  There is language that protects the bank.  I don't remember specifics on that deed of trust.

    **Q**    But you believe there is such a provision?

    **A**    I would not be surprised.

    **Q**    And Mr. Hauser, you testified that developers don't typically ask a lender to place a utility --

    **A**    I did.

    **Q**    -- easement?  But could have asked?

    **A**    Certainly.

    **Q**    Wachovia?

    **A**    Sure.

    **Q**    But chose not to?

    **A**    Thirty something years of not doing it.

    **Q**    And just to confirm, I think you testified you're not, the debtor Cascadia, is not asking for the deed of easement or this amendment --

    **A**    Not currently.  Not currently.

1    **Q**    -- deed of trust?  Mr. Hauser, you testified

2    that Cascadia, if the sewer line is constructed

3    Cascadia will have an obligation to reimburse the party

4    constructing the line; is that correct?

5    **A**    Yes.  Sixty percent.

6    **Q**    And you testified, or let me just ask you:

7    When would that payment be due?

8    **A**    When Cascadia hooks up to the sewer line

9    that's been installed.

10    **Q**    Mr. Hauser, how much cash does Cascadia

11    have?

12    **A**    I don't believe we have any cash on hand in

13    the account.  The CFO is here and could testify more

14    particular.

15    **Q**    But you don't believe Cascadia has any cash?

16    **A**    I do not believe so, no.

17    **Q**    Mr. Hauser, do you know if -- you referred

18    to an agreement with Southern Development Pantops?

19    **A**    Yes.

20    **Q**    Was that agreement -- did Cascadia schedule

21    that agreement as an executory contract on its --

22    **A**    I don't understand that question --

23    **Q**    -- schedules?

24    **A**    -- and I'm not sure I know the answer.

25    Could you ask it again?

1      **Q**      There's a set of schedules where the debtor

2   lists executory contracts when it files bankruptcy.

3   Was this agreement disclosed?

4      **A**      I don't know the answer to that.

5      **Q**      You don't know?  When did you anticipate the

6   hookup to the sewer line?

7      **A**      It would be following construction of the

8   roads and recording of the subdivision plat.  So if you

9   were to start construction today, it's a little

10   hypothetical.  If you started construction today it

11   would be at least six months from the time you started.

12      **Q**      Mr. Hauser, you're involved in developments

13   other than Cascadia; is that true?

14      **A**      Yes.

15      **Q**      There have been services provided in your

16   other projects where vendors haven't been paid and they

17   have filed mechanics liens?

18      **A**      There are.

19      **Q**      And, it's not inconceivable that if a vendor

20   who constructed the sewer line was not paid that they

21   would have a mechanics lien?

22      **A**      Well, I think that is the law.  I guess, if

23   that's what you're asking me.  It certainly would be a

24   plan under, in this particular case that a lender would

25   allow for that payment as part of their development

52

1    loan.  And would pay at an appropriate time.  So unless

2    a lender held back, presumably the payment would be

3    paid on schedule.

4         **Q**      But you were in the courtroom for that

5    earlier hearing, correct?

6         **A**      I've been here for a while, yes, sir.

7         **Q**      And what entity is going to make the

8    development loan to Cascadia?

9         **A**      We believe Union is.

10        **Q**      You believe they will?

11        **A**      Yes.

12        **Q**      And when will they agree to that?

13        **A**      Well, we have the contract with Ryan.  We

14   satisfied the appraisal, we satisfied -- we've had two

15   major contractors price the work.  And we satisfied

16   that.  So we're now in a position to proceed with our

17   formal loan request.

18        **Q**      But standing here today, sitting here today

19   there is no development loan?

20        **A**      I do not have it, no.  But again, it's

21   really sequential on the contract with Ryan.

22        **Q**      And no such loan has been approved by the

23   court?

24        **A**      Certainly.  Not to mine.

25             MR. MADDOCK:  Nothing further, Your Honor.

1          THE COURT:  Thank you very much.  You can

2     come back have a seat where you were.

