John H. Maddock III (VSB No. 41044)
Bryan A. Stark (VSB No. 75471)
McGUIREWOODS LLP
One James Center
901 East Cary Street
Richmond, Virginia 23219-4030
(804) 775-1000

*Attorneys to Wells Fargo Bank, N.A.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## CHARLOTTESVILLE DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| CASCADIA PARTNERS, LLC, | Case No. 10-63442 |
| Debtor. | |

## OBJECTION OF WELLS FARGO BANK, N.A. TO THE
## CONFIRMATION OF DEBTOR'S PLAN OF REORGANIZATION

Wells Fargo Bank, NA ("WF"), as successor by merger to Wachovia Bank, NA

("Wachovia"), through undersigned counsel, hereby responds and objects (the "Objection") to

the confirmation of the Plan of Reorganization (Docket No. 21) (the "Plan") filed by Cascadia

Partners, LLC (the "Debtor") in the above-captioned bankruptcy case (the "Bankruptcy Case").

In support of the Objection, WF respectfully states as follows:

### BACKGROUND

**I.      The Loan Documents and Foreclosure.**

1.      On July 25, 2007, the Debtor and Wachovia entered into that certain Construction

Loan Agreement in the original principal amount of $6,300,000 (the "Loan").  In connection

with the Loan, on July 25, 2007, the Debtor executed that certain Promissory Note in the amount of $6,300,000 for the benefit of Wachovia (the "Note").  Among other things, the Note provides that "[t]his Note shall be due and payable in consecutive monthly payments of accrued interest only, commencing on August 5, 2007, and continuing on the same day of each month thereafter until fully paid." Note at 2.

2.      On July 25, 2007, to provide collateral and secure payment under the Note, the Debtor executed that certain Deed of Trust, Assignment of Rents and Security Agreement (the "Deed of Trust").  The Deed of Trust granted Wachovia an interest in the Debtor's real property as described in more detail in the Deed of Trust (the "Real Property").

3.      On July 25, 2007, Robert M. Hauser ("Hauser") executed that certain Guaranty Agreement (the "Guaranty" and collectively with the Loan, the Note, and the Deed of Trust, as amended, modified, or supplemented, the "Loan Documents").[1]  Pursuant to the Guaranty, Hauser agreed to fully and unconditionally guarantee the Debtor's obligations under the Loan Documents.

4.      On December 31, 2008, in accordance with the terms of the Loan Documents, Wachovia sent a demand letter (the "Demand Letter") to the Debtor and Hauser.  The Demand Letter notified the Debtor and Hauser that each was in default under the Loan Documents and made demand for immediate payment of all outstanding amounts owed.  To date, neither the Debtor nor Hauser has cured the default.

---

[1] At the May 23 Hearing (as defined herein), the Note, the Deed of Trust, the Guaranty, and the Loan were admitted into evidence as Exhibits 1 to 4, respectively.

2

5.      Following the Debtor and Hauser's default, WF commenced foreclosure

proceedings against the Real Property pursuant to the Loan Documents and applicable law.  A

foreclosure sale (the "Foreclosure Sale") was scheduled to take place on December 2, 2010.

## II.      The Debtor's Bankruptcy Case, Disclosure Statement, and Plan.

6.      On December 1, 2010 (the "Petition Date"), the day prior to the Foreclosure Sale,

the Debtor filed its petition (the "Petition") under chapter 11 of title 11 of the United States Code

(the "Bankruptcy Code") commencing the Bankruptcy Case in the United States Bankruptcy

Court for the Western District of Virginia (the "Bankruptcy Court").

7.      The Petition states, among other things, that the nature of the Debtor's business is

"Single Asset Real Estate as defined in 11 U.S.C. § 101(51B)."  With regard to single asset real

estate bankruptcy cases, section 362(d)(3) of the Bankruptcy Code, provides that, within ninety

(90) days of the petition date, a debtor must either (i) file a plan of reorganization with a

reasonable possibility of being confirmed within a reasonable time or (ii) commence monthly

payments to the debtor's in an amount equal to interest at the applicable nondefault contract rate.

If a debtor fails to comply with section 362(d)(3), the secured creditor is entitled to relief from

the automatic stay to act against the single asset real estate.  In the Debtor's Bankruptcy Case,

the ninety (90) day period from the Petition Date ran on March 1, 2011.  The Debtor has not

commenced monthly interest payments to WF.

8.      On the Petition Date, the Debtor filed its Schedules of Assets and Liabilities (the

"Schedules").  On Schedule B, the Debtor scheduled no personal property including no cash on

hand and no checking, savings or other financial accounts.  Additionally, the Debtor's monthly

operating reports (collectively, the "Monthly Operating Reports") each state that the Debtor has produced no income during the pendency of the Bankruptcy Case.

9.      On February 28, 2011, the Debtor filed its Plan and accompanying Disclosure Statement (Docket No. 22) (the "Disclosure Statement"). Pursuant to section 2.01 of the Plan, WF's secured claim is separately classified in Class 1. Pursuant to section III of the Plan, WF's secured claim is impaired, and, therefore, WF is entitled to vote on the Plan. Because WF's secured claim is separately classed, WF controls the vote of Class 1. Pursuant to section 4.01 of the Plan, WF shall purportedly retain its lien on the Real Property and WF's secured claim will be paid in full with 4.5% interest. Section 4.01 of the Plan further provides that WF will receive distributions on account of its secured claim only after Union Bank is paid in full on account of the Union Loan (as defined below) "which should be in late 2012 or early 2013." The Disclosure Statement attached an unexecuted, incomplete draft lot purchase agreement (the "Draft Lot Purchase Agreement") as Exhibit B.

10.      On April 6, 2011, WF filed its Response and Objection to the Disclosure Statement Field by Cascadia Partners, LLC (Docket No. 32) (the "Disclosure Statement Objection"). The Disclosure Statement Objection objected to the Disclosure Statement because (i) the Disclosure Statement failed to provide "adequate information" under section 1125(b) of the Bankruptcy Code and (ii) the Plan, on its face, is unconfirmable.

11.      On April 11, 2011, WF filed the Motion of Wells Fargo Bank, N.A. for Relief from the Automatic Stay (Docket No. 34) (the "Motion for Relief"). The Motion for Relief seeks relief from the automatic stay pursuant to section 362(d)(3) of the Bankruptcy Code because within ninety (90) days of the Petition Date, the Debtor failed to (i) file a plan of

reorganization with a reasonable possibility of being confirmed within a reasonable time or (ii)

commence monthly payments to the debtor's in an amount equal to interest at the applicable

nondefault contract rate. In addition, as more fully set forth in the Motion for Relief, WF asserts

that the Plan does not have a reasonable possibility of being confirmed within a reasonable time

because the Plan fails to satisfy the provisions of sections 1129(a) & (b) of the Bankruptcy Code.

12.    On April 18, 2011, WF filed its proof of claim asserting a secured claim in the

amount of $4,022,693.82 (the "WF Claim"). The WF Claim is secured by a first priority lien on

the Real Property pursuant to the Deed of Trust.

13.    On April 20, 2011, the Court entered its order approving the Disclosure Statement

(Docket No. 45) (the "Disclosure Statement Order") over WF's Disclosure Statement Objection.

14.    On April 22, 2011, the Debtor filed the Debtor's Objection to Motion for Relief

Field by Wells Fargo Bank, N.A. (Docket No. 46) (the "Objection to the Motion for Relief").

15.    On April 26, 2011, the Debtor distributed Plan packages and solicited votes on the

Plan. The distributed packages included copies of the Plan, the Disclosure Statement, the

Disclosure Statement Order, and a voting ballot. The Disclosure Statement included in the Plan

package attached the unexecuted Draft Lot Purchase Agreement.

16.    On April 28, 2011, the Debtor filed its Motion for Approval of Lot Purchase

Agreement (Docket No. 50) (the "LPA Motion") seeking the Court's approval of a revised Lot

Purchase Agreement dated April 26, 2011 (the "Lot Purchase Agreement") by and between the

Debtor and NVR, Inc. ("NVR"). The Lot Purchase Agreement contains different terms than the

Draft Lot Purchase Agreement and, unlike the Draft Lot Purchase Agreement attached to the

Disclosure Statement, is fully executed.

17.   On May 3, 2011, WF submitted its ballot rejecting the Plan.

18.   On May 16, 2011, WF filed its Response and Objection of Wells Fargo Bank, N.A. to the Debtor's Motion for Approval of Lot Purchase Agreement (Docket No. 54) (the "Objection to LPA Motion").

19.   On May 23-24, 2011, the Court held hearings on the Motion for Relief, the Objection to the Motion for Relief, the LPA Motion, and the Objection to LPA Motion. Following the hearings, the Court took these matters under advisement.

## ARGUMENT

20.   The Court cannot confirm the Debtor's Plan because the Plan fails to satisfy the requirements of confirmation set forth in section 1129(a) of the Bankruptcy Code.  Specifically, Plan is not feasible and does not provide for the payment of administrative expenses on the Plan's effective date.  Even if the Debtor could carry its burden with respect to proving the requirements set forth in section 1129(a), the Debtor cannot prove that the Plan is "fair and equitable" pursuant to section 1129(b) and, thus, the Plan cannot be crammed down over WF's objection.

**I.    The Plan Fails to Satisfy the Explicit Requirements of Section 1129(a) and Cannot be Confirmed.**

21.   The Court cannot confirm the Plan because the Plan fails to satisfy the requirements of section 1129(a).  The Plan is not feasible pursuant to 1129(a)(11) because the Debtor has no ability to perform under the Plan.  The two principal components of the Plan are the hypothetical Union Loan (as defined herein) and the Lot Purchase Agreement.  However, neither the hypothetical Union Loan nor the Lot Purchase Agreement provides the Debtor any reasonable assurance of successfully reorganizing.  Thus, because the Plan is merely a visionary

scheme pursuant to which the Debtor hopes it will someday be able to perform, the Plan is not

feasible, fails to satisfy the specific requirements of the Bankruptcy Code, and cannot be

confirmed.  Additionally, the Plan fails to satisfy section 1129(a)(9)(A) because it fails to

provide for payments of all administrative claims on the effective date of the Plan.

### A.       *The Plan Is Not Feasible and Cannot Be Confirmed.*

22.       The Plan is not feasible on its face and, therefore, cannot satisfy the requirements

of section 1129(a) of the Bankruptcy Code.  To satisfy the feasibility requirement of the

Bankruptcy Code, the confirmation of a plan must not likely be followed by the liquidation or

need for further financial reorganization of the debtor or any successor.  11 U.S.C. § 1129(a)(11).