3          Any witnesses?

4          MR. SCOTT:  That's all I have.

5          MR. MADDOCK:  No, Your Honor.

6          THE COURT:  Argument?

7          MR. SCOTT:  Just briefly, Judge.  This is,

8     as indicated by the testimony and the pleadings,

9     this is a situation where over two years ago in

10    2008 an easement was originally recorded against

11    the property for this particular intended use of

12    purpose.  All we're asking to do today is to amend

13    that.  We're not asking this easement, the prior

14    one that was record in 2008 we're not asking it to

15    require Wells Fargo to subordinate to that.  It's

16    clear that '08 easement, as well as this one, is

17    subordinate to that deed of trust.  It doesn't

18    cost the bank any money for this easement to be in

19    place.  It's not costing the debtor any money for

20    it to go in place, and it appears that would

21    improve the value of the property once it does go

22    in place.  At the end of the day, even if the

23    court didn't approve this voluntary agreement, its

24    very conceivable that Albemarle County Service

25    Authority could come through and could condemn it

1    anyway, over the objection of everybody.

2    Including Wells Fargo.  So it seems to me this is

3    something that is important and is useful to the

4    debtor in proceeding with its projections and

5    development.  And there are two other parties out

6    there who need to have the use of this type of

7    easement for their development.  So it's more than

8    just Cascadia being affected by it.  We think it's

9    reasonable and should be approved.

10            THE COURT:  All right.

11            MR. MADDOCK:  Your Honor, the 2008 deed of

12    easement that was executed and recorded by the

13    debtor was in violation of the debtor loan

14    documents with Wachovia.  We set that forth in our

15    objection and cited the specific provisions.  And

16    at that point if there weren't already existing

17    breaches, would have been a breach of the loan.

18    Amending that agreement as is requested, again

19    would be a breach of the existing loan documents

20    unless Wachovia consented, and Wachovia has not

21    consented.

22            Your Honor, one point we raise that if this

23    motion is granted, that any order approving the

24    motion be clear that the deed of easement is

25    subordinate to the Wells Fargo lien.  I think

1        Mr. Scott and Mr. Hauser's testimony made clear

2        that they don't object to that.  And we would ask

3        for that in the event that the court grants the

4        motion.

5            Your Honor, our second point is really the

6        focus of the question of Mr. Hauser's.  It is the

7        possibility of the debtor incurring cost

8        associated with the construction of the sewer

9        line.  Mr. Hauser testified that if the other

10       party develops, constructs the line, he'll be

11       obligated for 60 percent.  That's the agreement,

12       which again is not scheduled so I'm not sure of

13       its status.  But if that's a binding agreement

14       that obligation would come due at some point.

15       This debtor has scheduled, on schedule B it's cash

16       at zero, Your Honor.  It has no development loan.

17       That was obviously a large focus of the disclosure

18       statement hearing, but there's no source to pay

19       that.  And it's quite conceivable if someone goes

20       on to the property, constructs the sewer line,

21       we're going to have a priming situation if they

22       file a mechanics lien.  And Wachovia would be yet

23       primed again in this case.  So that's the basis of

24       our objection.

25            The relief that's requested is simply to

1    execute the amendment.  If the relief is limited

2    to that, then again it breaches the loan

3    documents.  But that is different from authorizing

4    the debtor to incur debt with the conceivable

5    priming mechanics lien out on the horizon.  So

6    that is our primary concern, Your Honor, with the

7    motion.

8         THE COURT:  Mr. Scott?

9         MR. SCOTT:  Just to clarify that point,

10   Judge, I think the agreement says that the

11   noncontracting party is only obligated to pay the

12   contracting party when these lots connect.  The

13   contracting party would be these other two

14   developers who would be contracting with whomever

15   does the work.  So, those parties are the ones

16   that are ultimately responsible.

17        THE COURT:  He never becomes responsible to

18   pay, and do it on their part?