"[T]he feasibility standard is whether the plan offers a reasonable assurance of success." *Kane v.*

*Johns-Manville Corp.*, 843 F2d 636, 649 (2d Cir. 1988).  "'The purpose of section 1129(a)(11) is

to prevent confirmation of visionary schemes which promises creditors and equity security

holders more under a proposed plan than the debtor can possibly attain after confirmation.'"

*Pizza of Hawaii, Inc. v. Shakey's Inc. (In re Pizza of Hawaii, Inc.)*, 761 F.2d 1374, 1385 (9th Cir.

1985) (quoting 5 Collier on Bankruptcy ¶1129.02 [11] at 1129-34 (15th ed. 1984)).  Here, the

Plan is not feasible because, among other reasons, the Debtor lacks any development funding to

undertake its obligations under the Plan and the Plan relies entirely on the Lot Purchase

Agreement which fails to offer the Debtor any certainty of reorganizing.

### i.       *The Debtor Lacks Any Development Funding and Cannot Comply with Its Obligations Under the Plan.*

23.       Pursuant to the Lot Purchase Agreement, the Debtor is obligated to prepare and

develop a portion of the Real Property (the "NVR Lots") to sell to NVR.  However, the Debtor

has no ability to perform its development obligations under the Lot Purchase Agreement because

it lacks any working capital or funding. Thus, because the Debtor is wholly unable to perform

under the Lot Purchase Agreement, it is wholly unable to perform under the terms of the Plan

and the Plan cannot be confirmed.

24.    Despite the Debtor's significant obligations and undertakings required by the Plan

and the Lot Purchase Agreement, the Debtor lacks any financial ability to perform such

obligations. As set forth in the Debtor's Schedules, the Debtor has no cash, accounts

receivables, or any other asset to finance the development of the Real Property pursuant to the

Lot Purchase Agreement. Indeed, as set forth in the Monthly Operating Reports and

acknowledged by the Debtor's counsel at the April 18, 2011 hearings on the Disclosure

Statement and other matters in this Bankruptcy Case (the "April 18 Hearing"), the Debtor has no

income whatsoever. *See* April 18, 2011 Hearing Tr. 5:14-15. A copy of pertinent portions of the

April 18, 2011 Hearing Transcript is attached hereto as Exhibit A.

25.    Admittedly, pursuant to the Plan, the Debtor states that it will obtain a loan (the

"Union Loan") from Union First Market Bank ("Union") the proceeds of which the Debtor will

presumably use to fund its development and construction obligations under the Plan and the Lot

Purchase Agreement. However, no such loan exists and it is mere conjecture whether such loan

will *ever* exist.

26.    At the May 23, 2011 hearing on the Motion for Relief, the Objection to the

Motion for Relief, the LPA Motion, and the Objection to LPA Motion (the "May 23 Hearing"),

the Debtor admitted that it had "talked to Union for the last couple of years about Cascadia,"

including loan terms similar to those described in the Plan. May 23, 2011 Hearing Tr. 11:20-21.

A copy of pertinent portions of the May 23, 2011 Hearing Transcript is attached hereto as

Exhibit B.

      27.     During the past two (2) years and in furtherance of those discussions, the Debtor

provided Union with documents to support its request for a loan and had several in-person

meetings to discuss the same. *Id.* at 17:9-23. Nevertheless, Union has refused to make the

Union Loan. *Id.* at 17:24-18:1. Moreover, despite the Debtor obtaining an appraisal performed

by Appraisal Group, Inc. dated February 10, 2011 (the "Debtor's Appraisal") which values the

Real Property in the amount of $8,850,000,[2] Union continues to refuse to lend any amount to the

Debtor despite the Debtor's proposal to provide Union with a first deed of trust pursuant to

section 364(d) of the Bankruptcy Code.

      28.     The fact that Union has refused to enter into any lending agreement with respect

to Cascadia is especially telling regarding the Plan's feasibility and the Debtor's ability to

successfully reorganize because Union already has a "significant interest in Cascadia." *Id.* at

22:16. The Debtor's List of Equity Security Holders[3] lists Church Hill Development ("Church

Hill") as owning 40% of the Class A Membership Interest in the Debtor based on an initial

capital contribution totaling $554,539. According to the testimony of Robert M. Hauser, Union

has a lien on Church Hill's 40% Class A Membership Interest in Cascadia, which, the Debtor

---

[2] WF strongly disagrees with the Debtor's alleged value of the Real Property. Integra Realty
Resources-Richmond conducted an appraisal dated April 25, 2011 which values the Real
Property in the amount of $6,000,000 (the "Integra Appraisal"). The Integra Appraisal was
admitted into evidence at the May 23 Hearing as Exhibit 14. As argued at the May 23 Hearing,
WF asserts the Integra Appraisal is more reliable than the Debtor's Appraisal and accurately
represents the as-is value of the Real Property.

[3] At the May 23 Hearing, the Debtor's List of Equity Security Holders was admitted into
evidence as Exhibit 9.

concedes, creates a "material" interest for Union to preserve the value of Cascadia. *Id.* at 34:16-35:14. Nevertheless, Union refuses to consummate a loan or enter into any form of commitment to preserve its own interest and security for another loan. Despite such "significant interest" in preserving the value of Cascadia, the fact Union has not consummated any agreement provides a glimpse into the dire nature of the Debtor's hope to obtain funding and hope to confirm the Plan.

29.    Despite Union's refusal to finance the Debtor's operations, it is apparent that Union remains the *only* commercial lender from whom the Debtor concludes it could secure financing. At the May 23 Hearing, the Debtor admitted that it had contacted *no* other commercial lenders regarding a development loan. *Id.* at 23:20-21. Furthermore, although, the Debtor has contacted "a couple private lenders about development loans," the Debtor has been wholly unable to find any willing lender to prop up the Debtor's failing business. *Id.* at 23:16-19. Similarly, the Debtor has been unable to find any willing investor to take an equity stake in the Debtor despite contact with various investors since the Summer of 2010. *Id.* at 23:22-24:14. Indeed, the Debtor testified that it had three (3) meetings with potential investors the week of the May 23 Hearing. *Id.* at 24:15-21. The fact that the Debtor continues to scramble for any source of investment at this late date further evidences the fact that the Debtor's continued negotiations with Union are pointless. In sum, the Debtor has no new sources for a loan or new capital, no ability to perform under the Plan, and no realistic expectation it can secure any financing or investment in the future.

30.    At the April 18 Hearing, the Debtor's counsel reasoned that with the Lot Purchase Agreement, "the debtor is able to go to its other sources for the development funding *to be able to try* to put together a development proposal." April 18, 2011 Hearing Tr. at 7:11-15 (emphasis

10

added).  Currently, the LPA Motion and WF's Objection to LPA Motion are fully briefed and

argued and under advisement with the Court.  Importantly, however, the comments of Debtor's

counsel are clear that with a fully-executed and Court-approved Lot Purchase Agreement the

Debtor can merely "try" to create a proposal to secure financing.  Regardless, for the reasons

stated, it is clear that neither the Union Loan nor any other financing awaits the Lot Purchase

Agreement's approval.[4]

      31.    Indeed, despite the Plan and Disclosure Statement's collective insinuation that the

Union Loan is forthcoming, the Debtor's counsel already conceded that the Plan merely *outlines*

loan terms *"perceived to be necessary." Id.* 7:4-6 (emphasis added).  The Debtor's counsel's

comments are unequivocal: No financing currently exists.  Rather, the Debtor has generically

concluded that only the most onerous financing, including a priming lien pursuant to section

364(d) of the Bankruptcy Code, will be sufficient to allow the Debtor to perform its obligations

under the Lot Purchase Agreement.  Otherwise, the Debtor will not have the ability to perform

under the Lot Purchase Agreement.

      32.    The Debtor's counsel has represented to the Court that if the Debtor is ever able

to enter into a loan with Union, the Debtor will file a motion with this Court to approve the loan.

*See* April 18, 2011 Hearing Tr. 28:3-17.  It is evident that no such motion will be heard by the

Court on June 20, 2011 at the Plan's confirmation (the "Confirmation Hearing").  Local Rule

9013-1(M) of the United States Bankruptcy Court for the Western District of Virginia (the

---

[4] Despite the Debtor's counsel's repeated assertions that the Debtor hopes to find financing to
fund the Plan, the Debtor brazenly testified at the April 18 Hearing that the Union Loan is a mere
formality following the approval of the Lot Purchase Agreement. *See* April 18, 2011 Hearing Tr.
52:7-21.  Now, nearly two (2) months have passed since the Debtor testified that the Union Loan
was forthcoming and the Debtor has no commitment from Union.

"Local Rules") requires any response in a contested matter to be filed at least seven (7) days

prior to the hearing on such matter. The date of the filing of this Objection, June 13, 2011, is the

deadline to file any response to any contested matter scheduled to be heard at the Confirmation

Hearing. Thus, in the unlikely event the Debtor enters into a loan with Union or another entity,

any motion to approve such commitment cannot be heard at the Confirmation Hearing. Thus,

without development financing in place on June 20, 2011, the Debtor cannot perform under the

Plan and it is, therefore, not feasible.

33.    Therefore, because no financing exists and because the Debtor has only hope that

financing may someday be secured, the Plan is not feasible and fails to satisfy the requirements

for confirmation set forth in section 1129(a)(11) of the Bankruptcy Code.

            ii.    *The Plan is Not Feasible Because the Lot Purchase Agreement is Illusory.*

34.    Not only is the Plan infeasible because the Debtor lacks any ability to undertake

its obligations under the Lot Purchase Agreement, but the Plan is also infeasible because NVR

may terminate the Lot Purchase Agreement, at its sole discretion, without repercussion. Section

1B of the Lot Purchase Agreement provides for a sixty (60) day "feasibility period" (the

"Feasibility Period") commencing on the date the Bankruptcy Court enters an order confirming

the Plan (the "Confirmation Date"). During such period, the Debtor at its sole expense must

undertake certain engineering, development, marketing and other studies as NVR directs and

deliver to NVR copies of various reports, studies, and samples. In the event that NVR is not

satisfied with the NVR Lots or any information the Debtor delivers to NVR, it may, "for any

reason or *no reason at all*," terminate the Lot Purchase Agreement during the Feasibility Period.

Lot Purchase Agreement § 1B (emphasis added).

12

35.     Indeed, the Debtor and NVR materially altered the Feasibility Period provision in the Lot Purchase Agreement from the unexecuted Draft Lot Purchase Agreement attached as Exhibit B to the Disclosure Statement.  The changes provide the Debtor even less certainty that it can complete, or even begin, to operate under the terms of the Plan.  Under the Draft Lot Purchase Agreement, the Feasibility Period ran from the effective date of the Draft Lot Purchase Agreement, *i.e.* the last date a party signed the agreement.  However, the Feasibility Period in the Lot Purchase Agreement commences on the Confirmation Date.