19        MR. SCOTT:  He's not responsible for their

20   contracting to do the work.  He's responsible to

21   them to pay them 60 percent of what they paid to

22   get the work done, but it's not his obligation to

23   pay the contractors who installed the sewer line.

24   So if he has no privy of contract with the

25   contractors who put in the sewer line, they can't

1     possibly file a mechanics lien.  They have a claim

2     against the other parties.

3            THE COURT:  You want to answer anything?

4            MR. MADDOCK:  Your Honor, I would have some

5     concern if they are constructing an improvement on

6     the debtor's property.  I understand the point

7     that Mr. Scott is making, but I don't know if this

8     could be analogous to a subcontractor GC situation

9     where subs can still file mechanics lien even

10    without privy of contract.  So I am concerned they

11    would be constructing an improvement on the

12    debtor's property and probably have a right to

13    file a mechanics lien.  That's our concern.

14           THE COURT:  I still am not sure whether that

15    will happen or not.  The way I thought you

16    explained it, that would not take place.

17           MR. SCOTT:  That's my belief, Judge.

18           THE COURT:  That's what I understand you

19    said.  What he's stating now, could that be a

20    possibility?  Or is there any way he can waive

21    that?

22           MR. SCOTT:  I mean I guess, none of this has

23    started work at this particular point in time.  So

24    I don't know what ultimately the contractors or

25    who the parties are going to be.

1       THE COURT:  I'm trying to prevent a problem

2    in the future.

3       MR. SCOTT:  Yeah.  I mean certainly it seems

4    going forward they would probably do some kind of

5    a bonding or something.

6       (To Mr. Hauser)  Wouldn't they?

7       MR. HAUSER:  Yeah.  You know I would think

8    it would be, I guess we could contract around that

9    risk as part of the easement.

10       THE COURT:  Can you put that in writing?

11       MR. MADDOCK:  Your Honor, I think a

12    contractual work-around along the line of an

13    indemnity or a bond would be acceptable.  But that

14    the source of that bond or indemnity would have to

15    be someone other than the debtor.  Someone

16    acceptable to the bank, because the debtor has no

17    cash.

18       THE COURT:  I realize that.

19       MR. SCOTT:  Yeah.

20       THE COURT:  Okay.  You-all can work that

21    out.

22       MR. SCOTT:  Perhaps if the court is going to

23    approve this, perhaps we can have language that

24    would provide in it that the easement is approved

25    subject to appropriate indemnity and bonding being

59

1    placed to provide for the payment of work to be

2    done at such time as that work is required.  We

3    can come up with the language on that.

4         THE COURT: I think it can be worked out.

5    Okay.  The court will approve that.

6         Anybody got any further statements or

7    anything that needs to be said?

8         MR. MADDOCK:  No, Your Honor.

9         THE COURT:  Okay.  The court is going to

10   approve the disclosure statement.  Now the court

11   is approving that with some question.  I know that

12   you got a hearing, motion to lift stay coming up

13   in a week or two.

14        MR. MADDOCK:  May 23.

15        THE COURT:  We'll know about where we stand

16   after all that evidence gets before the court.

17   But as of today the disclosure statement will be

18   approved.

19        MR. SCOTT:  Is there a form order the court

20   uses?

21        THE CLERK:  The court has a formal order for

22   approval of disclosure statement, it also sets

23   confirmation hearing.

24

25        (Whereupon parties left the courtroom)

60

COMMONWEALTH OF VIRGINIA AT LARGE, to wit:

I, Marilou DeSetto, Notary Public in and for the Commonwealth of Virginia at Large, and whose commission expires November 30, 2013, do certify that the foregoing is a true, correct, and full transcript, consisting of 60 pages of the proceedings taken before me.

I further certify that I am neither related to nor associated with any counsel or party to this proceeding, nor otherwise interested in the event thereof.

Given under my hand and notarial seal this 1st day of May, 2011.

_____
Marilou DeSetto, CCR
Certification Number: 0315052
Notary Public Number 255952
Commonwealth of Virginia at Large