36.     The effective date of the executed Lot Purchase Agreement is April 26, 2011 (the "Effective Date").  Thus, under the terms of the Draft Lot Purchase Agreement, the Feasibility Period and NVR's right to terminate the agreement without repercussion likely would have concluded by the time the Court were in a position to consider confirming the Plan.  In such an instance, the Court and the Debtor could have been reasonably certain that the Debtor could, at the very least, begin to perform under a confirmed plan of reorganization.

37.     However, the Feasibility Period in the Lot Purchase Agreement, for which the Debtor seeks approval, begins only after the Court enters an order *confirming* the Plan.  Therefore, it is possible, if not likely, that within sixty (60) days of the Plan's confirmation, NVR will terminate the Lot Purchase Agreement without repercussion leaving the Debtor wholly unable to perform under the Plan.  Such a scenario is what Congress sought to avoid by including feasibility as a requirement for confirmation.

38.     Similarly, the Debtor must conduct, at its sole risk and expense, a phase I environmental assessment on the NVR Lots within thirty (30) days of the Plan's confirmation ("Environmental Study Period").  If the results of such environmental study are not acceptable to

NVR in its sole discretion, NVR may terminate the Lot Purchase Agreement after receiving an environmental study. *Id.* at § 2. Again, the Draft Lot Purchase Agreement provided that the Environmental Study Period commenced on the Effective Date.

39.     However, just as the Debtor and NVR materially modified the Feasibility Period to commence on the Confirmation Date (as opposed to the Effective Date as was set forth in the Draft Lot Purchase Agreement), the Environmental Study Period was also materially modified to commence on the Confirmation Date. Thus, despite its execution, the Lot Purchase Agreement is not a firm commitment and is simply a "visionary scheme" from which the Debtor hopes it can perform and eventually comply with the terms of the Plan.

40.     Additionally, and perhaps more importantly, in the event of NVR's breach of the Lot Purchase Agreement, the Debtor's *sole* remedy is to retain NVR's deposit. Pursuant to section 3.g of the Lot Purchase Agreement, NVR is required to deliver a $500,000 deposit (the "Deposit") to the Debtor on an installment basis. Also, pursuant to section 10.a of the Lot Purchase Agreement, the Debtor will repay the "Deposit" by providing NVR with a credit against the purchase price of each lot NVR purchases. Thus, at any given time, the amount of the Deposit is less than, perhaps significantly less than, $500,000.

41.     Section 12.a provides that the Debtor's "sole and exclusive right and remedy shall be to retain the Deposit paid to date or remaining in the Seller's hands as full, fixed and liquidated damages, not as a penalty, whereupon th[e] [Lot Purchase] Agreement shall terminate." In evaluating the likelihood that NVR would take advantage of this provision, it is important to consider that the amount that NVR is required to pay for lots on a quarterly basis

14

exceeds $1,000,000.[5] Thus, when faced with the purchasing over $1,000,000 of lots that NVR may not be able to sell, it is more than plausible that NVR would simply allow the Debtor to retain the Deposit to avoid being saddled with lots that it must administer, but cannot sell. It is, therefore, very possible for NVR to breach the Lot Purchase Agreement at any time leaving the Debtor with a negligible Deposit as its sole remedy and without any ability to perform under the Plan.

42.    Thus, because the Plan heavily relies on such a one-sided Lot Purchase Agreement that is terminable without penalty after the Plan is confirmed, the Plan is not feasible under section 1129(a)(11) and cannot be confirmed.

**B.    *The Plan Does Not Provide for Payments of Administrative Claims on the Effective Date.***

43.    Additionally, the Plan fails to satisfy section 1129(a)(9)(A) of the Bankruptcy Code because it does not provide for the payment of allowed administrative claims on the effective date of the Plan. Section 1129(a)(9)(A) requires, as a requirement for the confirmation of a plan, that "with respect to a claim of a kind specified in section 507(a)(2) or 507(a)(3) of this title, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim." 11 U.S.C. § 1129(a)(9). It is well-settled that a plan cannot be confirmed without the payment of administrative claims on the plan's effective date, unless the holder of such claim consents to different treatment. *See CIT*

---

[5] Pursuant to the Lot Purchase Agreement, NVR agrees to purchase a minimum of six (6) SFA Lots (as defined in the Lot Purchase Agreement ) and six (6) SFD Lots (as defined in the Lot Purchase Agreement) per quarter. *See* Lot Purchase Agreement § 3.a. The purchase price for each SFA Lot is $80,000 and the purchase price for each SFD Lot is either $110,000 or $130,000. *Id.* at § 3.f.

*Commc'n Fin. Corp. v. Midway Airlines Corp. (In re Midway Airlines Corp.)*, 406 F.3d 229, 242 (4th Cir. 2005).

44.    Here, the Plan does not provide for the payment of administrative expenses on the Plan's Effective Date.  Rather, the Plan seeks to pay the Class 4[6] and Class 6 administrative claims "upon approval by the Bankruptcy Court," and seeks to pay Class 5 claims over an ambiguous period of time following the sale of the NVR Lots.  Because the Plan does not propose to pay any administrative claim on the Plan's effective date, it violates section 1129 of the Bankruptcy Code and well-settled case law, and the Plan cannot be confirmed.

## II.    The Plan Cannot Satisfy the Cramdown Requirements in Section 1129(b)(2)(A) Because It Is Not "Fair and Equitable" with Respect to WF's Secured Claim.

45.    Further, even if the Court were to determine that the Plan satisfies the requirements of section 1129(a), the Plan is not fair and equitable as to WF, a holder of an impaired claim who has voted against the Plan, thus, the Plan fails to meet the cramdown requirements of section 1129(b).

46.    Section 1129(b) of the Bankruptcy Code provides that a court shall confirm a plan of reorganization which satisfies all of the requirements under section 1129(a) other than subsection (8), if the plan "does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan."  11 U.S.C. § 1129(b)(1).  Thus, if a plan is deemed "fair and equitable" as to impaired, non-accepting classes, it may be "crammed down" on such impaired, non-accepting classes.

---

[6] Admittedly, the Debtor's counsel has likely consented to this treatment.

**A.**    ***The Plan is Not Fair and Equitable Under Section 1129(b)(2)(A)(i).***

47.    A plan is "fair and equitable" with respect to a class of secured claims if the plan

provides:

> (i)    (I) the holders of such [secured] claims ***retain the liens***
> securing such claims, whether the property subject to such liens is
> retained by the debtor or transferred to another entity, to the extent
> of the allowed amount of such claims; and
>
> (II) that each holder of a [secured] claim of such class
> receive on account of such claim deferred cash payments totaling
> **at least the allowed amount of such claim**, of a value, as of the
> effective date of the plan, of at least the value of such holder's
> interest in the estate's interest in such property[.]

11. U.S.C. 1129(b)(2)(A)(i) (emphasis added).

48.    The Plan fails to satisfy either component of 1129(b)(2)(A)(i) because WF does

not retain its lien on the Real Property and the Plan fails to provide WF with deferred cash

payments in at least the amount of the WF Claim.  Thus, the Plan cannot be crammed down on

WF under section 1129(b)(2)(A)(i).

> i.    *WF Does Not Retain its Lien and the Plan Fails to Satisfy Section*
> *1129(b)(2)(A)(i)(I).*

49.    First, a plan cannot be crammed down on an impaired non-accepting class of

secured creditors unless each of the secured creditors in the class "retains its lien" on the

collateral.  In limited circumstances, a plan may be deemed to comply with the requirements of

section 1129(b)(2)(A)(i) where a secured creditor is to retain its lien and such lien is to be

primed, but only if such priming lien leaves the secured creditor's lien unaffected.  Specifically,

if a plan proposes to prime a secured creditor's lien, the priming lien may attach only to the

collateral's future appreciation in value, thereby leaving the secured claimant's collateral base

unaffected. *Compare In re Sherwood Square Assocs.*, 107 B.R. 872, 880-81 (Bankr. D. Md.
1989) (finding that a secured lien is deemed retained under section 1129(b)(2)(A)(i) when a
priming lien for a construction loan attaches only to the "actual added market value" added to the
value of the collateral), *with In re L.B.G. Prop., Inc.*, 72 B.R. 65, (Bankr. S.D. Fla 1987) (finding
that senior lien that is subordinated to a new lien fails to preserve the existing lien and fails to
satisfy section 1129(b)(2)(A)(i).

50.    In this case, the Plan proposes to prime WF's lien on the Real Property by
granting Union a first priority lien to secure the Debtor's obligations under the Union Loan.  This
proposed priming lien is not limited to a first priority lien on the increase in value of the Real
Property attributable to the development of lots, but rather is to be a first priority lien as to *all* of
the Real Property.  Proposed financing on these terms fails to conform to the limited
circumstances outlined in *Sherwood Square* where a priming lien may be acceptable under
section 1129(b)(2)(A)(i).  Thus, WF cannot be considered to retain its lien for purposes of
section 1129(b)(2)(A)(i).  As such, the Plan is not "fair and equitable," and the Plan cannot be
crammed down on WF.

51.    Moreover, the Debtor's argument that based on the value of the Real Property as
set forth in the Debtor's Appraisal WF will remain fully secured and, therefore, should be
considered to retain its lien despite granting Union a first priority lien is misleading and factually
incorrect because the Plan and the Disclosure Statement materially misrepresent the amount of
the Union Loan and neglect to disclose the Debtor's intention to obtain letters of credit.

52.    The claims secured by the Real Property total at least $4,396,470.57, consisting of
the WF Claim in the amount of $4,022,983.82, statutory tax liens held by Albemarle County

scheduled in the amount of $263,879.75, and W.W. Associates, Inc.'s scheduled secured claim in

the amount of $109,797.  When the $4,000,000 Union Loan is added, the total secured claims on

the Real Property will be in the approximate amount of $8,396,470.57.

53.     The Disclosure Statement states that the Debtor's Appraisal values the Real

Property in the amount of $8,850,000.  Thus, by comparing the Debtor's appraised value to

secured claims totaling $8,396,470.57, the Debtor appears to argue that even after WF's lien is

primed by the Union Loan, the WF Claim remains oversecured and, therefore, WF should be

considered to retain its lien on the Real Property.[7]  However, even using the Debtor's greatly

inflated value of the Real Property, WF will not be oversecured because the Plan and Disclosure

Statement materially misstate the actual amount the Debtor intends to borrow under the Union

Loan.

54.     The Plan and the Disclosure Statement each state that the Union Loan will be "in

the amount of $4MM bearing 6% interest as a construction/revolving loan which will be granted

first lien priority."  Plan § 4.01; Disclosure Statement 4.  At the April 18 Hearing, WF's counsel

referenced the amount of the Union Loan as $4MM no less than six (6) times and neither the

Debtor nor the Debtor's counsel disputed or made any attempt to correct the amount.  *See* April

18, 2011 Hearing Tr. 16:7, 21, 24; 21:21; 23:19; 39:1.

55.     A closer reading of the cash flow analysis attached as Exhibit C to the Disclosure

Statement (the "Cash Flow Analysis") and a review of the Lot Purchase Agreement, however,

---

[7] In its Motion for Relief, WF argues that if the Court were to approve the Union Loan and grant
Union a priming lien pursuant to 11 U.S.C. § 364(d)(1), WF would lack adequate protection and
be entitled to relief from the automatic stay pursuant to section 362(d)(1) of the Bankruptcy
Code.  For further discussion on this issue, please see the Motion for Relief ¶¶ 45-51.

Case 10-63442    Doc 67    Filed 06/13/11    Entered 06/13/11 16:57:38    Desc Main
                              Document        Page 20 of 62

make it readily apparent that the Debtor intends to borrow at least $6,000,0000 under the Union Loan thereby leaving a significant portion, if not all, of the WF Claim unsecured. The "Finance Assumptions" of the Cash Flow Analysis assume that the Union Loan "Revolver Cap" will be $4,000,000. However, the "Union Bank Loan" component of the Cash Flow Analysis makes clear that the Debtor intends to draw $3,987,047 in 2011, $1,980,282 in 2012, $84,895 in 2012 for a total draw of $6,052,224 through the end of 2012. Thus, rather than accurately list the total funds the Debtor intends to borrow under the Union Loan or the total amount of principal the Debtor will repay under the Union Loan, the Plan and Disclosure Statement refer only to what appears to be a cap on the revolver aspects of the Union Loan.[8]

56.     That the Debtor's intent is to borrow an amount greater than $6,000,000 is confirmed by the Lot Purchase Agreement which states that the Debtor intends to borrow $6,500,000. As more fully set forth below, the Lot Purchase Agreement provides that NVR's Deposit will be secured and subordinated to a "third priority position" behind the Union Loan and the WF Claim. The Union Loan is specifically described as the Debtor's "development financing *in the amount of $6,500,000.*" Lot Purchase Agreement § 3.g.

57.     Indeed, despite the Plan providing that the Debtor will obtain a loan in the amount of "$4MM" and the assertions of Debtor's counsel at the April 18 Hearing, *see supra* at ¶ 54, the Debtor readily admits that it intends to borrow "$6,052,224" under the Union Loan. *See* May 23, 2011 Hearing Tr. 28:1-3.

---

[8] Such material contradictions in the Plan and Disclosure Statement raise serious issues with respect to the accuracy of the disclosures made in the Disclosure Statement.

58.    Additionally, and wholly undisclosed in the Plan and the Disclosure Statement, the Debtor intends to post letters of credit (the "Letters of Credit") to obtain certain necessary bonds from Albemarle County during its proposed development of the Real Property. *Id.* at 38:18-39:24. The Debtor further intends to include the Letters of Credit in the Union Loan and include the Letters of Credit under Union's priming deed of trust. *Id.* at 39:25-40:14. Thus, not only does the Debtor intend to borrow an amount dramatically greater than that set forth in the Plan, but it also intends to post the Letters of Credit the liability for which would take a priming position ahead of the WF Claim.[9]

59.    Thus, it is clear that contrary to the representations made in the Plan and the Disclosure Statement, the Debtor intends to borrow well in excess of $4,000,000. Nevertheless, the Debtor seems to take the position that because the WF Claim will be primed by only $4,000,000 at any given time, the total amount the Debtor borrows from and repays to Union Bank before WF is paid a penny from the sale of its collateral is irrelevant. The Debtor, however, disregards the fact that because WF's collateral is the only source of funds to repay the Union Loan, WF's collateral will be depleted each time the Debtor sells an NVR Lot. Thus, as

_____

[9] Whether the Debtor intends to seek a priming lien in an amount greater than $4,000,000 is not yet determined, but the recent revelation of the Letters of Credit is fatal to the Debtor's Plan. In the event the Debtor hopes to secure the Letters of Credit under the $4,000,000 deed of trust ceiling, the Debtor will not have adequate financing to complete its development because its debt ceiling will be consumed by Union's reserves for the Letters of Credit. In such an instance, the Debtor will be unable to comply with the terms of the Plan, the timelines set forth in the Cash Flow Analysis, or the terms of the Lot Purchase Agreement. On the other hand, if the terms of a Union Loan are ever agreed to and those terms include a first deed of trust in an amount greater than $4,000,000 to account for the Letters of Credit, both the Debtor's Plan and Disclosure Statement must be amended and the Debtor will be in clear violation of the requirements of 11 U.S.C. § 362(d)(3) providing further basis for granting WF relief from the automatic stay with respect to the Real Property.

the Cash Flow Analysis suggests, it is possible, if not likely, that the Debtor will borrow

$4,000,000 under the Union Loan, repay $2,000,000 from the sale of the NVR Lots, *i.e.* reducing

WF's collateral, and then borrow an additional $2,000,000 up to the proposed revolver cap.  The

end result: WF's lien remains primed by the $4,000,000 first priority lien with $2,000,000 of its

collateral sold.  Such scenario[10] depletes WF's collateral by more than 30%, but does not reduce

WF's claim by a single cent.  Under such circumstances, WF cannot be considered to have

retained its lien for the purposes of section 1129(b)(2)(A)(i) and the Plan cannot be crammed

down on WF.

60.     Additionally, a secured creditor does not retain its lien for purposes of

1129(b)(2)(A)(i) if a plan proposes to deplete the secured creditor's collateral through systematic

sales of the collateral free and clear of the secured creditor's lien.  *See In re Sparks*, 171 B.R.

860, 865 (Bankr. N.D. Ill. 1994) ("The Debtor's Plan does not meet the requirements of clause

(i) because the Plan requires [the secured creditor] to release its lien on each converted

condominium as it is sold.").

61.     In *Sparks*, the debtor's plan of reorganization proposed to pay a secured creditor

100% of its secured claim plus interest through the sale of condominiums.  As the condominiums

were sold, the plan required the secured creditor to release its lien on each condominium unit

sold.  *Id.* at 864.  Because the plan required the secured creditor to release its lien on each

---

[10] Moreover, the above scenario does not account for the specter of the Letters of Credit the
Debtor intends to obtain under the Union Loan.  Although the Debtor's potential liability under
the Letters of Credit and each Letter of Credit's priming position is not certain, considering the
uncertainty of the Debtor's ability to fully perform under the Plan and NVR's minimal damages
in the event of its breach of the Lot Purchase Agreement, it is likely that, for any number of
reasons, Albemarle County will draw on the Letters of Credit thereby placing the WF Claim
behind an even greater amount of secured debt than the Plan anticipates.

condominium sold, the bankruptcy court concluded that the plan did not comply with the

provisions of section 1129(b)(2)(A)(i). *Id.* at 865. Similarly, because the Debtor's Plan requires

WF to partially release its lien on the Real Property as the NVR Lots are sold, WF cannot be

considered to retain its lien for purposes of section 1129(b)(2)(A)(i) and the Plan cannot be

crammed down over WF's objection. *See* Plan, at § 4.01 (proposing to sell the NVR Lots "free

of all liens at the closing of each lot sale"); *see also* Lot Purchase Agreement § 1A ("[T]he Lots

shall be conveyed free and clear of all liens . . . .").

> ii.    *The Plan Fails to Provide WF with Deferred Cash Payments Equal to the
>        Amount of the WF Claim and Fails to Satisfy Section 1129(b)(2)(A)(i)(II).*

62.    Second, to satisfy the requirements of section 1129(b)(2)(A)(i), a plan of

reorganization must provide that the secured creditor "receive on account of [its] claim deferred

cash payments totaling at least the allowed amount of such claim, of a value, as of the effective

date of the plan, of at least the value of such holder's interest in the estate's interest in such

property. 11 U.S.C. § 1129(b)(2)(A)(i)(II). The Debtor's Plan fails to satisfy the second

component of 1129(b)(2)(A)(i) because it fails to provide WF with deferred cash payments

totaling at least the amount of the WF Claim and fails to provide WF the appropriate cramdown

interest rate.

63.    As a preliminary and conclusive matter, the Plan fails to satisfy the clear and

explicit terms of section 1129(b)(2)(A)(i)(II) because it fails to provide for payment of the WF

Claim in full. Section 1129(b)(2)(A)(i)(II) unequivocally requires that a plan of reorganization

provide "deferred cash payments totaling ***at least the allowed amount of [its] claim***." However,

in contravention to the clear and explicit terms of the Bankruptcy Code, the Plan fails to provide

for full satisfaction of the WF Claim and, rather, proposes to partially reduce the WF Claim to

the amount of $1,454,337.  The Cash Flow Analysis includes a chart titled "Wachovia Loan"

which sets forth the Debtor's treatment of the WF Claim under the Plan.  The Cash Flow

Analysis anticipates the Debtor will complete distributions under the Plan in 2013 and provides

that the Union Loan, WW Associates, Inc.'s secured claim, and Albemarle County, Virginia's

secured claim will be paid in full under the Plan.  However, the Cash Flow Analysis, as set forth

in the "Wachovia Loan" chart, provides that the WF Claim's "Ending Balance" after calendar

year 2013 will be $1,454,337 reflecting the Debtor's intent to not pay the WF Claim in full

through the Plan.  Thus, despite such a clear statutory mandate, the Plan fails to pay the WF

Claim in full.  Indeed, at the May 23 Hearing, the Debtor testified that "[t]he [P]lan calls for

them to pay off, I believe it's 60- to 70 percent of the Wells Fargo claim after the NVR lots[ are

sold]."  May 23, 2011 Hearing Tr. 25:8-10.

      64.    WF has been unable to find a single case applying section 1129(b)(2)(A)(i)(II)

where a plan of reorganization was confirmed that did not provide for full payment of an allowed

secured claim.  Thus, the Debtor may not cramdown the Plan over WF's objection pursuant to

section 1129(b)(2)(A)(i).

        *iii.*    *The Plan Fails to Provide for Payment of WF's Claim with an*
               *Appropriate Rate of Interest.*

      65.    Additionally, the Plan fails to provide WF with the appropriate cramdown interest

rate.  Although the Plan provides for payment of WF's claim with 4.5% interest, such rate is not

the appropriate rate under established case law and unsupported by any evidentiary support.

      66.    Section 1129(b)(2)(A)(i)(II) requires a creditor to receive the present value of its

claim through deferred cash payments.  "Simply stated, 'present value' is a term of art for an

almost self evident proposition: a dollar in hand today is worth more than a dollar to be received

a day, a month, or a year from now." *In re Birdneck Apartment Assocs. II, L.P.*, 156 B.R. 499,

507 (Bankr. E.D. Va. 1993). Thus, the present value concept dictates that a dollar in hand today

is equal to a dollar in hand at some point in the future plus the appropriate rate of interest from

the present date to the date of actual payment. *Id.*

  67. The Bankruptcy Code, however, is silent on how to calculate the appropriate rate,

thus the courts themselves have determined appropriate cramdown interest rates. *See Till v. SCS*

*Credit Corp.*, 541 U.S. 465 (2005) ("The Bankruptcy Code provides little guidance as to which

of the rates of interest . . . Congress had in mind when it adopted the cram down provision."). In

2005, the Supreme Court of the United States concluded that the "formula rate"[11] is the

appropriate cramdown interest rate in chapter 13 cases. *Id.* at 479-80.

  68. Although the Supreme Court's decision in *Till* concerned a cramdown interest

rate in chapter 13, the decision has been instructive in determining the appropriate cramdown

interest rate in chapter 11 cases. In *Bank of Montreal v. Official Committee of Unsecured*

*Creditors (In re American Homepatient, Inc.)*, 420 F.3d 559 (6th Cir. 2005), the Sixth Circuit

analyzed *Till*'s application to chapter 11 cases and determined that the formula rate is not

required in all chapter 11 cases. *Id.* at 567.

  69. Specifically, the Sixth Circuit took guidance in *Till*'s footnote 14 which states that

"when picking a cramdown interest rate in a Chapter 11 case, it might make sense to ask what

---

[11] The formula rate is calculated by taking the national prime rate, as reported in daily industry or news publications (such as the Wall Street Journal), and upwardly adjusting the prime rate to account for the risk of nonpayment from a bankrupt debtor taking into account "the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan." *Till*, 541 U.S. at 478. The formula rate is also known as the "prime-plus rate."

rate an efficient market would produce." *Id.* at 567 (quoting *Till*, 541 U.S. at 476 n.14).  From

this language, the Sixth Circuit adopted a hybrid approach and concluded that "the market rate

should be applied in Chapter 11 cases where there exists an efficient market.  But where no

efficient market exists for a Chapter 11 debtor, then the bankruptcy court should employ the

formula approach endorsed by the *Till* plurality." *Id.* at 568.  Here, despite guidance from

*American Homepatient* as to two (2) appropriate cramdown interest rates, the Plan fails to

provide WF with an appropriate rate of interest and the Plan is not confirmable.

70.    As an initial matter, the Plan provides to pay WF 4.5% interest on account of the

WF Claim and its proposed second priority position.  The Plan further provides to pay Union 6%

on account of its claim and first deed of trust pursuant to the priming lien the Debtor will seek if

the Debtor ever consummates the Union Loan.  It is inconceivable that a secured creditor whose

lien is subordinated to a proposed priming lien would receive a lower interest rate on account of

its subordinate lien position.  Indeed, the Debtor concedes that the value of a deed of trust is, at

least partially, based on the "quality of security." May 23, 2011 Hearing Tr. 24:22-25:2.  The

Debtor also concedes that a second position deed of trust is "less secure" than a first deed of

trust. *See id.* at 25:3-5.  Thus, logically, a creditor with less security based on a subordinate deed

of trust has a less valuable deed of trust and should appropriately receive a higher interest rate on

account of the increased risk.  Nevertheless, the Plan actually provides for a lower interest rate to

be paid to WF who, under the terms of the Plan, holds a less secure and riskier position.  Such

treatment is unconscionable and the Plan cannot be confirmed.

71.    Notwithstanding the aforementioned fatal flaw regarding the Plan's interest rates,

to calculate the appropriate interest rate in accordance with *American Homepatient*, one must

26

first determine whether there is an efficient market. Here, the Debtor has proposed to pay Union

6% interest. Assuming that the 6% proposed to be paid to Union is a market rate, then to

account for WF's subordinate lien and accompanying risk, the efficient market rate of 6% must

be upwardly adjusted. Although the *Till* Court concluded that, with respect to the formula rate,

an adjustment of one (1) to three (3) percent is "generally" appropriate, *Till*, 541 U.S. at 801, at

least one court in the Fourth Circuit concluded that an adjustment of four (4) percent is

appropriate. *See In re Price Funeral Homes, Inc.*, Case No. 08-04816-8-ATS, 2008 Bankr.

LEXIS 3462, at *8 (Bankr. E.D.N.C. Dec. 12, 2008).

      72.    In *Price Funeral Homes*, the secured creditor maintained a first deed of trust, was

oversecured by over 300% of its proof of claim amount, and the debtor's plan of reorganization

provided for the sale of the debtor's real estate in the event it could not satisfy its plan payments.

*See id.* at *3, *5, & *6. Despite such a secure position, Judge Small concluded that "a rate of 8%

(prime rate of 4% plus a risk factor of 8% [sic]) is an appropriate rate according to the standard

adopted by the court [sic] in *Till. Id.* at *8. Here, WF's position is far less secure and

substantially more risky than the secured creditor in *Price Funeral Homes* and should, thus, be

afforded at least a 4% upward adjustment from the efficient market interest rate due to WF's

substantial risks. Thus, considering an efficient market interest rate of 6%, as provided by the

Debtor, and adjusting for the substantial risk WF will be subjected to as a second deed of trust

holder, the appropriate interest rate for the WF Claim is at least 10%.

73.     Alternatively, if the Court determines that the Debtor's efficient market interest rate provided to Union is not appropriate,[12] the Plan's proposed interest rate for the WF Claim must be adjusted to provide WF with the formula rate.  Currently, as reported in the <u>Wall Street Journal</u>, the prime interest rate is 3.25%.  In accordance with *Till*, the Court must adjust the prime rate to account for the uncertainty and risk of repayment from a bankrupt borrower.  Accounting for the significant risk being bore solely by WF, as set forth above, the prime rate should be adjusted upward by at least 4% and the appropriate formula rate for the WF Claim would be at least 7.25%.

**B.     *The Plan Is Not Fair and Equitable Under Section 1129(b)(2)(A)(ii).***

74.     A plan may also be fair and equitable to an impaired, non-accepting class of secured creditors if the plan provides

> for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph.

11 U.S.C. § 1129(b)(2)(A)(ii).

75.     Importantly, section 1129(b)(2)(A)(ii) "requires the debtor to pay 100% of the proceeds to the secured creditor or for the secured creditor to retain a lien on these proceeds." *Sparks*, 171 B.R. at 865.  The Plan fails to satisfy section 1129(b)(2)(A)(ii) because the Plan proposes to sell the NVR Lots free and clear of WF's lien but does not provide for WF's lien to attach to the proceeds from the sale of the NVR Lots.  Rather the Plan proposes to use the NVR

---

[12] Accordingly, in the event the Court determines that the efficient market rate is not appropriate, the 6% interest rate provided to Union under the Union Loan should be adjusted according to the formula rate.

Lot sale proceeds to repay the Union Loan and satisfy the claims of other creditors, including

creditors who do not have an interest in the Real Property.  Accordingly, the Plan fails to satisfy

the "fair and equitable" standard under 1129(b)(2)(A)(ii) and confirmation must be denied.

### C.    The Plan Fails to Provide WF the "Indubitable Equivalent" of its Claim and Is Not Fair and Equitable Under Section 1129(b)(2)(A)(iii).

76.    Alternatively, a plan may be fair and equitable to an impaired, non-accepting class

of secured creditors if the plan provides "for the realization by such holders of the indubitable

equivalent of such claims." 11 U.S.C. § 1129(b)(2)(A)(iii).

77.    To satisfy the indubitable equivalent standard a court must conclude that the

substitute collateral is "completely compensatory" and determine the likelihood the creditor will

be paid. *Sparks*, 171 B.R. at 866 (citing *In re San Felipe @ Voss, Ltd.*, 115 B.R. 526, 529 (S.D.

Tex. 1990)).  Specifically, a court must examine the value and the risk associated with substitute

collateral and conclude that it is "sufficiently 'safe' and 'completely compensatory.'" *Id.*

78.    In *Sparks*, as part of the debtor's plan for reorganization, the debtor sought to

convert the secured lender's collateral apartments into condominiums for sale and satisfy its loan

obligations to the secured creditor through the sale of such condominiums.  In analyzing the

debtor's scheme with respect to the indubitable equivalent standard the court said that:

> New collateral with a value less than the value of the original
> collateral cannot be "completely compensatory."  Similarly, new
> collateral with a value projected to be equal to, or more than, the
> original is not "completely compensatory" if the new collateral is
> so much riskier than the original collateral that there is a
> substantially greater likelihood that the secured creditor will not be
> paid.

*Id.* at 866.  Thus, new collateral must have a value of at least the value of the original collateral

and its substitution for the original collateral cannot increase the risks of non-payment.  Applying

this standard, the *Sparks* court found that, although the converted condominiums may have a

greater value than the apartment complex, the risk of the conversion is significantly greater to the

secured creditor and, therefore, the plan failed to meet the indubitable equivalent standard. *Id.* at

867.

79.    Here, through the Plan, WF receives no "value" and bears all of the "risk" of the

Debtor's reorganization, thus, the Plan fails to provide WF with the indubitable equivalent of its

claim.  When the Debtor and WF entered into the Loan Documents, WF negotiated and was

granted a fully secured first priority lien, which WF currently maintains.  With respect to its first

lien position, WF maintains an equity cushion of nearly $2,000,000 based on the Integra

Appraisal.  Thus, WF is adequately protected and sits in the same position that it negotiated and

for which it bargained.

80.    The Plan, however, proposes to subordinate the WF Claim to the $6,000,000

Union Loan with WF's secured priority lien secured by the Real Property.  To the extent the Real

Property can be considered "new" collateral, it is not plausible that this "new" collateral, *i.e.*, the

Real Property reduced by the $6,000,000 priming lien, is of an equal or greater value than the

"original" collateral, *i.e.*, the Real Property without the $6,000,000 priming lien.  Nor is it

plausible to argue that WF's risk of non-payment is not significantly greater once its lien is

primed by a first priority $6,000,000 lien.  Therefore, WF receives no "value," the Plan's

treatment of the WF Claim is not "completely compensatory," and the Plan fails to satisfy the

indubitable equivalent standard.

81.    Moreover, WF bears all of the risk relating to the Debtor's reorganization.

Because the Plan proposes to subordinate the WF Claim to a second lien position behind a

$6,000,000 priming lien on the Real Property valued at only $6,000,000, such priming lien will

transform the WF Claim from a fully secured claim with a 50% equity cushion to a fully

unsecured claim. This scenario is the diametrical opposite to a secured creditor receiving the

indubitable equivalent of its claim and, therefore, the Plan fails to satisfy the indubitable

equivalent standard under section 1129(b)(2)(A)(iii).

82.    In sum, such scheme is in clear contravention of section 1129(b)(2)(A)(iii) and

case law interpreting the same, as the Debtor's Plan unreasonably shifts all of the risk associated

with the Debtor's effort to reorganize from the Debtor and its equity holders to WF alone. As

such, the Plan cannot be crammed down over WF's objection. *See In re EFH Grove Tower

Assocs.*, 105 B.R. 310, 313 (Bankr. E.D.N.C. 1989) (finding that a plan that proposed to prime

the lien of an existing secured creditor imposed significant risk to the secured creditor and

provided the possibility of great reward with minimal risk to the debtor is not "fair and

equitable" under section 1129(b)).

### D.    *The Plan Is Not Fair and Equitable Because it Provides Negative Amortization of the WF Claim.*

83.    Additionally, the Plan is not fair and equitable because it provides for negative

amortization of the WF Claim contrary to established case law. A plan of reorganization

provides for negative amortization if it allows existing debt (generally accrued interest) to be

added to the principal amount owed, thus increasing the debt, and provides for its payment at

some point in the future. *See In re Windwood Heights, Inc.*, 385 B.R. 832, 839-40 (Bankr. N.D.

W. Va. 2008). Under the Plan, the WF Claim is negatively amortized because the Debtor will

not make any payments on the WF Claim until the Union Loan is paid in full, a period estimated

to be two (2) years. Although negative amortization is not *per se* prohibited by the Bankruptcy

Code, "it is rarely permitted." *In re Greenwood, LLC*, No. 07-62155-LYN-7, at *11 (Bankr. W.D. Va. Mar. 14, 2008) (Anderson, J.) (order granting motion for relief pursuant to 11 U.S.C. § 362(d)(3)).

84.    Indeed, "[o]nly where it is clear that a negative amortization plan does not unduly shift the risk of loss to the creditor should the court find that it is fair and equitable." *In re Consolidated Properties Ltd. P'ship*, 170 B.R. 93, 99 (Bankr. D. Md. 1994); *see also In re Carlton*, 186 B.R. 644, 649 (Bankr. E.D. Va. 1994) ("Although most courts have been reluctant to adopt a per se rule against negative amortization, courts are hesitant to confirm such plans because the plans tend to place undue risk on creditors.").

85.    When analyzing the risk associated with negative amortization and the conformability of a plan, courts look at the following factors set forth by the Ninth Circuit in *Great Western Bank v. Sierra Woods Grp.*, 953 F.2d 1174 (9th Cir. 1992):

1.  Whether the plan offers a market rate of interest and the present value of the deferred payments;

2.  Whether the amount and length of the deferral of payments is reasonable;

3.  Whether there is a sufficient equity cushion;

4.  Whether the plan is feasible;

5.  The nature of the collateral;

6.  Whether the risks involved are unduly shifted to the creditor;

7.  Whether the risks are borne by one secured creditor or a class of secured creditors;

8.  Whether the plan precludes secured creditor's foreclosure of the collateral;

9.  Whether the original loan terms provide for negative amortization; and

> 10. Whether there are adequate safeguards to protect the secured creditor against plan failure.

*See id.* at 1178; *see also Carlton*, 186 B.R. at 649. Previously, this Court found that negative amortization is not permitted unless the original loan documents include negative amortization or there is an ample equity cushion. *Greenwood*, Case No. 07-62115-LYN-7, at *11.[13]

86.    Applying these factors to the Debtor's Plan, not only does the Plan fail to satisfy the specific requirements, *i.e.* factors 3 and 9, that this Court emphasized in *Greenwood*, but the Plan fails to satisfy any of the ten (10) factors. Specifically: (1) as set forth above, the Plan fails to offer a market rate of interest and fails to provide WF with the present value of its claim; (2) the Plan proposes to defer payment to WF for at least two (2) years; (3) to the extent the Debtor is able to consummate the Union Loan, there is no equity cushion on the Real Property to protect WF's interest; (4) as more fully set forth herein, the Plan is not feasible; (5) the collateral is raw, undeveloped land that produces no income; (6) and (7) all risk is shifted to WF because the Debtor intends to transform WF's fully secured first deed of trust to a fully unsecured second deed of trust; (8) the Plan does not allow for the Real Property's foreclosure; (9) the Loan Documents do not provide for negative amortization; and (10) the Plan has absolutely no safeguard against the Plan's failure.

---

[13] When assessing the *Great Western* factors, other courts have paid particular attention to factors (1), (2), (4), (8), and (10) and generally concluded that negative amortization plans are not fair and equitable when the interest rate was inadequate, the length of deferral was excessive, the plan was not feasible, the plan barred the creditor's foreclosure rights, and/or there are inadequate safeguards against the plan's failure. *Windwood Heights*, 385 B.R. at 840. All of these factors are present in the instant case.

87.    Thus, because the Plan negatively amortizes the WF Claim and fails to satisfy any of the factors set forth in *Great Western*, the Plan is not fair and equitable, cannot be crammed down on WF, and the Plan cannot be confirmed.

## CONCLUSION

WHEREFORE, WF respectfully requests that the Court enter an order denying confirmation of the Plan and such other and further relief as may be just and proper.

Dated: June 13, 2011                              Respectfully submitted,

                                                  /s/ John H. Maddock III
                                                  John H. Maddock III (VSB No. 41044)
                                                  Bryan A. Stark (VSB No. 75471)
                                                  McGUIREWOODS LLP
                                                  One James Center
                                                  901 East Cary Street
                                                  Richmond, Virginia 23219-4030
                                                  (804) 775-1000

                                                  *Attorneys to Wells Fargo Bank, N.A.*

34

## CERTIFICATE OF SERVICE

I hereby certify that on June 13, 2011, a copy of *OBJECTION OF WELLS FARGO BANK, N.A. TO THE CONFIRMATION OF THE DEBTOR'S PLAN OF REORGANIZATION* was served by (I) the Court's ECF system on all parties and entities who have filed notices of appearance or otherwise requested to receive notice in the above-captioned case; and (II) the parties listed below by first-class mail postage prepaid.

| | |
|---|---|
| W. Stephen Scott<br>Scott Kroner, PLC<br>418 East Water Street<br>Charlottesville, Virginia 22902<br>*Counsel to the Debtor* | Margaret K. Garber<br>Office of the United States Trustee<br>210 First Street, Suite 505<br>Roanoke, Virginia 24011<br>*United States Trustee* |
| Stonehaus, LLC<br>2421 Ivy Road<br>Charlottesville, Virginia 22903<br>*Creditor* | Cline Design Associates, PA<br>125 N. Harrington Street<br>Raleigh, North Carolina 27603<br>*Creditor* |
| Stonehaus Construction, LLC<br>2421 Ivy Road<br>Charlottesville, Virginia 22903<br>*Creditor* | |

/s/ John H. Maddock III
John H. Maddock III

\31594987.2

35

# Exhibit A

1

1             IN THE UNITED STATES BANKRUPTCY COURT
        FOR THE WESTERN DISTRICT OF VIRGINIA
2               CHARLOTTESVILLE DIVISION

3   _____

4

5   CASCADIA PARTNERS, LLC           10-63442

6

7

8   _____

9

10

11                   PROCEEDINGS
    BEFORE THE HONORABLE WILLIAM E. ANDERSON
             April 18, 2011
12            Charlottesville, Virginia

13

14

15     DISCLOSURE STATEMENT HEARING; MOTION BY DEBTOR FOR
  AUTHORITY TO EXECUTE DEED OF EASEMENT; CONT'D STATUS
                HEARING

16

17                 Chapter 11

18

19              *   *   *   *

20

21                EVANS & COMPANY
            Court Reporters
22            Post Office Box 11822
      Lynchburg, Virginia 24506-1822
23             (434) 239-2552

24

25   Reported by: MARILOU DESETTO, Certified Court Reporter

ORIGINAL

1    financing for the purchase of the property.  They

2    have a first deed of trust on the property.

3    Foreclosure.  The debtor went into default, and

4    initially foreclosure was scheduled for last June

5    or July.  And because of a need to do an

6    environmental report analysis, Wachovia rescinded

7    that foreclosure sale and conducted whatever it

8    needed to do.  And subsequently, because the

9    debtor had not been able to resolve its obligation

10   with Wachovia, it rescheduled the foreclosure

11   sale.  And that's what precipitated the filing of

12   the Chapter 11.

13        Since the debtor has been in Chapter 11 it

14   has been acting as debtor-in-possession.  It has

15   no income.  And it has been attempting to find

16   financing and develop a plan with a partner to

17   develop the real estate so that it can be sold off

18   and so that Wachovia can get paid.  The debtor has

19   timely filed its Chapter 11 plan and disclosure

20   statement within the 90 day period subsequent to

21   the filing of the case.  Because it has no income

22   it has not been able to make any other interest

23   accrual payments to Wachovia.  Wachovia is owed,

24   apparently, somewhere about $3.8 million.

25        As far as I'm aware, Wachovia has not yet

1    to it at that time because the terms were still

2    being negotiated.  The plan also referred to the

3    fact that we would be needing to get a development

4    loan.  And we identified, generally, what the

5    terms of that loan were perceived would be

6    necessary.  And so subsequently, and really as of

7    today, the debtor has obtained a contract with

8    Ryan.  They finished negotiating the terms, and

9    one of four parties at Ryan has signed the

10   contract.  The contract is subject to court

11   approval.  And now that that contract, the debtor

12   is able to go to its other sources for the

13   development funding to be able to try to put

14   together a development proposal as the second part

15   of this plan design.  The debtor has been

16   continuing to operate by holding the property.

17   Its filed its plan timely.  And we are optimistic

18   that within the next few months we'll be able to

19   complete the second necessary factor of getting

20   the development funding commitment in place so the

21   proposal can go forward.

22        Also while the debtor's been in Chapter 11,

23   we have the debtor has been working with two other

24   groups with regard to a sewer easement.  These

25   other groups which are identified in this motion

1    development loan.  In the disclosure statement it

2    states that that loan would be from Union First

3    Market Bank.  I don't know if that's still true

4    today.  But this is obviously a critical component

5    of the plan.  Page 4 of the disclosure statement

6    states that the debtor will obtain a loan from

7    Union Bank in the amount of $4 million at six

8    percent interest which will be secured by a first

9    priority lien.  The disclosure statement then goes

10   on to say that the debtor expects to repay the

11   loan by late 2012 or early 2013.  Your Honor, for

12   a $4 million loan that is to prime Wells Fargo's

13   lien, what I just said to you, those two

14   sentences, is all of the information that is

15   provided in this disclosure statement about that

16   loan.  If this was a separate motion to incur debt

17   the motion would be two sentences long.

18       Your Honor, there are no loan documents.  We

19   heard from Mr. Scott earlier that if Ryan Homes

20   contract is fully executed -- which it's not

21   today -- then they'll go out shopping for the

22   loan.  There's just no loan.  There's no

23   information, whatsoever, about this loan.  And

24   again, this is a priming lien, Your Honor.  Four

25   million dollars.  There's no information regarding

21

1    second category, that the plan is not confirmable

2    on its face.  As we stand today, Your Honor, we

3    have a lot purchase agreement that we concur is

4    executed by one of a total of four parties.  I

5    think that's completely irrelevant.  The

6    disclosure statement, the only item before you is

7    the unexecuted lot purchase agreement attached to

8    the disclosure statement.  Your Honor, there's no

9    agreement to approve, there's no agreement to be

10   evaluated at this time based on the disclosure

11   statement.  With the Union loans, or with the

12   development loan, that situation I think is even

13   worse.  We don't have, unlike the lot purchase

14   agreement where we at least have an unexecuted

15   copy that has brackets and other blanks in it, we

16   don't even have that for the Union loan.  There's

17   no documents whatsoever.  I'm not sure that it's

18   even going to be Union after what I've heard from

19   Mr. Scott, that it will even be Union Bank out

20   there making the loan.  This plan is just not

21   confirmable if it depends on a $4 million

22   development loan and there's no loan.

23        Your Honor, we also believe there's a

24   significant feasibility issue.  The unexecuted lot

25   purchase agreement we cited in our objection.

1  probably guess based on what I said so far, that

2  Wachovia is not going to vote in favor of this

3  plan.  So it will be a cramdown situation.  The

4  plan proposes that Wachovia retain its lien.  And

5  then receive payments not for a few years or

6  commencing in a couple years, and then be paid

7  over time.  As Your Honor knows, when a plan is

8  crammed down over a secured creditor, the

9  treatment of that secured creditor's claim has to

10  be fair and equitable.  And one of the

11  possibilities of cramming down is 1129(b)(2)A-I,

12  which provides for a secured creditor retaining

13  its lien then receiving deferred cash payments in

14  the amount of its claim.  But what does it mean to

15  retain its lien in this situation.  Keep in mind,

16  Your Honor, if the plan were confirmed Wachovia's

17  roughly $4 million debt, or claim, gets moved to

18  the back.  Because there's going to be a

19  $4 million development loan in front of it.

20      Debtor says that Wachovia is retaining its

21  lien under those circumstances.  We don't think

22  that's the case, we don't think case law bears

23  that out.  When there was a priming situation in

24  order for a creditor to retain its lien, case law

25  states that the priming lien has to be limited to

1    no loan commitment.  And it's, in fact, due to the

2    fact that the debtor needed to obtain this

3    contract first.  Now we've got that.  It's always

4    been my plan to file separate motions as we got

5    the contracts, or when we got them all together.

6    One motion to approve the contract with Ryan or

7    whoever the ultimate purchaser of the lots was

8    going to be.  NVR is the same as Ryan Homes.  I

9    also had contemplated that we would be filing a

10   separate motion to incur indebtedness at the time

11   that we got the loan terms, or loan commitment, or

12   investor plan worked out.  And that would be

13   noticed and set for hearing.  Likewise, when it

14   came to the issue of the priming aspect.  Priming

15   Wells Fargo's loan with a super priority

16   development loan.  That would also be filed in a

17   separate motion.  I didn't contemplate or feel

18   that just putting that in the plan or disclosure

19   statement would really be the appropriate

20   procedural way to get those matters before the

21   court and the creditors.  And we knew generally

22   what the plan was going to be.  The cash flow

23   analysis was provided based upon certain

24   assumptions that the debtor had, but when it gets

25   down to it we were going to be filing separate

1    will prime to the amount of $4 million.  There's

2    no information whatsoever.  There's a partially

3    signed lot purchase agreement.  How would the

4    average creditor make a determination on this

5    plan, Your Honor?

6         And lastly, my last point I'd like to make,

7    Your Honor, goes back to 365(d)(3).  We've heard

8    today there may be amendments to the plan.  We've

9    heard today there may be motions that affect the

10   plan.  365(d)(3) sets a 90-day period of time to

11   file a plan with a reasonable chance of

12   confirmation.  Your Honor, they filed a plan on

13   the 89th day.  It's that plan that has to meet the

14   test.  It's not a plan that may be filed a month

15   from now, two months from now, a year.  Time was

16   frozen on day 90.  Either the plan they filed had

17   a reasonable chance to confirm or it didn't, Your

18   Honor.  Amending it to provide for a loan that

19   might materialize six months later is simply...

20   You heard earlier in another case that's not what

21   365(d)(3) is meant to do.  It's meant to put a

22   time limit on single asset real estate cases, not

23   let these cases drag out forever.  That's exactly

24   the game plan of this debtor.

25        Thank you, Your Honor.

52

```
1    loan.  And would pay at an appropriate time.  So unless

2    a lender held back, presumably the payment would be

3    paid on schedule.

4         Q    But you were in the courtroom for that

5    earlier hearing, correct?

6         A    I've been here for a while, yes, sir.

7         Q    And what entity is going to make the

8    development loan to Cascadia?

9         A    We believe Union is.

10        Q    You believe they will?

11        A    Yes.

12        Q    And when will they agree to that?

13        A    Well, we have the contract with Ryan.  We

14   satisfied the appraisal, we satisfied -- we've had two

15   major contractors price the work.  And we satisfied

16   that.  So we're now in a position to proceed with our

17   formal loan request.

18        Q    But standing here today, sitting here today

19   there is no development loan?

20        A    I do not have it, no.  But again, it's

21   really sequential on the contract with Ryan.

22        Q    And no such loan has been approved by the

23   court?

24        A    Certainly.  Not to mine.

25             MR. MADDOCK:  Nothing further, Your Honor.
```

60

1    COMMONWEALTH OF VIRGINIA AT LARGE, to wit:

2

3         I, Marilou DeSetto, Notary Public in and for

4    the Commonwealth of Virginia at Large, and whose

5    commission expires November 30, 2013, do certify that

6    the foregoing is a true, correct, and full transcript,

7    consisting of 60 pages of the proceedings taken before

8    me.

9         I further certify that I am neither related

10   to nor associated with any counsel or party to this

11   proceeding, nor otherwise interested in the event

12   thereof.

13        Given under my hand and notarial seal this

14   1st day of May, 2011.

15

16

17

18

19   _____
                                    
20        Marilou DeSetto, CCR
          Certification Number: 0315052
          Notary Public Number 255952
21    Commonwealth of Virginia at Large

22

23

24

25

# Exhibit B

1

1       IN THE UNITED STATES BANKRUPTCY COURT
        FOR THE WESTERN DISTRICT OF VIRGINIA
2                CHARLOTTESVILLE DIVISION

3    _____

4

5    CASCADIA PARTNERS, LLC                    10-63442

6

7    _____

8

9

10                        PROCEEDINGS
            BEFORE THE HONORABLE WILLIAM E. ANDERSON
11                       May 23, 2011
                     Lynchburg, Virginia
12

13

     CONTINUED PRE-TRIAL CONFERENCE-COMPLAINT FOR DAMAGES IN
14              CORE ADVESARY PROCEEDING

15

16                       Chapter 13

17

18                    *   *   *   *

19

20                   EVANS & COMPANY
                     Court Reporters
21                Post Office Box 11822
             Lynchburg, Virginia 24506-1822
22                   (434) 239-2552

23

24

25    Reported by:  MARILOU DESETTO, Certified Court Reporter

1    the sale of land to a contractor.  And as part of

2    that, and another essential element, is the debtor

3    being able to find and development being able to

4    find funding.  Either from a commercial lender or

5    third party.  Which would fund the development of

6    the property so that the general, the builder can

7    come in and build houses, or condominiums, or

8    townhouses, or commercial space on the land.

9         When we were at the hearing last month we

10   were presenting the disclosure statement.  And

11   attached to the disclosure statement was an

12   unexecuted draft of a lot purchase agreement with

13   an entity known as Ryan Homes.  At the time that

14   the plan was filed that contract was still being

15   negotiated.  Just a few days before the hearing we

16   were able to get a final agreement reached between

17   the parties, subject to bankruptcy court approval,

18   and executed by the parties that were necessary.

19   At that time we did not have the funding achieved

20   at that point.  And at this time we're still

21   trying to see if we can get the funding.  But we

22   do now have an executed agreement.  That was the

23   second part of today's hearing.

24        In fact, the evidence on the stay motion

25   really is going to involve the real estate

1    BY MR. MADDOCK:

2        Q    When did Cascadia and Union Bank first begin

3    discussing the Union loan?

4        A    We've talked to Union for the last couple

5    years about Cascadia.  They are, in addition to being a

6    possible lender, they own a security interest in one of

7    the partnerships.  So I've spoken to them as an

8    investor for the last couple years.

9        Q    And over that two-year period you've

10   provided Union Bank with various documents in support

11   of Cascadia's request for a loan?

12       A    We have.  Most recently we have had

13   discussions.  Certainly.

14       Q    Have you provided documents in conjunction

15   with those discussions?

16       A    I'm sure we have provided financial

17   forecast.  We've provided plans, we've probably

18   provided, potentially, an appraisal.

19       Q    And, over the two-year period that you

20   described, you've had several inperson meetings with

21   Union Bank regarding a loan for Cascadia?

22       A    We've had a couple recently to discuss

23   helping in Cascadia.

24       Q    And, is there a commitment letter for a

25   loan?

1        A      There is not.

2        Q      Does the proposed plan state that the

3    interest rate for the Union loan would be six percent?

4        A      To my knowledge, yes.

5        Q      And, is the interest rate something that's

6    been agreed to between Cascadia and Union Bank, or is

7    it merely a projection?

8        A      It's our projection.

9        Q      So ultimately it could be higher?

10       A      Potentially.  Or lower.

11       Q      Are you familiar with the February 1, 2011,

12   Appraisal Group, Inc. appraisal of the Cascadia

13   property?

14       A      I am.

15       Q      And according to that appraisal what is the

16   appraised value of Cascadia real property?

17       A      I believe 8.9 million.

18       Q      And have you shown that appraisal to Union

19   Bank?

20       A      We have provided it, yes, sir.

21       Q      And at any time have you asked Union to loan

22   on terms where Union's lien would be subordinate to

23   Wells Fargo's lien?

24       A      We have discussed lending on various bases.

25   So, I guess specifically we've asked Union to provide a

1   recall a time prior how far in advance of February 28

2   did you speak with them about the loan that's referred

3   to in 4.01?"

4            The answer is:  "I have talked to them for

5   the better part of two years under various conditions

6   which might provide them an opportunity to lend money

7   on Cascadia.  That includes concepts that were similar

8   to the ones that are included in the plan."

9            Is that an accurate reflection of your

10   response to my question in the deposition?

11        A    Well, it is accurate.  I don't have any

12   objection to the transcript.  I would offer to you that

13   I have had a relationship with Union.  One, I have

14   borrower relationship with them on other properties.

15   So I'm in touch with them regularly.  As I've said

16   before, they hold a significant interest in Cascadia

17   security for one of their other loans to another

18   borrower.  So I have contact with them as an investor.

19   And certainly I have asked them over those two years

20   about helping on Cascadia.

21            As it relates to my most recent response,

22   just to try to clarify for the court, when the

23   foreclosure notice came in, which certainly made it

24   clear to Union that we were going to take action and

25   that we were hoping for their support.

1      Q      Mr. Hauser, your testimony at the deposition

2   on Tuesday that you've spoken to Union Bank for a year

3   and-a-half about a loan similar to the one in the plan,

4   was that testimony correct?

5      A      I will say I'm not trying to be evasive.  I

6   was not familiar with debtor-in-possession financing a

7   year and-a-half to two years ago.  So I did not speak

8   to them on that basis.  I did speak to them about

9   paying off Wachovia and lending me development money to

10  develop the site.

11     Q      So your testimony on Tuesday that you spoke

12  to them about the structure similar to the loan

13  described in the plan was incorrect?

14     A      If that's your interpretation, yes.  That is

15  not my intent.

16     Q      Cascadia contact any other possible lenders

17  regarding a development loan?

18     A      I talked to a couple private lenders about

19  development loans.

20     Q      What about commercial lenders?

21     A      No.

22     Q      And Mr. Hauser, you testified at your

23  deposition that Cascadia has been in contact with a

24  number of probable investors to invest in Cascadia; is

25  that correct?

1        A       Yeah.

2        Q       And how long has Cascadia been in contact

3    with these various investors?

4        A       We began a process when we first received

5    notice that Wachovia wished to foreclose on the

6    Cascadia loan, that was an involved process of

7    developing a proposal.  I would guess that happened

8    late summer.  And occurred particularly with one group,

9    through the fall.

10       Q       Midsummer 2010?

11       A       Yes, sir.  Sorry.  And we worked through the

12   balance of that year diligently with a firm out of

13   Texas that had expressed interest, had offered some

14   verbal assurances.  Unfortunately, it didn't succeed.

15       Q       And is Cascadia currently in contact with

16   any possible investors today?

17       A       We are.

18       Q       How many?

19       A       I have three meetings this coming week with

20   potential investors.  And remain in contact with two

21   others.  Three others.

22       Q       Mr. Hauser, based on your experience, is a

23   second deed of trust generally less valuable than a

24   first deed of trust?

25       A       I would say it's less secure.  Its value is

1    based on the terms of the note, and quality of the

2    security.

3        **Q**    But less secure?

4        **A**    It certainly is behind a first deed of

5    trust, yes, sir.

6        **Q**    Will the sale of NVR lots under the lot

7    purchase agreement be sufficient to pay Wells' claim?

8        **A**    The plan calls for them to pay off, I

9    believe it's 60- to 70 percent of the Wells Fargo claim

10   after the NVR lots.

11       **Q**    After the last lot is sold --

12       **A**    For NVR.

13       **Q**    -- 60 to 70 percent?

14       **A**    For the first phase, yes, sir.

15       **Q**    Mr. Hauser, could you refer to Exhibit 11 in

16   the binder.

17       **A**    Yes, sir.

18       **Q**    Can you identify that document?

19       **A**    It was the disclosure statement from

20   Cascadia Partners, LLC to United States Bankruptcy

21   Court Western District.

22       **Q**    And if you could flip to Exhibit C of the

23   disclosure statement, which I believe is the last two

24   pages.

25       **A**    Yes, sir.

1      Q      Fourth from the bottom.  How much does

2   Cascadia intend to borrow under the Union Bank loan?

3      A      In total, $6,052,224.

4      Q      And, if you refer back to the large box

5   above that, the Investor Pro Forma, and near the middle

6   there's a row called Bank Draw?

7      A      Yes, sir.

8      Q      How much will be borrowed in 2011?

9      A      $3,987,047.

10      Q      And how much for year 2012?

11      A      $1,980,282.

12      Q      And the last small piece in 2013?

13      A      $84,895.

14      Q      And that totals that $6,052,224 amount that

15   you referred to earlier?

16      A      It does.

17      Q      Mr. Hauser, if there ever is a Union bond,

18   is it your understanding that at any one time the

19   amount outstanding will be capped at 4 million?

20      A      Yes.

21      Q      And the cash flow analysis contemplates that

22   money would be borrowed and then repaid with lot sale

23   proceeds?

24      A      Correct.

25      Q      And Cascadia would then have the ability to

34

1        **A**      Yes, sir.

2        **Q**      And what information appears on schedule

3    one?

4        **A**      Well, it's a list of members of Cascadia,

5    both class A and class B, overall voting interests, and

6    their original capital contributions.

7        **Q**      And, does that schedule indicate that Church

8    Hill development has a 40 percent class A membership

9    interest?

10       **A**      It does.

11       **Q**      And its initial capital contribution was

12   $554,539?

13       **A**      It was.  One small caveat; it was a

14   combination of cash and a small piece of land which we

15   valued.  So it was not all cash.

16       **Q**      And, Mr. Hauser, I think you testified

17   earlier that Union Bank has a lien on Church Hill

18   Development's 40 percent class A membership interest;

19   is that correct?

20       **A**      That is.  It's all based on verbal

21   communication.  I did approve, as a managing member, I

22   originally approved using the stock to secure a loan.

23   But beyond that I have not seen any of the paperwork.

24   But I've certainly been told by Church Hill's

25   representative and Union to that fact.

1            MR. MADDOCK:  Your Honor, I'd ask that

2       Exhibit 9 be admitted.

3            MR. SCOTT:  No objection.

4            THE COURT:  No objection, be made part of

5       the record.

6   BY MR. MADDOCK:

7       Q       Mr. Hauser, considering the fact that Union

8   Bank has a loan on Church Hill's interest in Cascadia,

9   is it your view that Union Bank has an interest in

10  preserving the value of Cascadia?

11      A       I would think so just based on business

12  experience.  554,000, I don't know the amount they

13  lent, but I would assume that's material even to a

14  bank.

15      Q       And if you could refer to Exhibit 20 in the

16  binder.

17      A       Yes, sir.

18      Q       Is this a copy of the e-mail from Mike Ball

19  to Marshal Hall, dated May 24, 2010?

20      A       It is.

21      Q       And who is Mike Ball?

22      A       Mike Ball is Stonehaus' chief financial

23  officer.

24      Q       And who is Marshall Hall?

25      A       Marshall Hall was our loan officer with

1    **A**    Yes.

2    **Q**    I'm sorry, there appears to be two pages.

3    If you look at the bottom right there's a what we call

4    a Bates number?

5    **A**    Yes, sir.

6    **Q**    The one that ends in 2-3-5 in the small

7    print.

8    **A**    Okay.

9    **Q**    Does that first sentence state that

10   "Cascadia will be a compact, walkable hillside village

11   of approximately 300 homes"?

12   **A**    Yes.

13           MR. MADDOCK:  Your Honor, I'd ask that

14       Exhibit 17 be admitted.

15           MR. SCOTT:  No objection.

16           THE COURT:  No objection, be admitted.

17   BY MR. MADDOCK:

18   **Q**    Mr. Hauser, with regard to the development

19   of Cascadia, will it be necessary to post letters of

20   credit?

21   **A**    That would be normal in a development

22   process, yes.

23   **Q**    What letters of credit?

24   **A**    Let me back up.  And I'm not trying to be

25   overly complex.  I need to provide the municipality,

1    Albemarle County, certain surety at a couple different

2    points in time in the development process.  One would

3    be at the commencement of the project.  I need to bond

4    soil erosion.  Now, historically letters of credit are

5    used to show insurance surety.  I guess the point I'm

6    trying to make is really not the letter of credit.  I

7    do need to provide surety to Albemarle County.  And

8    then upon recording a subdivision plat, which would

9    create the lots that I would then sell, I need to be

10   able to provide Albemarle County a financial guarantee,

11   the surety, that the work will be completed.

12       Q    And you mentioned insurance product or a

13   letter of credit.  Have you decided?

14       A    Cash.  Any of those are potentially

15   available.

16       Q    Do you know which you intend to use, for

17   example, for the soil erosion?

18       A    Historically, Union Bank development loans

19   have included a provision for providing letter of

20   credit as part of their loan.

21       Q    Is that what you would intend to do --

22       A    It is.

23       Q    -- in this case?

24       A    Yeah.

25       Q    Under the Union loan, they will have a deed

40

1    of trust, obviously; is that correct?

2        A       That's our plan, yes.

3        Q       What will be the amount on that deed of

4    trust?

5        A       We proposed $4 million.

6        Q       So the actual amount on the deed of trust

7    would be $4 million?

8        A       I'm sorry, I'm not a lawyer but it is my

9    impression, yes, the deed of trust would be in the

10   amount of $4 million.

11       Q       If any of the letters of credit provided by

12   Union Bank are drawn, would the amount that is drawn be

13   secured by the bank's deed of trust?

14       A       Presumably, yes.

15       Q       And if there were $4 million outstanding on

16   the revolving cap at that time, the deed of trust would

17   then secure the 4 million, but would not secure the

18   letters of credit that were drawn because it was capped

19   at 4 million?

20       A       Again, I'm not trying to be evasive, but it

21   would depend on the language in the document.

22       Q       Do you have any reason to believe that Union

23   Bank will agree to a $4 million revolving cap and then

24   provide you with letters of credit that would be drawn

25   and ultimately unsecured?

165

1          COMMONWEALTH OF VIRGINIA AT LARGE, to wit:

2

3          I, Marilou DeSetto, Notary Public in and for

4     the Commonwealth of Virginia at Large, and whose

5     commission expires November 30, 2013, do certify that

6     the foregoing is a true, correct, and full transcript,

7     consisting of 165 pages of the proceedings taken before

8     me.

9          I further certify that I am neither related to

10    nor associated with any counsel or party to this

11    proceeding, nor otherwise interested in the event

12    thereof.

13         Given under my hand and notarial seal this

14    3rd day of June, 2011.

15

16

17

18

19         ---------------------------------------
                      Marilou DeSetto, CCR
20             Certification Number: 0315052
                  Notary Public Number 255952
21          Commonwealth of Virginia at Large

22

23

24

25